WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
**AMY S. HOWE, IDAHO STATE BAR NO. 3385**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
800 E. PARK BLVD., SUITE 600
BOISE, IDAHO 83712-7788
TELEPHONE:  (208) 334-1211
FACSIMILE:   (208) 334-1414
Email:  Amy.Howe@usdoj.gov

STUART F. DELERY
ASSISTANT ATTORNEY GENERAL
MICHAEL D. GRANSTON
RENÉE BROOKER
JAY D. MAJORS
CIVIL DIVISION, DEPARTMENT OF JUSTICE
601 D STREET N.W., ROOM 9550
WASHINGTON, D.C. 20004
TELEPHONE:  (202) 307-0264
FACSIMILE:   (202) 514-0280
Email:  Jay.Majors@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KATIE BROOKS and NANNETTE WRIDE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| STEVENS-HENAGER COLLEGE, INC., a Utah Corporation, THE CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC. an Indiana Corporation d/b/a STEVENS-HENAGER COLLEGE, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 1:13-CV-00009-BLW

**UNITED STATES' COMPLAINT IN INTERVENTION UNDER THE FALSE CLAIMS ACT AND COMMON LAW FOR UNJUST ENRICHMENT AND PAYMENT BY MISTAKE**

Plaintiff, the United States of America, through its undersigned counsel and on behalf of the United States Department of Education, brings this complaint against Defendants Stevens-Henager College, Inc. (Stevens-Henager) and the Center for Excellence in Higher Education, Inc. (CEHE), doing business as Stevens-Henager College, for damages and penalties under the False Claims Act,  31 U.S.C. §§ 3729-3733 (1986 and as amended in 2009), arising from knowing violations of federal law prohibiting for-profit colleges from paying enrollment-based incentive compensation to their recruiters.  20 U.S.C. § 1094(a)(20), in Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq.*  Congress enacted the prohibition on such incentive compensation to curtail the indiscriminate enrollment of unqualified students, reduce the high student loan default rates that result from incentive-based recruitment, and eliminate the waste of millions of dollars in federal student loans and grant funds that occurs when students are cajoled for financial reasons to enroll in programs of instruction that are not suited to their needs.  (Unless otherwise specified, the Defendants are collectively referred to herein as Stevens-Henager).

## I.    INTRODUCTION

1.    Plaintiff, the United States of America (United States) brings this action to recover treble damages, civil penalties and costs under the False Claims Act, 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law and equitable theories of unjust enrichment and payment by mistake.

2.    This action arises from false statements and claims that Stevens-Henager knowingly presented to, or caused to be presented to, the United States Department of Education, in violation of the False Claims Act and common law.  Stevens-Henager falsely claimed that it was in compliance with federal law prohibiting for-profit colleges from paying incentive-based

**UNITED STATES' COMPLAINT IN INTERVENTION-1**

compensation to their recruiters.  Congress enacted the prohibition on such incentive compensation to protect students from abusive enrollment tactics and save taxpayers from the effects of wasted federal funds.

3.      Stevens-Henager, which at all times relevant to this complaint was a for-profit post-secondary educational institution, knowingly presented and/or made, or caused to be presented or made, the false claims and statements at issue, in order to participate in the federal student aid programs authorized pursuant to Title IV of the Higher Education Act (Title IV programs).  Title IV programs, which are administered by the United States Department of Education, provide students with financial aid in the form of grants and loans issued or guaranteed by the federal government.  Stevens-Henager presented, made, and/or used numerous false claims and statements in order to obtain and maintain eligibility to participate in Title IV programs.

4.      Pursuant to the False Claims Act and common law theories of payment by mistake and unjust enrichment, the United States seeks to recover damages and civil penalties arising from Stevens Henager's knowingly false, misrepresented, and/or improper certifications of eligibility to the Department of Education for participation in its Title IV programs.  From approximately July 1, 2007 to July 1, 2011, Stevens-Henager knowingly submitted, or caused to be submitted, numerous claims for payment to the Department of Education based upon these false certifications.

5.      From approximately July 1, 2007 to July 1, 2011, Stevens-Henager, and/or students enrolled in its institutions, received millions of dollars of federal funds through Title IV programs.

**UNITED STATES' COMPLAINT IN INTERVENTION-2**

6.     The Higher Education Act's prohibition on incentive compensation bars compensation based directly or indirectly on success in securing enrollments.  20 U.S.C. § 1094(a)(20).  During the period at issue in this complaint, a regulatory safe harbor permitted incentive-based compensation based on student completions of an academic program.  Stevens-Henager's compensation system ostensibly rewarded its recruiters, called "admissions consultants," on this basis, i.e., when their successfully-recruited students completed academic programs.  However, the availability and the amount of compensation per completion actually depended on the number of students the consultant enrolled.  A recruiter could double his or her income by recruiting a large number of students, so long as a few graduated.  Conversely, the reward per student completion was reduced or entirely withheld if the consultant had not enrolled a sufficiently high number of students.

7.     With this lucrative incentive compensation program and constant performance reminders to its recruiters, Stevens-Henager directly or indirectly encouraged its recruiters to enroll anyone who was willing to apply for federal funds regardless of the student's likelihood of success or ability to benefit from Stevens-Henager's educational programs.  Stevens-Henager wrongfully procured funding for its own benefit and abused the Title IV program's purposes. Further, this irresponsible recruitment saddles unqualified students with large debts that are difficult or impossible to repay, leading to defaults that ultimately cost the government millions of dollars.

8.     This compensation system, as designed and carried out, violated the Higher Education Act's prohibition on incentive compensation because the reward was impermissibly based on student enrollments.  Because Stevens-Henager misrepresented to the federal government its compliance with the Higher Education Act's Incentive Compensation Ban, the

**UNITED STATES' COMPLAINT IN INTERVENTION-3**

federal government paid money to Stevens-Henager and its students that it would not have paid had the federal government known the true facts. Thus, the federal government paid money to Stevens-Henager by mistake and Stevens-Henager was unjustly enriched.

9.     Despite knowing that recruiter compensation may not be based on improper enrollment incentives, Stevens-Henager created and carried out a compensation system that did just that. Stevens-Henager falsely represented and certified to the federal government its compliance with Title IV of the Higher Education Act and submitted or caused Stevens-Henager students to submit claims for payment pursuant to Title IV programs. Stevens-Henager's conduct thus violated the False Claims Act.

## II.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730 and 3732.

11.     This Court has personal jurisdiction over Stevens-Henager pursuant to 31 U.S.C. § 3732(a) because Stevens-Henager transacts business and is found in this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because at all times relevant to this Complaint, Stevens-Henager transacted business in this District and operated campuses in this District. Furthermore, acts that form the basis of this Complaint occurred in this District.

## III.   PARTIES

13.     Plaintiff United States files this Complaint in Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A), intervening on some but not all of the causes of action brought by Relators, and against some but not all of the Defendants named by Relators.

**UNITED STATES' COMPLAINT IN INTERVENTION-4**

14.     Relator Katie Brooks is and was at all times relevant to this Complaint, a resident and citizen of the State of Utah.  From March 2009 to approximately March 2011, Ms. Brooks was one of the highest performing admissions consultants at Stevens-Henager's Orem, Utah, campus.  As an admissions consultant, Ms. Brooks became aware of Stevens-Henager's incentive compensation practices for admissions consultants.  During her employment at Stevens-Henager, Ms. Brooks attended conferences in Las Vegas, Nevada.  At the conferences, Stevens-Henager conducted training for Stevens-Henager consultants from its campuses and affiliated schools in Utah, Idaho, and other states.  As a result of the training and materials distributed to all consultants, Ms. Brooks understood that Stevens-Henager's incentive compensation practices were institution-wide.

15.     Relator Nannette Wride is and was at all times relevant to this Complaint, a resident and citizen of the State of Utah.  From July 2009 to June 2011, Ms. Wride worked at Stevens-Henager's Orem, Utah campus as an admissions consultant as well as a part-time executive assistant.  In the various positions she held, Ms. Wride became aware of Stevens-Henager's incentive compensation practices for admissions employees.  During her employment at Stevens-Henager, Ms. Wride attended conferences in Las Vegas, Nevada.  At the conferences, Stevens-Henager conducted training for Stevens-Henager consultants from its campuses and affiliated schools in Utah, Idaho, and other states.  As a result of the training and materials distributed to all consultants, Ms. Wride understood that Stevens-Henager's incentive compensation practices were institution-wide.

16.     Stevens-Henager College, Inc. was at all times relevant to this Complaint, a Utah corporation with its principal place of business in Murray, Utah.  At all times relevant to this Complaint Stevens-Henager operated campuses in Boise, Idaho and Nampa, Idaho.  It operated

**UNITED STATES' COMPLAINT IN INTERVENTION-5**

Utah Campuses in Salt Lake City-Murray, Logan, Ogden, Layton, Lehi, Provo-Orem, and St. George.

17.    CEHE is an Indiana nonprofit corporation with its principal place of business in Murray, Utah at the same location as the former principal place of business of Stevens-Henager. CEHE, doing business as Stevens-Henager College, became either the owner of or the successor in interest to Stevens-Henager College, Inc. on or about December 31, 2012.

18.    Until December 31, 2012, Stevens-Henager also owned, managed or operated affiliated schools: (1) California College San Diego, Inc., a Utah corporation with its principal place of business in Salt Lake City, Utah; (2) CollegeAmerica Denver, a Colorado corporation with its principal place of business in Denver, Colorado; and (3) CollegeAmerica Arizona, Inc., a Colorado corporation with its principal place of business in Flagstaff, Arizona and a campus in Idaho Falls, Idaho.  CEHE became either the owner of or the successor in interest to not only Stevens-Henager but also its affiliated schools on or about December 31, 2012.  Until approximately 2013, Stevens-Henager and its affiliated schools collectively used CollegeAmerica Services, Inc., to provide centralized management and operational support to each of these schools.  Upon information and belief, CEHE now provides the services that CollegeAmerica Services, Inc. provided until 2013.

19.    Carl Barney is the former sole shareholder of Stevens-Henager.  The Carl Barney Living Trust of Crystal Bay, Nevada is the sole or largest creditor of CEHE.  This debt is unsecured and registered with the Secretary of State in Cheyenne, Wyoming.  The Carl Barney Living Trust is also the owner of Anthem Properties LLC, which owns or manages the property locations of various Stevens-Henager colleges in Utah and Idaho.  Mr. Barney was at all times relevant to this Complaint the chairman of Stevens-Henager and he controlled its operations,

**UNITED STATES' COMPLAINT IN INTERVENTION-6**

policies and procedures.  At all times relevant to this Complaint, CollegeAmerica Services was also owned, managed, and operated by Carl Barney.

## IV.     FEDERAL STATUTORY BACKGROUND

### A.     The Federal False Claims Act

20.     For violations occurring prior to May 20, 2009, the False Claims Act provides in pertinent part that a person is liable to the United States government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States government . . . [a] false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(1986).

21.     For violations occurring on or after May 20, 2009, the False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009, provides in pertinent part that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States government.  31 U.S.C. § 3729(a)(1)(A) (2009).

22.     The False Claims Act defines the term "claim" to mean:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. § 3729(b)(2)(A) (2009).

23.     The False Claims Act, prior to the 2009 amendments, provides that a person is liable to the United States government for each instance in which the person "knowingly makes,

**UNITED STATES' COMPLAINT IN INTERVENTION-7**

uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(2) (1986).

24.     As amended in 2009, the False Claims Act extends liability to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *material to* a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).  (Emphasis added).

25.     The False Claims Act defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(A) (2009).  The False Claims Act further provides that no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

## V.     UNITED STATES' FACTUAL ALLEGATIONS

### A.     Eligibility for Title IV funding

26.     Under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*, Congress established various student loan and grant programs, including but not limited to the Federal Pell Grant Program, the Federal Family Education Loan Program, and the Federal Direct Loan Program (collectively "Title IV funding") to assist eligible students financially in obtaining a post-secondary education.

27.     Each Title IV funding program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

28.     In order to become eligible to receive Title IV funding, a post-secondary educational institution such as Stevens-Henager must first enter into a Program Participation Agreement with the Department of Education.  20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.

**UNITED STATES' COMPLAINT IN INTERVENTION-8**

29.     Each Program Participation Agreement expressly conditions a school's initial and continuing eligibility to receive Title IV funding on compliance with specific statutory and regulatory requirements, including  20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

30.     Title 20 U.S.C. § 1094(a)(20) explicitly prohibits schools from providing ". . . any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . ." 20 U.S.C. § 1094(a)(20) (Incentive Compensation Ban).  Compliance with the Incentive Compensation Ban is an express condition for the initial and continuing eligibility of schools to obtain Title IV funding. *Id.*

31.     In each Program Participation Agreement, a school such as Stevens-Henager certifies that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." The Program Participation Agreements further state that a school's participation in Title IV funding is "subject to the terms and conditions of this Agreement" and that:

> [b]y entering into this Program Participation Agreement, the Institution agrees that . . . (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance.

34 C.F.R. § 668.14(b)(22) (Incentive Compensation Regulations).  (*See* Ex. A, 2007 Stevens-Henager Program Participation Agreement, p. 6, and Ex. B, 2010 Stevens-Henager Program Participation Agreement, p. 6.)

**UNITED STATES' COMPLAINT IN INTERVENTION-9**

32.     When Congress amended the Higher Education Act in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including those that resulted from the payment of incentive compensation.  S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) (Abuses in Federal Student Aid Programs) (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period."); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").  Congress enacted the Incentive Compensation Ban because payments that turned on recruitment were associated with high loan default rates.  These defaults cause a significant drain on program funds where the government acts as a loan issuer or guarantor.

33.     In 2002, the Department of Education adopted the Incentive Compensation Regulations accompanying the Incentive Compensation Ban to clarify, among other things, that schools were permitted to pay a fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period.  "Further, any adjustment must not be based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (Regulatory Safe Harbor A).

34.     The 2002 Incentive Compensation Regulations also included a safe harbor permitting schools to pay "[c]ompensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter." 34 C.F.R. § 668.14(b)(22)(ii)(E) (Regulatory Safe Harbor E).

**UNITED STATES' COMPLAINT IN INTERVENTION-10**

35.    In order to maintain its eligibility to receive Title IV funding, an educational

institution must provide the Department of Education with an annual compliance audit of its

administration of Title IV programs, and an audit of the institution's general purpose financial

statements, prepared by independent auditors.  20 U.S.C. § 1094(c)(1)(A); 34 C.F.R.

§ 668.23(a)(2) & (a)(4).  For-profit educational institutions such as Stevens-Henager must

conduct their annual financial statements and compliance audits in accordance with the

Department of Education Office of Inspector General's Audit Guide.  The Department of

Education uses the results of the compliance and financial audits to determine whether schools

meet requirements for Title IV funding, including observation of the Incentive Compensation

Ban.  As part of the annual audits, Stevens-Henager was required to certify in writing that it

complied with the requirements for eligibility to participate in Title IV programs, including

observation of the Incentive Compensation Ban.  (*See* Ex. C, Department of Education Audit

Guide, at p. II-3.)  Specifically, Stevens-Henager certified in its Required Management

Assertions regarding institutional eligibility and participation that it had "[n]ot paid to any

persons or entities any commission, bonus, or other incentive payment based directly or

indirectly on success in securing enrollments, financial aid to students, or student retention."  34

C.F.R. § 668.14(b)(22).

36.    In June 2010, the Department of Education proposed to eliminate all of the

regulatory safe harbors, including Regulatory Safe Harbor A and Regulatory Safe Harbor E.

The Department of Education explained that the elimination of the safe harbors was necessary

"[s]ince [the adoption of the regulatory safe harbors], the Department's experience demonstrates

that unscrupulous actors routinely rely upon these safe harbors to circumvent the intent of section

487(a)(20) of the HEA."  75 Fed. Reg. 34816, 34817 (June 18, 2010).  The Department of

**UNITED STATES' COMPLAINT IN INTERVENTION-11**

Education concluded that "rather than serving to effectuate the goals intended by Congress through its adoption of section 487(a)(20) of the [Higher Education Act], the safe harbors have served to obstruct those objectives." *Id.*

37.     In particular, the Department of Education observed that while many schools had adopted compensation practices that complied with the regulatory safe harbors "on paper," "in practice" those same schools had used compensation practices that directly violated the Incentive Compensation Ban and failed to comply with both the letter and spirit of the safe harbor provisions. *Id.* Stevens-Henager's conduct as described herein is an example of this type of overt effort to circumvent the Incentive Compensation Ban.

38.     The Department of Education promulgated final regulations eliminating the regulatory safe harbors, including Regulatory Safe Harbor A and Regulatory Safe Harbor E, on October 29, 2010, effective July 1, 2011.  75 Fed. Reg. 66832, 66873 (October 29, 2010); 34 C.F.R. § 668.14(b)(22) (2011).

39.     In particular, when eliminating Regulatory Safe Harbor E, the Department of Education observed that there is a "proliferation of short-term, accelerated programs, and the potential for shorter and shorter programs" and stated that, "we believe that the retention of the current safe harbor can be readily exploited, and that it is not necessary for institutions to appreciate the value of keeping students in school."  75 Fed. Reg. 66874 (October 29, 2010).

40.     Subsequently, the Department of Education further highlighted its reasons for eliminating Regulatory Safe Harbor E by stating, "retaining this safe harbor could contribute to lower admissions standards, misrepresented program offerings, lowered academic progress standards, altered attendance records, and a lack of meaningful emphasis on academic performance and program quality. . . .As a result, if the safe harbor were retained, in order for

**UNITED STATES' COMPLAINT IN INTERVENTION-12**

recruiters to secure incentive compensation, they would likely need to enroll even more marginal students, and make even greater unfounded claims about a program to increase the potential that some will actually complete their program of instruction." 78 Fed. Reg. 17599 (Mar. 22, 2013.)

### B.    Claims for Payment under Title IV Programs

41.    After a school becomes eligible to receive Title IV funding by entering into an Agreement, it can make claims for payment in various ways.  Under the Pell Grant and Federal Direct Loan programs, for example, students submit requests for funding to the Department of Education, directly or with the assistance of their schools.  Under the Federal Family Education Loan Program, which originated loans through June 2010, students and schools jointly submitted requests to private lenders for loans.  The Department of Education ultimately insured those loans and paid the lenders in the event of a default.

42.    With respect to all Title IV funding, the disbursement of federal funds rests on required statements of eligibility schools make to the Department of Education that are necessary for requests for payment to be considered.  For-profit schools are permitted draw up to 90% of their revenue from Title IV funds.

43.    For all Title IV funding, students who are interested in receiving federal student aid must complete a "Free Application for Federal Student Aid," known as a "FAFSA."

### 1.    Title IV Grant Programs

44.    Under the Pell Grant program, which provides federal funds to assist post-secondary school students in financial need, the student initiates the application process by submitting a FAFSA to the Department of Education to have his or her expected family contribution calculated in order to determine the amount of Pell Grant funds the student may be entitled to receive based on family income and resources.  20 U.S.C. § 1070(a);

**UNITED STATES' COMPLAINT IN INTERVENTION-13**

34 C.F.R. § 690.12(a).  The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit to the Department of Education on the student's behalf.  34 C.F.R. § 690.12(b).

45.     The Department of Education sends the student's application information to the student on a Student Aid Report and sends each school an Institutional Student Information Record for that student.  34 C.F.R. § 690.13.

46.     The school uses the above-described information to calculate the student's eligibility for all aid and to assemble a financial aid award package for the prospective student. The financial aid package may include Pell Grants, Direct Loans, or Campus-Based Aid (which in turn includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

47.     The student can accept all or part of the financial aid award package.

48.     If the student accepts a Pell Grant, a Direct Loan (for which the Department of Education is the lender), or both a Pell Grant and a Direct Loan, the school creates an electronic origination record that the school submits to a Department of Education computerized database called the Common Origination and Disbursement System (COD).  The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts.  The COD database, in turn, links the information in the origination record to the Department of Education's central processing system database, which compares the information in the origination record to the information on the student's Student Aid Report and Institutional Student Information Record.

UNITED STATES' COMPLAINT IN INTERVENTION-14

49.     Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to draw down electronically from a computerized system known as G5 which is part of the Grants Management System.

50.     Prior to drawing upon the federal funds, schools must electronically certify that "by processing this payment request . . . the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement." This is known as a "G5 certification."

51.     In addition to the Pell Grants, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV student aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.

### 2.     Title IV Loan Programs

52.     Under the Federal Family Education Loan Program, which includes subsidized and un-subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the United States. No new loans were made under this program after July 1, 2010. Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student. If a student defaults in repaying a loan under the Federal Family Education Loan Program, a state or private guaranty agency reimburses the lender or the subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action. 34 C.F.R. § 682.401(b)(14). If the guaranty agency is unable to collect from the borrower, the Department of Education reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims. 20 U.S.C. § 1078(c)(1)(A). The Department of Education then may, in its

**UNITED STATES' COMPLAINT IN INTERVENTION-15**

discretion, take assignment of the loan.  20 U.S.C. § 1078(c)(8).  In this way, the government ultimately satisfies claims for payment.

53.     In order to participate in the Federal Family Education Loan Program or any other Title IV loan program, as opposed to grant programs, a student completes a Master Promissory Note and submits it to the educational institution.  The institution, in turn, completes a School Certification, in which it certifies the accuracy of the information it provides to the Department of Education and the student's eligibility for the loan.  34 C.F.R. § 682.102.  While the Master Promissory Note is valid for ten years, the educational institution determines the student's ongoing eligibility for aid and completes the School Certification annually.

54.     Under the Federal Family Education Loan Program, the educational institution submitted the Master Promissory Note to the lender.  Upon approval by the lender, the lender obtained a loan guarantee from a guarantee agency.  34 C.F.R. § 682.102.  The lender made the loan in reliance upon the accuracy of the information provided by the educational institution.

55.     For loans under the Federal Family Education Loan Program, the lender transferred funds directly into the educational institution's account.  Upon receiving these funds, the educational institution credited a student's account for education-related expenses, such as tuition, fees, books, and supplies.

56.     For subsidized Stafford loans, the government paid the interest on the student's behalf during the time the student was enrolled in school on at least a half-time basis, and during the student's grace period before repayment commenced.  34 C.F.R. § 682.102(d)(2).

57.     In the event of default on Federal Family Education Loans, the Department of Education pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs.  34 C.F.R. § 682.404.

**UNITED STATES' COMPLAINT IN INTERVENTION-16**

58.     Stevens-Henager knowingly made or used false statements, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible to receive Title IV funding.  Stevens-Henager's statements were false when made or used, and caused the Department of Education to pay various claims under Title IV programs including Federal Family Education Loans that it would not have paid had it known Stevens-Henager paid incentive compensation based on student enrollments.

C.     **Stevens-Henager's Participation in Title IV Programs**

59.     At all times relevant, Stevens-Henager and its affiliated schools operated under approved Program Participation Agreements.

60.     On April 19, 2007, Vicky Dewsnup, as president of Stevens-Henager, signed the Program Participation Agreement for Stevens-Henager institutions and certified that Stevens-Henager complied with the Incentive Compensation Ban.  (*See* Ex. A, p.15).

61.     More recently, on January 21, 2010, Ms. Dewsnup also signed a Program Participation Agreement on behalf of Stevens-Henager.  (*See* Ex. B, p.14).

62.     In each Program Participation Agreement, Stevens-Henager certified that it would ". . . comply with all statutory provisions of or applicable to Title IV of the Higher Education Act, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV."  (*See* Ex. A, p. 4; Ex. B, p. 3)

63.     Stevens-Henager further certified in each Program Participation Agreement that "[i]t will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making

**UNITED STATES' COMPLAINT IN INTERVENTION-17**

decisions regarding the awarding of student financial assistance . . . ." (*See* Ex. A, p. 5 ¶ 22; Ex. B, p. 6 ¶ 22).

64.     In addition to the certifications it made in its Program Participation Agreements, Stevens-Henager also made, or caused to be made, additional certifications as part of its annual compliance audits and as part of the student financial aid process. These certifications included, but were not limited to, Required Management Assertions, G5 Certifications, Master Promissory Notes, and their accompanying School Certifications.

65.     As a required part of its annual compliance audits, at all times relevant to this Complaint, Stevens-Henager certified that it complied with the requirements for eligibility to participate in Title IV programs, including compliance with the Incentive Compensation Ban.

66.     From July 1, 2007, or earlier, through the last claims for the funding year ending July 1, 2011, Stevens-Henager submitted numerous claims to the government for Title IV funding that it knew to be false based upon its non-compliance with the Incentive Compensation Ban.

**D.     Stevens-Henager's Compensation System for Admissions Consultants**

67.     At all times relevant, Stevens-Henager admissions consultants enrolled students by developing leads.  Stevens-Henager's call center and marketing campaigns generated many if not most leads.  In addition, the consultants obtained leads through various events, promotions, and networking activities.  Consultants also independently obtained leads. Consultants met with the prospective students that the leads and referrals produced, either by phone or in person at Stevens-Henager's campuses, and persuaded them to enroll.

68.     Stevens-Henager distributed manuals to admissions consultants that explained Stevens-Henager's compensation system.  (*See* Ex. D, 2006 manual; Ex. E, 2007 manual; Ex. F,

**UNITED STATES' COMPLAINT IN INTERVENTION-18**

2008- 2009 manual; Ex. G, 2010-2011 manual.)  Each manual sets forth examples of compensation consultants can achieve by enrolling more students.  (*See e.g.* Ex. E, pp. 45-48, describing how more enrollments will boost completion compensation, which is "not part of regular compensation").

69.     In addition to the manuals, Stevens-Henager issued various types of directives to its employees, including directives to the admissions department staff.  These communications took the form of "Procedure Directives" and "Information Letters."

70.     In 2000, 2003 and 2004, Carl Barney, the former sole shareholder and chairman of Stevens-Henager, issued Procedure Directive 85R to the Stevens-Henager admissions staff. (*See* Ex. H).  Mr. Barney issued Procedure Directive 85R again in 2007 to admissions consultants, admissions directors and campus directors.  (*See* Ex. I).

71.     Procedure Directive 85R described new policies for "Admissions Consultant Compensation."  (*See* Exs. H and I).  The 2007 version of Procedure Directive 85R based completion bonuses on the average conversion rate (i.e., the number of prospective students the consultant interviewed compared to the number of students the consultant actually enrolled) over the three previous "modules" (i.e., an academic period of essentially one month and generally comprising 3-4 credits).

72.     Both versions of the Procedure Directives discussed Stevens-Henager's "compensation plan based upon students who completed 36 credits and were thus likely to graduate," and made explicit reference to Regulatory Safe Harbor E.  (*See* Exs. H and I, pp. 1-2).

73.     The 2007 Procedure Directive 85R also explained that each student who completed 36 credits entitled the consultant who enrolled that student to a "Completion Certificate" if, and only if, the completing "student ha[s] a value at completion of 36 credits as

**UNITED STATES' COMPLAINT IN INTERVENTION-19**

shown in Appendix One." (*See* Ex. I).  The manual and the directives have continually maintained that "completion" bonuses associated with the "[C]ompletion [C]ertificates are not part of regular compensation."  (*See* Ex. D, p. 4; Ex. E, p. 45; Ex. F, p. 28; Ex. G, p. 27; *see also* Ex. I, p.6).  The completion certificate assigns a value to the completion "based on the average of the last three months."  (*See* Ex. J).

74.    "Appendix One" of the 2007 Procedure Directive 85R contains a chart of completion bonus amounts varying according to each consultant's "average starts."  (*See*, Ex. I, p.8).  These starts, or enrollments, were averaged over the three previous months.  Thus, Stevens-Henager based the value of completion bonuses on enrollments.

75.    The top row of the Appendix One chart lists a criterion called "Intconversion%." Stevens-Henager calculated "Intconversion%" by "[t]otal[ing] the last three modules' starts and interviews" and dividing the total number of starts by the total number of interviews.  (*See* Ex. I, p. 9).

76.    The lowest value in the row is ">33%."  There are no values for anything less than 33%.  Thus, without converting at least this minimum percentage of interviewed leads into enrolled students, a consultant could not receive the completion bonus.

77.    The chart in Appendix One also demonstrates that potential compensation for admission consultants was higher if the consultants' enrollments and conversion rates were higher.  *Id.*

78.    The Appendix One chart contains a range of completion bonuses from $100 up to $600 per student completion.  The first column in the chart is titled "Packaged Starts."  The lowest value shown in the row is five packaged starts.  There are no values for student completion bonuses if the consultant enrolled less than "5 starts."

**UNITED STATES' COMPLAINT IN INTERVENTION-20**

79.     Completion values were higher if consultants personally developed their own leads ("non-campus center leads") and enrolled students from those leads who completed academic programs. (*See* Ex. K, October 27, 2008 Information Letter). These higher completion bonuses for independent leads still varied based on the number of enrollments and the interview-to-enrollment rate, and they ranged from $500 to $3,000 or more per student. (*See* Ex. I, Appendix Two).

80.     Thus, according to the chart in Appendix One of Procedure Directive 85R, before a consultant could receive a bonus for a completing student, the consultant had to (1) enroll at least five students per module, and (2) convince at least one out of every three potential students he or she met with to enroll in the school. Based on the compensation systems set forth in the Procedure Directive, if a consultant failed to meet either of these two enrollment-related requirements, the consultant was ineligible to receive a bonus, regardless of how many students the consultant was responsible for starting who completed 36 credit hours.

81.     Appendix One provided incentive for consultants to enroll as many students as possible regardless of the ability of the student. A consultant who had an interview-to-start rate greater than 50% was eligible to receive $600 per completing student. A consultant with a conversion rate of only 33% received only $100 per completing student. A consultant with 20 completing students and an interview-to-start rate of 50% could receive a total of $12,000. A consultant with the same number of completing students and a 33% conversion rate would receive far less – only $2,000 according to the chart in Appendix One. Thus, the value of a completion bonus depended much more upon enrollments than completions. Without the requisite enrollments, a completion certificate was worth nothing, fostering an environment where the objective was to enroll every student possible.

**UNITED STATES' COMPLAINT IN INTERVENTION-21**

82.     The 2007 Procedure Directive 85R acknowledged that the incentive compensation plan was designed to ensure that consultants "contribute to admissions goals." (*See* Ex. I, Procedure Directive, p. 1).  As such, it reflected a corporate culture that deliberately rewarded enrollment of students above all else.

83.     Stevens-Henager employed this bonus system at all of its campuses, requiring consultants to meet an enrollment-related conversion rate in order to get a completion bonus.  By enrolling as many students as possible, a consultant could increase the value of a single completion bonus by up to six times as much.  This incentive directly and indirectly motivated consultants to enroll as many students as possible, regardless of their qualifications or their ability to derive any benefit from Stevens-Henager's programs.

84.     When explaining its reasons for eliminating Regulatory Safe Harbor E, the Department of Education stated as follows:  "As the primary function of admissions representatives is to serve as counselors, their primary goal should be to make sure that the institution and program are a good fit for the student, and not to enroll the student if this is not the case.  A decision by a recruiter not to enroll a student should be considered every bit as valuable to the institution as a decision to enroll the student, if, in fact, the student and the institution or the program are not a good match."  78 Fed. Reg. 17599 (Mar. 22, 2013).

85.     As previously set forth in this Complaint, Incentive Compensation Regulations accompanying the Incentive Compensation Ban were adopted in 2002 to clarify that, under Regulatory Safe Harbor A, schools may pay a fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of

**UNITED STATES' COMPLAINT IN INTERVENTION-22**

students recruited, admitted, enrolled, or awarded financial aid.  34 C.F.R.

§ 668.14(b)(22)(ii)(A).

86.     Because of the variation in values based on the conversion rate,

Stevens-Henager's completion certificates never provided for a fixed rate or hourly wage.  Also,

because these bonuses were paid throughout the year, consultants could have their compensation

adjusted more than twice during a twelve-month period.  For these reasons, these completion

bonuses did not fall within the purview of Safe Harbor A.

87.     Further, because the completion certificates and bonuses were based on

enrollments, they did not fall within the purview of Safe Harbor E.

88.      Consequently, until July 1, 2011, Stevens-Henager's compensation system, as it

was designed and implemented, violated the Incentive Compensation Ban and did not qualify for

protection under any Regulatory Safe Harbor.

### E.     Stevens-Henager's Knowing Violation of the Incentive Compensation Ban

89.     At all times relevant to this Complaint, Stevens Henager offered condensed

programs in "modules" instead of years or semesters.  As noted above, a module typically lasted

one month and consisted of three or four credit hours.  One years' worth of an "academic

program" was equivalent to 36 credit hours.

90.     Until July 2011, Stevens-Henager paid its admissions consultants bonuses when a

student whom a consultant enrolled had completed 36 credit hours, ostensibly under Safe Harbor

E, which allowed compensation based on completions of an "academic year."

91.     In practice, however, Stevens-Henager calculated and paid these bonuses on a

"completion certificate" based not on a student's completion but based on the consultant's

conversion rate, which was based on enrollments.

**UNITED STATES' COMPLAINT IN INTERVENTION-23**

92.    The completion certificate clearly stated that its value was "based on an average of the past three months." (*See* Ex. J).  This average referred to the conversion rate – i.e., success in enrollments.  (*See* Exs. H and I).

93.    Without fulfilling the conversion rate, a consultant could not earn a bonus even if a student completed 36 credit hours.  Moreover, the higher an employee's conversion rate, the higher the bonus.  (*See* Ex. I).

94.    By using the terms "completion certificate" and "completion bonus" Stevens-Henager masked the true basis for the reward.

95.    Indeed, the consultants' compensation was a result of Stevens-Henager's relentless and exclusive focus on the number of new students a consultant succeeded in recruiting.

96.    In Procedure Directive 85R and its manuals, Stevens-Henager acknowledged that the payment of incentive compensation based directly or indirectly on enrollments was barred by applicable regulations and accrediting standards.  (See Ex. F, p. 33; Ex. I).  These acknowledgements demonstrate that Stevens-Henager knew that compensation practices resulting in the payment of incentive compensation based directly or indirectly on student enrollments was strictly prohibited.

97.    While Stevens-Henager's written compensation plan appeared to invoke several regulatory safe harbors, the completion certificate clearly stated that its value was based on the average interview-to-enrollment conversion rate of the last three months (or modules).  (See Ex. E, 2007 manual, pp. 40, 43;  Ex. F, 2008-2009 manual,  pp. 25 - 27, Ex. G, 2010-2011 manual, pp. 25 - 27, Ex. H and I, Procedure Directives).  Thus, the payment was tied to enrollments in violation of the Incentive Compensation Ban.

**UNITED STATES' COMPLAINT IN INTERVENTION-24**

98.     Stevens-Henager knew that its completion certificates were based on enrollments and that the Incentive Compensation Ban prohibited enrollment-based payments.  It also knew that Safe Harbor E allowed only "[c]ompensation of recruiters based on the number of students successfully completing a program of study...." (*See* Ex. H).

99.     At the time that Stevens-Henager stated in its Program Participation Agreements and other documents that it would not make incentive payments based on success in securing enrollments, Stevens-Henager knew that it was paying and planned to continue to pay admissions consultants incentive payments based on the consultants' success in securing enrollments.

100.     Stevens-Henager made false certifications of compliance with the Incentive Compensation Ban and of its eligibility for Title IV funding in its Program Participation Agreements, compliance audit Management Assertions, G5 Certifications, Master Promissory Notes, School Certifications, and other documents.

101.     Stevens-Henager knew that its misrepresentations regarding compliance with the Incentive Compensation Ban would result in the payment of federal funds and that a reasonable and foreseeable consequence of such misrepresentations was that the federal government would pay out such funds.

102.     Every request for a federal grant, a loan under the Federal Direct Loan Program, a federally guaranteed loan under the Federal Family Education Loan Program, an interest payment on a subsidized Stafford Loan and for Title IV funding made on behalf of a student attending a Stevens-Henager institution constitutes a separate false claim.

103.     Stevens-Henager's false certifications and statements caused the payments of millions of dollars of loan and grant awards, as well as government repayments of loan interest

**UNITED STATES' COMPLAINT IN INTERVENTION-25**

or defaulted loan principal.  Stevens-Henager made these false certifications and statements despite the fact that they knew or should have known that they were false.

## VI.    COUNTS

### COUNT I: VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT,
### 31 U.S.C. § 3729(a)(1) (1986)

104.    The United States re-asserts all previous allegations as if set forth herein.

105.    From approximately July 1, 2007 to May 20, 2009, Stevens-Henager knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1).  Specifically, Stevens-Henager knowingly submitted or caused to be submitted, false representations regarding compliance with the requirements of Title IV of the Higher Education Act, its Program Participation Agreements and annual financial and compliance audits as well as in student loan and grant applications. Stevens-Henager submitted these false representations in order to obtain eligibility to participate in Title IV funding programs and receive Title IV funding.  However, Stevens-Henager's compensation system was not compliant with Title IV funding requirements.  Although Stevens-Henager paid compensation to its admissions consultants based on completion certificates, the reward was impermissibly conditioned on the consultants' enrollment success (conversion rate and starts) during the three months or modules prior to the student completion.  In submitting or causing the submission of certifications and applications suggesting otherwise, Stevens-Henager acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

106.    Stevens-Henager made express representations in writing to the Department of Education that it would not make incentive payments to its admissions personnel based directly or indirectly on their success in securing enrollments.  These representations induced the

Department of Education to make students at Stevens-Henager colleges eligible for many forms of financial aid. These representations were material to the Department of Education's decision to make Stevens-Henager eligible for these financial aid programs. When Stevens-Henager made these representations, it knew that these representations were false, and would continue to be false, because Stevens-Henager was paying its admissions personnel incentive payments based on their success in securing enrollments. Therefore, Stevens-Henager fraudulently induced the Department of Education to make Stevens-Henager eligible to participate in Title IV funding, and each and every one of the claims it submitted or caused a student to submit violated the False Claims Act.

107.   Compliance with the Incentive Compensation Ban was mandatory and material to the government's decision to make Stevens-Henager eligible for Title IV funding. Thus, Stevens-Henager knowingly submitted false claims for student financial aid and caused students to submit claims for and receive student financial aid to which neither the students nor the schools were entitled.

108.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

### COUNT II:  VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A) (2009)

109.   The United States re-asserts all previous allegations as if set forth herein.

110.   From approximately May 20, 2009 to July 1, 2011, Stevens-Henager knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1). Specifically, Stevens-Henager knowingly submitted or caused to be submitted, false representations regarding compliance with the requirements of Title IV of the Higher Education Act, its Program Participation Agreements

**UNITED STATES' COMPLAINT IN INTERVENTION-27**

and annual financial and compliance audits as well as in student loan and grant applications. Stevens-Henager submitted these false representations in order to obtain eligibility to participate in Title IV funding programs and to receive Title IV funding.  In fact, Stevens-Henager's compensation system was not compliant with Title IV of the Higher Education Act and its associated safe harbor regulations.  In practice, the compensation Stevens-Henager paid to its admissions consultants upon student completions was impermissibly based on the consultants' enrollment success (conversion rate) during the three months or modules prior to the student completion.  In submitting, or causing to be submitted, such certifications and applications, Stevens-Henager acted with actual knowledge, reckless disregard, and deliberate ignorance of the truth or falsity of the claims.

111.    Stevens-Henager made express representations in writing to the Department of Education that it would not make incentive payments to its admissions personnel based directly or indirectly on their success in securing enrollments.  These representations induced the Department of Education to make students at Stevens-Henager colleges eligible for many forms of financial aid.  These representations were material to the Department of Education's decision to make Stevens-Henager eligible for these financial aid programs.  At the time Stevens-Henager made these representations, it knew that these representations were false, and would continue to be false, because Stevens-Henager was paying its admissions personnel incentive payments based on their success in securing enrollments.  Therefore, Stevens-Henager fraudulently induced the Department of Education to make Stevens-Henager eligible to participate in Title IV funding, and each and every one of the claims it submitted or caused a student to submit violated the False Claims Act.

**UNITED STATES' COMPLAINT IN INTERVENTION-28**

112.    Compliance was mandatory and material to the government's decision to make Stevens-Henager eligible for Title IV funding.  Thus, Stevens-Henager knowingly submitted false claims for student financial aid and caused students to submit claims for and receive student financial aid to which neither the students nor the schools were entitled.

113.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

### COUNT III:  VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B) (2009)

114.    The United States re-asserts all previous allegations as if set forth herein.

115.    From July 1, 2007 to July 1, 2011, Stevens-Henager knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B) (2009).  Specifically, Stevens-Henager knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of Title IV of the Higher Education Act, in, *inter alia*, its Program Participation Agreements and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV funding.  In fact, Stevens-Henager's compensation system was not compliant with Title IV of the Higher Education Act and its associated safe harbor regulations.  In practice, the compensation Stevens-Henager paid to its admissions consultants when students whom they had enrolled completed an academic program was impermissibly based on the consultants' enrollment success during the three months or modules prior to the student completion.  In submitting or causing to be submitted such certifications and applications, Stevens-Henager acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

**UNITED STATES' COMPLAINT IN INTERVENTION-29**

116.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**COUNT IV:  UNITED STATES PAYMENT BY MISTAKE OF FACT**

117.    This is a claim for recovery of monies paid by the United States to Stevens-Henager by mistake.

118.    The United States re-asserts all previous allegations as if set forth herein.

119.    Because Stevens-Henager's compensation system paid bonuses impermissibly based upon enrollments, Stevens-Henager's compensation system violated the Incentive Compensation Ban of the Higher Education Act and did not come within the purview of any Safe Harbor.

120.    The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid to Stevens-Henager certain sums of money to which they were not entitled.  Stevens-Henager is thus liable to account for and pay such amounts, which are to be determined at trial, to the United States.

**COUNT V:  UNJUST ENRICHMENT**

121.    This is a claim for the recovery of monies by which Stevens-Henager has been unjustly enriched.

122.    The United States re-asserts all previous allegations as if set forth herein.

123.    As described above, Stevens-Henager received, and/or has continued to maintain control over, federal monies to which it was not entitled.

124.    By directly or indirectly obtaining federal funds to which they were not entitled, Stevens-Henager was unjustly enriched and is liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

**UNITED STATES' COMPLAINT IN INTERVENTION-30**

## VII.   PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Stevens-Henager, as follows:

1.    On Counts I through III, under the False Claims Act, for triple the amount of the United States' damages plus interest and such civil penalties as are allowable by law, together with the costs of this action and such other and further relief as may be just and proper;

2.    On Count IV, for payment by mistake of fact, for the damages sustained, plus pre-judgment and post-judgment interest, costs, and all such further relief as may be just and proper;

3.    On  Count V, for unjust enrichment, for the amount of unjust enrichment, plus pre-judgment and post-judgment interest, costs, and all such further relief as may be just and proper;

4.    That judgment be entered in favor of the United States and against Stevens-Henager for actual damages, pre-judgment and post-judgment interest, litigation costs, investigative costs, disgorgement of all profits, and an accounting, to the fullest extent as allowed by law, and for such further relief as may be just and proper.

## VIII.   JURY DEMAND

The United States requests a trial by jury with respect to all issues so triable.

**UNITED STATES' COMPLAINT IN INTERVENTION-31**

DATED this 2nd day of May 2014.

Respectfully submitted,

STUART F. DELERY
ASSISTANT ATTORNEY GENERAL

WENDY J. OLSON
UNITED STATES ATTORNEY

_____
AMY S. HOWE
Assistant United States Attorney
JAY D. MAJORS
Trial Attorney

**UNITED STATES' COMPLAINT IN INTERVENTION-32**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 2, 2014, the foregoing **UNITED STATES'**

**COMPLAINT IN INTERVENTION** was electronically filed with the Clerk of the Court using

the CM/ECF system, which sent a Notice of Electronic Filing to the following person(s):

John N. Zarian-jzarian@parsonsbehle.com

Brandon Mark and Joseph Stultz-bmark@parsonsbehle.com & jstultz@parsonsbehle.com

Eric Jones-eric@jonesandswartzlaw.com

Gerald Ritzer-gritzert@ritzert-leyton.com

Steven M. Gombos-sgombos@ritzert-leyton.com

And, I hereby certify that the following listed non-registered CM/ECF participants were

served by:

     x United States Mail, postage prepaid
     ☐ Hand-delivery
     ☐ Facsimile transmission (fax)

Center for Excellence in High Education, Inc., d/b/a Stevens-Henager College, Inc.,
c/o Helena Hanson, Registered Agent
1444 South Entertainment Ave.
Boise, ID  83709

Center for Excellence in High Education, Inc.
c/o Eric Juhlin
4021 S. 700 E., Suite 400
Salt Lake City, UT  84107

                                        _____
                                        Heather R. Crawford
                                        Legal Assistant

**UNITED STATES' COMPLAINT IN INTERVENTION-33**