Eric B. Swartz, ISB #6396
JONES & SWARTZ PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808
Telephone: (208) 489-8989 / 8988 (fax)
Email:eric@jonesandswartzlaw.com

Steven M. Gombos (*Admitted pro hac vice*)
Gerald M. Ritzert (*Admitted pro hac vice*)
RITZERT & LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, VA 22030
Telephone: (703) 934-2660
Email: sgombos@ritzert-leyton.com
gritzert@ritzert-leyton.com

Attorneys for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE,<br><br>Plaintiffs,<br><br>vs.<br><br>STEVENS-HENAGER COLLEGE, INC. a Utah Corporation; CALIFORNIA COLLEGE SAN DIEGO, INC., a Utah Corporation; COLLEGEAMERICA DENVER, INC., a Colorado Corporation; COLLEGEAMERICA ARIZONA, INC., a Colorado Corporation; CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., an Indiana Corporation; CARL BARNEY, an individual; and DOES 1-500, Inclusive, et al.,<br><br>Defendants. | ) | Case No. 1:13-CV-00009-BLW<br><br>**DEFENDANTS' AMENDED BRIEF IN SUPPORT OF MOTIONS TO TRANSFER VENUE PURSUANT TO 28 U.S.C. 1404(a) OR TO DISMISS PURSUANT TO FRCP 9(b) and 12(b)(6)** |

## TABLE OF CONTENTS


**I. INTRODUCTORY STATEMENT .......... 1**

**II. SUMMARY OF ARGUMENT .......... 2**

**III. BACKGROUND .......... 2**

**A. PROCEDURAL HISTORY .......... 2**
**B. SUMMARY OF CLAIMS BY RELATORS AND GOVERNMENT .......... 4**

**IV. ARGUMENT .......... 6**

**A. VENUE SHOULD BE TRANSFERRED TO UTAH BECAUSE THE VAST MAJORITY OF ANY SPECIFIC ALLEGATIONS OCCURRED IN AND RELATE TO THE UTAH CAMPUS. .......... 6**
**B. CONSIDERATION OF THE EIGHT JONES FACTORS DEMONSTRATES TRANSFER IS WARRANTED .......... 9**
**1. None of the Relevant Agreements Alleged to Give Rise to FCA Liability Were Executed in Idaho. .......... *9***
**2. The Courts' Familiarity With the Law Is a Neutral Factor Because the Claims Seek Damages for Alleged Violations of Federal Law .......... *10***
**3. Relators' Choice of Forum Is Not Entitled to Deference or Substantial Weight Because They Do Not Reside in the Forum, Are Qui Tam Litigants, and the Most Specific Facts Pled Occurred in Utah, Not Idaho. .......... *10***
**4. Transfer Is Appropriate Because Both Parties' Contacts With Idaho Are Slight And Attenuated While Their Contacts With Utah Are Substantial. .......... *14***
**5. Relators' Claims Predominantly Arise From Utah-Based Activities Engaged in by Utah-Based Employees in Utah. .......... *16***
**a. The Wrongful Acts Alleged to Give Rise to Liability for Claims I and II Occurred in Utah. .......... 16**
**b. The Wrongful Acts Alleged to Give Rise to Liability For Claims III, IV, V, VI, VII, and VIII Occurred in Utah. .......... 17**
**c. All of the Claims Have a Direct Connection to an Event or Act That Occurred in Utah, Which Is the Appropriate Forum. .......... 17**
**6. Litigation Costs (Particularly for Defendants) Increase Significantly and Unnecessarily if This Case Is Heard in Idaho, Instead of Utah .......... *18***
**a. Transfer to Utah Will Not Shift Litigation Expenses from Defendants to Relators. .......... 18**
**b. Transfer to Utah Will Substantially Reduce Travel Costs for Relators and Defendants. .......... 19**

**c. Costs and Associated Inconvenience Will Be Reduced for Defendants (and Relators) if This Trial Is Transferred to Utah. .................................................... 22**

**7. The Availability of Compulsory Process for Unwilling, Non-Party Witnesses Is Significantly Enhanced if this Case Is Heard in Utah. ........................................... *22***

**8. Ease of Access to Proof Is Significantly Enhanced by Transfer to Utah. ............... *24***

**V. THE INTERVENTION COMPLAINT AND SAC SHOULD BE DISMISSED PURSUANT TO RULES 9(B) AND 12(B)(6)........................................................................ 25**

**A. THE COMPLAINTS FAIL IN MATERIAL WAYS TO SATISFY RULE 9(B)'S SPECIFICITY REQUIREMENTS FOR FCA PURPOSES. .................................... 25**

**1. Rule 9(b) Standard of Particularity Applicable to FCA Cases............................... *25***

**2. Allegations Related to 90/10 Violations.................................................................. *29***

**3. The Government's Allegations Regarding SHC's Certifications Fail to Meet the Elevated Rule 9(b) Pleading Standards. .................................................................. *31***

**4. Allegations Related to Incentive Compensation Violations.................................... *33***

**5. Allegations Related to Attendance, Grades, and Other Accreditation Records. ... *34***

**B. THE INTERVENTION COMPLAINT AND SAC FAIL TO STATE CLAIMS AS A MATTER OF LAW FOR 12(B)(6) PURPOSES. ...................................................... 35**

**1. Legal Standard for Rule 12(b)(6)............................................................................ *35***

**2. Application To FCA Claims.................................................................................... *36***

**a. Regulatory Non-Compliance Is Not A Basis For FCA Liability............................ *37***

**b. The PPA Is Not A "Certification." ........................................................................ *40***

**c. Relators Do Not Identify a Single False Certification or Claim for Payment. ....... *40***

**V. CONCLUSION ........................................................................................................ 41**

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) .................................................... 36

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007) ..................... 35

*Big Sky W. Bank v. Jensen Family Inv. Co.*, 2013 U.S. Dist. LEXIS 112709, *22 (D. Idaho 2013) ........................................................................................................................................ 11

*Comwest, Inc. v. Am. Operator Serv., Inc.*, 765 F.Supp. 1467, 1470 (C.D. Cal. 1991) ............... 26

*Cooper v. Blue Cross Blue Shield of Florida*, 19 F.3d 562, 566–67 (11th Cir. 1994) ................. 26

*Costco Wholesale Corp. v. Liberty Mutual Life Ins. Co.*, 472 F. Supp. 2d 1183, 1189 (S.D. Cal. 2007)........................................................................................................................................ 9

*Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979) ...................................... 9

*Glaxo Grp. Ltd. v. Genentech, Inc.*, 2010 U.S. Dist. LEXIS 46440, *11-12 (N.D. Cal. 2010).... 13

*Grafton v. EMI Products, LLC*, 2011 U.S. Dist. LEXIS 144132, *12 (D. Idaho 2011)................ 9

*Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 645 (C.D.Cal. 1983) ......................... 26, 29

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000)............................................. 8

*Kaur v. U.S. Airways, Inc.*, 2013 U.S. Dist. LEXIS 64519, *6-7 (N.D. Cal. 2013)..................... 11

*McFarland v. Memorex Corp.*, 493 F.Supp. 631, 639 (N.D.Cal. 1980)...................................... 26

*Mikes v. Straus*, 274 F.3d 687, 699 (2nd Cir. 2001) ............................................................. 37

*Moore v. Kayport Package Exp.*, Inc., 885 F.2d 531, 540 (9th Cir. 1989).................................. 26

*Outdoor Media Grp. Inc., v. City of Beaumont*, 506 F.3d. 895, 900 (9th Cir. 2007) ................... 35

*Patent Mgmt. Found., LLC v. Analog Devices*, Inc., 2011 U.S. Dist. LEXIS 7389, * 8-9 (N.D. Cal. 2011) ............................................................................................................ 11, 24

*Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)........................................................... 25

*Stewart Org., Inc. v. Ricoh Corp.*, 497 U.S. 22, 31,108 S.Ct. 2239, 101 L.Ed 2nd 22 (1988)....... 8

*U.S. ex rel. Bowman Educ. America*, Inc., No. H-00-3028 (S.D. Tax. 2004), aff'd (5th Cir. 2004) ........................................................................................................................................ 37

*U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d. 1365, 1369 (M.D. Fla. 2000) ........ 27, 28

*U.S. ex rel. Castnor v. URS Consultants, Inc.*, 317 F.3d 883, 886 (8th Cir. 2003) ........ 37

*U.S. ex rel. Charles Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 309 (3rd Cir. 2011).. 38, 39, 40

*U.S. ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1312-13 (11th Cir. 2002) .. 27

*U.S. ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008) ........ 38

*U.S. ex rel. Cox v. Iowa Health Sys., Inc.*, 29 F. Supp. 2d 1022 (S.D. Iowa 1998) ........ 27, 28

*U.S. ex rel. Gay v. Lincoln Tech. Inst.*, No. 3:01-cv-505-k (N.D. Tax. 2003), aff'd (5th Cir. 2004) ........ 37

*U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F.Supp 2d 487, 495 (S.D. Tex. 2003), aff'd (5th Cir. 2004) ........ 36, 40

*U.S. ex rel. Gross v. Aids Research Alliance – Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) ...... 26

*U.S. ex rel. Jorgenson v. Alan Ritchey, Inc.*, No. C-01-588-Z, 2007 WL 1287932 (W.D. Wash. 2007) ........ 28

*U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011) ........ 36

*U.S. ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC*, No. 12-35278, 2014 W.L. 1244276 (9th Cir. 2014) ........ 28

*U.S. ex rel. Russell v. Epic Healthcare Management Group, Inc.*, 193 F.3d 304, 308-09 (5th Cir. 1999) ........ 28

*U.S. ex rel. Sallade v. Orbital Sciences. Corp.*, No. CV 05-0604-PHX-NVW, 2008 WL 2020463 (D. Ariz. 2008) ........ 28

*U.S. ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d. 141 (D. Mass. 2000) ........ 27, 29

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006) ........ 34, 36

*Van Dusen v. Barrack*, 376 U.S. 612, 645-46, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964) ........ 9

*W. Digital Techs., Inc. v. Bd. of Regents of the Univ. of Tex.*, 2011 U.S. Dist. LEXIS 4499, *10 (N.D. Cal. 2011) ........ 12

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ........................... 35

*Williams v. Bowman*, 157 F.Supp.2d 1103, 1107 (N.D. Cal. 2001) ........................................... 11

**Statutes**

20 U.S.C. § 1094(c)(1)(G) ................................................................................................. 39

28 U.S.C. § 1404.............................................................................................................. 7, 8

31 U.S.C. § 3279.............................................................................................................. 4, 6

31 U.S.C. § 3730................................................................................................................. 6

34 C.F.R. § 668.14 ......................................................................................................... 9, 33

34 C.F.R. § 668.166 ........................................................................................................... 32

34 C.F.R. § 682.102 ........................................................................................................... 32

34 C.F.R. § 682.32 ............................................................................................................. 32

34 C.F.R. §§ 668.84-85, 95................................................................................................ 40

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................................... 25

Fed. R. Civ. P. 9(b) and 12(b)(6) ........................................................................................ 1

COMES NOW Defendants Stevens-Henager College, Inc. ("SHC"), California College San Diego, Inc. ("CCSD"), College America Denver, Inc. ("CAD"), College America Arizona, Inc. ("CAA"), Center for Excellence in Higher Education, Inc. ("CEHE"), (collectively, SHC, CCSD, CAD, CAA, and CEHE shall be referred to as "Colleges") and Carl Barney (collectively, Colleges and Carl Barney shall be referred to as "Defendants"), by and through counsel, seeking entry of an order transferring venue to the District Court of Utah because that state is the more appropriate forum for the reasons provided below. Defendants also move to dismiss the complaints pursuant to Rules 9(b) and 12(b)(6).

## I. INTRODUCTORY STATEMENT

Defendants respectfully request the Court to consider the Motion to Transfer Venue before ruling upon the Motion to Dismiss pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). If the case is transferred, the District Court in Utah should consider the False Claims Act ("FCA") issues in accordance with the law of the Tenth Circuit Court of Appeals related to any Rule 9(b) and 12(b)(6) motions to dismiss. FCA case law as related to participation in Title IV federal financial aid programs varies between the Circuits.

This case presents a unique situation because the Government elected to partially intervene as to one alleged FCA claim (violation of the incentive compensation regulation), even while the *qui tam* Relators pursue that same claim over a longer period of time and with varied and sometimes contradictory theories. In addition, Relators seek to expand existing Ninth Circuit precedent to additional areas of regulatory compliance under the FCA. For these reasons, it is appropriate for the district court that will rule on dispositive motions and preside over trial to determine these fundamental legal issues.

Should the motion to transfer venue be denied, the Complaint should be dismissed pursuant to Rules 9(b) and 12(b)(6).

## II. SUMMARY OF ARGUMENT

The *qui tam* Relators who bring this action on behalf of the United States reside in Utah. SAC ¶ 12, 14. They both worked at the same Orem, Utah campus for about two years. *Id.* Relators' personal knowledge relates to alleged bad acts that occurred in Utah. *See*, e.g., SAC ¶¶ 187, 196-203, 216, 219-30, 235, 289, 300-05, 309-19, 326-39; IC ¶¶ 14-15. Their personal knowledge is based upon their employment in Utah and related interactions with Utah-based co-workers, managers, and executives. *See generally*, *id.* The significant majority of expected witnesses, including those Relators cited as having knowledge of the bad acts alleged, are located in Utah. Application of the relevant legal test shows the appropriate forum is Utah.

The claims set forth by Relators and the Government should be dismissed because the respective complaints fail to plead fraud with sufficient particularity as required by Rule 9(b). The claims also fail to state a claim for which relief can be granted under Rule 12(b)(6).

## III. BACKGROUND

### A. PROCEDURAL HISTORY

On January 3, 2013, Katie Brooks ("Brooks") and Nanette Wride ("Wride") (collectively, "Relators") filed this *qui tam* False Claims Act ("FCA") action in this Court ("Idaho Court") despite having no personal contacts with the jurisdiction.[1] Relators allege Defendants made false

[1] This Motion relates to Relators' most recently filed complaint ("Second Amended Complaint" or "SAC") (CM/ECF Document 86) and the United States' ("Government") Complaint in Intervention ("Intervention Complaint" or "IC") (CM/ECF Document 41). The SAC and the Intervention Complaint are collectively referred to as "Complaints."

claims and statements in order to participate in Title IV federal financial aid programs. Dkt. 1. The Court sealed the complaint for 60 days. Dkt. 19 at 2. On March 8, 2013, the Court granted the Government a 120-day extension of the seal period, until July 15, 2013, to decide whether to intervene. Dkt. 19 at 2. The Government then requested an additional extension to investigate more information disclosed by Relators, assess Defendants' alleged "prior violation" of regulatory requirements, and review internal information regarding Defendants. Dkt. 13. The Court extended the seal period 90 days, to October 15, 2013. Dkt. 19 at 3.

Relators filed an amended complaint which added new defendants and fraud claims on September 27, 2013. Dkt. 19 at 3. The Government requested another 120-day extension of the seal period to investigate Relators' allegations. *Id.* at 4. The Court granted that request and extended the Government's deadline to reach a decision whether to intervene to February 14, 2014. *Id.* On February 13, 2014, the Government sought an additional 120-day extension to the seal period. Dkt. 19 at 3. On March 3, 2014, the Court denied that request and directed the seal be lifted on March 17, 2014. *Id.* at 8-9. However, the Court subsequently modified that Order by granting the Government until April 7, 2014, to make its decision whether to intervene. Dkt. 21 at 2-3.

On April 7, 2014, the Government filed its Notice electing to intervene as to some of Relators' claims but not to intervene as to others. Dkt. 23. One day later, the Court issued an Order unsealing the case. Dkt. 24 at 3.

On May 2, 2014, the Government filed its Complaint in Intervention ("Intervention Complaint" or "IC"). Dkt. 41. The Intervention Complaint names only SHC and CEHE as defendants. *Id.* Relators filed a redacted Second Amended Complaint ("SAC") on September 8, 2014. Dkt. 86. After the Government reviewed the redacted allegations, it declined to intervene

as to Relators' additional claims. The Court entered an Order granting Defendants until October 27, 2014, to respond to the redacted allegations raised by Relators in the SAC. Dkt. 92.

**B. SUMMARY OF CLAIMS BY RELATORS AND GOVERNMENT**

On September 8, 2014, Relators filed the un-redacted SAC about eighteen months after they filed their *qui tam* complaint on behalf of the Government under 31 U.S.C. § 3279 of the FCA. The SAC primarily makes allegations about activities occurring in Orem or Salt Lake City, Utah during the two-year period Relators worked at SHC's Orem campus. Notwithstanding allegations based on their alleged personal knowledge – which are almost exclusively limited to activities and events in Utah at their former work location – Relators filed the SAC in federal court in Idaho. Importantly, their allegations relating to events in any state other than Utah, including any activities in Idaho, are merely based on information and belief or mere supposition. Moreover, they do not provide the basis for their knowledge in these instances.

All of the Relators' eight claims involve alleged violations of the FCA. None involve any state law claims. The claims include that the Colleges signed and delivered false Program Participation Agreements ("PPA") to the Department of Education ("Department" or "ED" or "DOE") over a more than ten-year period. They also include allegations that Defendants falsified records including grades, attendance, and faculty credentials without providing significant detail about those activities. For example, Relators allege grades were falsified by administrators and faculty without identifying any students whose grade was changed or when it was done. Similarly, they fail to identify the dates of attendance that were allegedly falsified or which student's attendance was falsified.

Relators also allege, upon information and belief, that the Colleges violated the so-called 90/10 rule because of an undefined scheme involving textbooks which allegedly inflated non-governmental revenues sources. They exclude significant related details so as to obscure the elements of the scheme. Allegations are made that the Colleges created false records to ensure compliance with the 90/10 rule without identifying which records were falsified or how that falsification impacted the 90/10 calculation. Relators never actually allege that Defendants would have failed 90/10 but for the alleged wrongful conduct.

The non-specific improper activities alleged by Relators to form the basis for their FCA claims were made to the Department and an accrediting commission and resulted in unspecified false claims for payment to the Government. Relators do not identify a single specific claim for payment or resulting payment made in violation of the FCA. Finally, Relators allege violations of incentive compensation regulations even though the Government intervened on that basis.

While Relators' SAC names nine defendants, including three audit firms and one individual, the Government intervened on May 2, 2014, against only two corporate defendants – SHC and CEHE. It intervened on only one claim: incentive compensation violations. In fact, the Government likely sued CEHE only as the successor in interest following a corporate merger in December 2012. SHC was organized and existed pursuant to the laws of Utah. Its main campus was located in Utah even though it maintained one branch and one satellite locations, as designated by the Department, in Boise, Idaho and Nampa, Idaho, respectively. The surviving corporation, CEHE, operates the schools formerly operated by SHC from its offices in Utah. The Intervention Complaint has five Counts: three FCA-based claims, one based on mistake of fact, and one claiming unjust enrichment. The Government's claims suffer from a similar lack of specificity in asserting liability. In fact, it appears to base its claims upon mere participation in

Title IV programs, as opposed to the submission of any particular false claim. The Intervention Complaint certainly does not provide significant information about the who, what, where, and how associated with the allegedly false or fraudulent claims. Instead, the Government references activities undertaken in the Colleges' admissions department that complied with certain safe harbors in compensating their admissions counselors provided for in the Department's regulations governing incentive compensation. Specifically, the safe harbors allowed for payments to counselors based on the event of students graduating and recognized that instance as an exception to limits on payments to counselors. The Government also alleges that the Colleges were making certain false representations merely upon submissions of documentation confirming a student was eligible to receive Title IV aid as opposed to a submission asking the Government to pay a claim as required by the FCA. As with the SAC, the Intervention Complaint makes no specific allegations of specific activities occurring in Idaho. Moreover, it concedes that CEHE maintains its principal place of business in Murray, Utah in the same location as SHC had conducted business until December 31, 2012.

## IV. ARGUMENT

### A. VENUE SHOULD BE TRANSFERRED TO UTAH BECAUSE THE VAST MAJORITY OF ANY SPECIFIC ALLEGATIONS OCCURRED IN AND RELATE TO THE UTAH CAMPUS.

The venue provisions of the FCA, 31 U.S.C. § 3732 (a), states:

> " Any action under section 3730 [31 U.S.C. § 3730] may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 [31 U.S.C. § 3729] occurred."

While venue is permissible in Idaho, the overwhelming number of factual allegations establish the Colleges' significant contacts with Utah warrant transfer for the reasons argued below. Indeed, the Colleges' employees primarily reside, work, and purportedly committed a majority of acts prohibited by 31 U.S.C. § 3729 in Utah. *See*, SAC ¶¶ 12-15, 22-24, 31, 33-34, 182-93, 196, 198-206, 212, 231, 235-36, 246, 250, 252, 300-19, 326-48, 367-76, and 381-83; Intervention Complaint ¶¶14-18.

The appropriate forum for this civil action alleging violations of the FCA is Utah. The inconveniences of this forum on Defendants are significant and merit in favor of transfer. The agreements which give rise to potential federal liability were primarily (though not solely) executed in Utah. None of them were executed in Idaho. Relators have no meaningful contacts with Idaho. Their only personal knowledge of bad acts alleged to give rise to FCA liability relate to actions by Utah-based employees in Utah. As a result, this Court should discount Relators' choice of forum and question their motives for bringing this case in Idaho.

In contrast, both Parties' respective contacts with Utah are substantial. Relators' claims relate almost exclusively to alleged activities occurring in Utah. Expected litigation-related costs substantially increase if this action is heard in Idaho as opposed to Utah, particularly since many of these costs could be avoided or significantly minimized given the relative ease of access to proof and witnesses in Utah.

28 U.S.C. § 1404(a) requires that the district court to which a transfer is sought be one where the action could have been brought initially. The allegations in the Complaints and the Declaration submitted in support of this Motion to Transfer establish that this action could have been brought in the Utah Court. For instance, the Colleges' transact business in Utah. Juhlin

Dec. ¶¶ 1, 6, 8, 9, 39-47, 60-63. This action could have been brought in the Utah Court pursuant to 31 U.S.C. § 3732.

The allegations in the Complaint confirm that it was proper to commence this action in the Utah Court. Relators allege that the Colleges' principal place of business is in Utah. *See,* SAC ¶¶ 12-15, 22-24, 31, 33-34, 182-93, 196, 198-206, 212, 231, 235-36, 246, 250, 252, 300-19, 326-48, 367-76, and 381-83 (identifying the Colleges' locations in Utah where they have been transacting business for a number of years); IC ¶¶ 14-18 (containing factual allegations as to occurrences in Utah alleged to give rise to FCA liability).

28 U.S.C. § 1404(a) authorizes a district court to transfer an action in the interests of justice and for the convenience of the parties "to any district or division where it might have been brought . . ." Upon a motion to transfer filed under that statute, the district court considers eight factors and conducts an "individualized, case-by-case consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). The eight factors are:

> (1) The location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

*Id.* at 498-99.

Section 1404(a) affords the district court broad discretion with respect to transferring a case. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31,108 S.Ct. 2239, 101 L. Ed 2d 22 (1988). The party seeking transfer has the burden to establish transfer is appropriate. *Grafton v. EMI*

*Products, LLC*, 2011 U.S. Dist. LEXIS 144132, *12 (D. Idaho 2011) (citing *Costco Wholesale Corp. v. Liberty Mutual Life Ins. Co.*, 472 F. Supp. 2d 1183, 1189 (S.D. Cal. 2007)). The moving party must show a "clear balance of inconveniences" against it if the action remains in the original venue. *Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979). A motion to transfer should be denied if the moving party merely prefers another forum or if the result of transfer would merely be to shift the inconvenience of litigation from one party to another. *Van Dusen v. Barrack*, 376 U.S. 612, 645-46, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964).

### B. CONSIDERATION OF THE EIGHT *JONES* FACTORS DEMONSTRATES TRANSFER IS WARRANTED.

#### 1. None of the Relevant Agreements Alleged to Give Rise to FCA Liability Were Executed in Idaho.

The most important agreements at issue in this case are the Program Participation Agreements ("PPAs") because the Colleges must have them to participate in Title IV financial aid programs. 34 C.F.R. § 668.14(a)(1). All of the claims are based on the Colleges' participation in Title IV programs. *See, e.g.*, SAC ¶¶ 122-28, 407-16; IC ¶¶ 105-24. The Complaints allege that the Colleges' wrongful acts violated the PPAs and thereby created liability under the FCA.

Neither Defendants nor the Department executed any of the PPAs in Idaho. Juhlin Dec. ¶¶ 20, 23-35. Those PPAs executed after a corporate merger on December 31, 2012, were signed by the Colleges in Arizona at an annual meeting of campus directors and by the Department in locations other than Idaho. *Id.* at ¶ 23, 27, 31, 33. Prior to the merger, the Colleges executed PPAs in Utah, Colorado, California, Nevada, and Arizona. *Id.* at ¶¶ 20, 23-35.

The other agreements having significance to the FCA claims are those relating to audits the Colleges must obtain and submit to the Department. Specifically, the Colleges are required to have both financial and compliance audits ("Audits") prepared and submitted to the Department each fiscal year. *Id.* at ¶ 38. Relators and the Government allege that the Colleges submitted inaccurate Audits to the Department which constituted false certifications to the federal government. SAC ¶¶ 387-404; IC ¶¶ 3-5, 64-65, 100, 105.

Engagement letters form the contract between the Defendants and the auditors and define the Audits' parameters. Juhlin Dec. ¶¶ 48-56. Defendants executed these engagement letters in Utah or Nevada but never in Idaho. *Id.* Similarly, the auditors executed these letters in Utah or California. *Id*. None of the Colleges or auditors executed the Audit engagement letters in Idaho. *Id.* Given the complete lack of any such activities in Idaho, this factor weighs convincingly in favor of transfer to Utah.

**2. The Courts' Familiarity With the Law Is a Neutral Factor Because the Claims Seek Damages for Alleged Violations of Federal Law.**

The SAC is based on purported regulatory violations related to Title IV financial aid programs. No state law issues will be involved in determining whether a violation of the FCA has occurred. The absence of any state law claims or the need to resolve any issues involving state law means the focus is solely on federal law. As a result, this factor should be weighed as neutral because courts in both venues are equally familiar with the applicable federal law.

**3. Relators' Choice of Forum Is Not Entitled to Deference or Substantial Weight Because They Do Not Reside in the Forum, Are *Qui Tam* Litigants, and the Most Specific Facts Pled Occurred in Utah, Not Idaho.**

The Ninth Circuit's traditional deference to the plaintiff's chosen forum is significantly limited when "'a plaintiff does not reside in the forum.'" *Big Sky W. Bank v. Jensen Family Inv.*

*Co.*, 2013 U.S. Dist. LEXIS 112709, *22 (D. Idaho 2013) (quoting *Kaur v. U.S. Airways, Inc.*, 2013 U.S. Dist. LEXIS 64519, *6-7 (N.D. Cal. 2013)). This reflects a policy to discourage forum-shopping. *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1107 (N.D. Cal. 2001). In *Big Sky*, the court transferred the venue from Idaho to Montana and held plaintiff's choice of the Idaho forum was "entitled to little weight." 2013 U.S. Dist. Lexis at *23-24. The court reached this conclusion because the plaintiff was not an Idaho resident, the defendants were not Idaho residents, and the disputed Idaho property had been sold. *Id.* at *22.

Relators' choice of the Idaho forum is similarly "entitled to little weight." Relators are not Idaho residents, but instead residents of Utah. SAC ¶¶ 12, 14; IC ¶¶ 14-15. Although CEHE operates three campus locations in Idaho, it is incorporated in Indiana and has its principal place of business and corporate headquarters in Utah. Juhlin Dec. ¶¶ 6, 8. Moreover, the Colleges were incorporated in Utah or Colorado, not Idaho. *Id.* at ¶¶ 6-17.

Courts in the Ninth Circuit hold that the weight afforded a plaintiff's choice of forum is further undermined when filing a case as a *qui tam* relator. *Patent Mgmt. Found., LLC v. Analog Devices, Inc.*, 2011 U.S. Dist. LEXIS 7389, *8-9 (N.D. Cal. 2011). In *Patent Management*, the plaintiff did reside in the chosen forum. *Id.* at *8. In spite of this fact, the court "accord[ed] little deference" to plaintiff's decision because he "filed this action as a *qui tam* relator" and transferred the case from California to Massachusetts. *Id.*

Unlike *Patent Management*, Relators do not reside in the chosen forum and instead reside in Utah. SAC ¶¶ 12, 14; IC ¶¶ 14-15. As *qui tam* relators, their choice of forum is not entitled to deference and the court should transfer this case to Utah because it is the more convenient forum.

It is particularly relevant that a foreign *qui tam* plaintiff's choice of forum is entitled to minimal weight and such weight diminishes even further when "the operative facts have not

occurred within the forum." *W. Digital Techs., Inc. v. Bd. of Regents of the Univ. of Tex.,* 2011 U.S. Dist. LEXIS 4499, *10 (N.D. Cal. 2011). In reaching the decision to transfer venue from California to Texas, the *Western Digital* court considered (and discounted) the fact that one plaintiff's principal place of business was in California. *Id.* at 11. That case dealt with patents developed in Texas by employees of the University of Texas and whether the engineers enforced their patent rights in Texas. *Id.* at 10-11. The court concluded that California had "no connection to the events that form the basis of the action" because those events occurred in Texas. *Id.* at 11. As a result, it transferred the case to Texas. *Id.* at 18.

Unlike *Western Digital*, <u>none</u> of the Defendants have their principal place of business or residence in this forum and Relators do not reside in the forum. SAC ¶¶ 12, 14; IC ¶¶ 14-15; Juhlin Dec. ¶¶ 75-83. The parties contacts with the Idaho forum are even more attenuated in its connection to Relators' chosen forum than in *Western Digital*. The operative facts giving rise to FCA liability occurred in Utah, not the chosen forum. Defendants did not negotiate, execute, or submit the PPAs from Idaho. Juhlin Dec. ¶¶ 18-38. Defendants made the payments alleged to violate the regulations through its payroll operations in Utah, not from Idaho. *Id.* at ¶ 39-47. Relators never received improper compensation in Idaho because they did not work or reside there. SAC ¶¶ 12, 14; IC ¶¶ 14-15. Defendants did not develop their compensation plan (and related polices) in Idaho. Juhlin Dec. ¶¶ 57-59. Relators do not allege Defendants distributed their written policies in Idaho, but instead in Nevada. SAC ¶ 207; IC ¶¶ 14-15.

Relator Brooks alleges she received improper incentives from her Director at the Orem, Utah campus because she met goals applicable to that campus. SAC ¶¶ 187, 196-203; IC ¶¶ 14-15. Relator Wride alleges she learned about the Colleges' compensation system from her Orem, Utah-based manager and co-workers. SAC ¶ 216. Wride further alleges she enrolled students at

the Orem campus, became eligible for compensation bonuses based upon her work at that campus, and received improper additional compensation from the same Director as Relator Brooks. SAC ¶¶ 219-30, 235. Both Relators allege the Colleges attempted to "hide" violations of the 90/10 Rule based upon what they believe happened at the Salt Lake City/Murray, Utah campus. SAC ¶ 289. Relators also allege that the Colleges engaged in other fraudulent practices, including those in violation of accrediting standards, based upon their observations of activities at the Orem campus. SAC ¶¶ 300-05, 309-19. Wride states that she learned of additional bad acts based upon her "investigation," which took place entirely at the Orem campus. SAC ¶¶ 326-38. She then allegedly reported the results of her investigation to managers working in Utah. SAC ¶ 339.

It is significant that Relators' references to events in Idaho are pled "upon information and belief." *See, e.g.*, SAC ¶¶ 177-81, 205, 243-45, 247-48, 298, 356-57, 376. The Complaints demonstrate that the only facts pled in this case based upon alleged personal knowledge relate to activities and events that did not occur in Idaho, but instead in Utah and Nevada. IC ¶¶ 14-16, 60-61, 90-91. Based on the above, this Court should give less deference to Relators' choice of forum. *See Glaxo Grp. Ltd. V. Genentech, Inc.*, 2010 U.S. Dist. LEXIS 46440, *11-12 (N.D. Cal. 2010) (internal citations omitted) (holding that as judicial deference to plaintiff's choice of forum lessens, defendant's "burden to upset the plaintiff's choice of forum also decreases"). Relators' choice of forum is entitled to essentially no deference and the bar setting Defendants' burden to demonstrate Utah is the more convenient forum is also very low. This Court should transfer this action to Utah, the more appropriate forum.

**4. Transfer Is Appropriate Because Both Parties' Contacts With Idaho Are Slight And Attenuated While Their Contacts With Utah Are Substantial.**

Neither Relator has any meaningful contacts with Idaho, but both have substantial contacts with Utah, which is the most appropriate forum. First, Relators are Utah residents. SAC ¶¶ 12, 14; IC ¶¶ 14-15. Second, Relators worked for Defendants' campus location in Orem, Utah. *Id.* Neither Relator alleges any personal connection to Idaho.

Carl Barney is not a resident of Idaho. SAC ¶ 21. None of the Colleges are incorporated in Idaho. Juhlin Dec. ¶¶ 6-11. Two of the Defendants, SHC and CCSD, were (until the 2012 merger) Utah corporations. *Id.* at ¶¶ 8, 9. Defendants operate more campus locations in Utah than in any other state. SAC ¶¶ 8-11. Only two of the Defendants, SHC and CAA, have campuses located in Idaho. Juhlin Dec. ¶¶ 8, 11. Two of those Idaho campuses, in Boise and Idaho Falls, are designated as branch campuses by the Department and managed by main campuses located in Ogden, Utah, and Flagstaff, Arizona, respectively. *Id.* at 8. The third campus, in Nampa, is designated as a satellite location of the Boise branch campus and also managed from the Ogden, Utah-based main campus. *Id.* at ¶ 8. None of these three campuses make independent reports to the Department or their national accrediting agency and instead flow information through their main campus locations in Utah and Arizona, which are in turn managed by executives at Defendants' Salt Lake City, Utah corporate headquarters. *Id.* at ¶¶ 39, 60-64.

In May 2010, CEO Eric Juhlin became CEO of CEHE and has worked out of Salt Lake City, Utah throughout his tenure. *Id.* at ¶¶ 1-5. Since the merger in 2012, CEHE's corporate headquarters and principal place of business is in Salt Lake City, Utah. *Id.* at ¶¶ 6-7. Executive-

and management-level functions are performed or managed from Salt Lake City, Utah, including those related to policy/procedure development, human resources, information technology systems, marketing, and regulatory compliance. Juhlin Dec. ¶ 39.

Since 2005, one of two central financial aid processing centers is located in Ogden, Utah. *Id.* at ¶¶ 60, 61, 66. The other is located in Denver, Colorado. *Id.* at ¶ 60. These centers manage the financial aid process for all campus locations (including those in Idaho). *Id.* at ¶¶ 60-68. They also manage and maintain bank accounts into which the Colleges deposit federal financial aid funds for disbursement to students. Juhlin Dec. 46-47. System-wide decisions related to financial aid administration are made from the corporate headquarters in Salt Lake City, Utah, and implemented through the processing centers in Utah and Colorado. *Id.* at ¶¶ 60-68.

As argued, Relators' factual allegations relate primarily to activities that occurred in Utah at SHC's Orem campus. Juhlin Dec. ¶¶ 75-83. Between 43-65% of the students enrolled at the Colleges attended a campus location in Utah. Juhlin Dec. at ¶ 72. SHC's Orem campus employed 156 instructors and teaching assistants during the time period relevant to Relators' allegations. Juhlin Dec. at ¶ 74. The substantial majority of the Colleges' employees are and have been based in Utah. The Colleges have also employed substantially more Admissions Consultants in Utah as compared to Idaho. Juhlin Decl. at 71.

The difference between the nature and extent of the Parties' contacts with Utah as compared to Idaho is significant and warrants transfer to Utah. Moreover, Defendants contacts with Utah are significant, while their contacts with Idaho are, at best, minimal. Idaho is an inconvenient forum, while Utah is the proper and more convenient forum for all of the parties.

### 5. Relators' Claims Predominantly Arise From Utah-Based Activities Engaged in by Utah-Based Employees in Utah.

#### a. The Wrongful Acts Alleged to Give Rise to Liability for Claims I and II Occurred in Utah.

The principal wrongful acts that form the factual basis for the purported FCA violations did not occur in Idaho. Rather, the specific allegations of fact about which Relators have actual knowledge occurred in Utah (or with minor exceptions in other states) but not in Idaho. *See, e.g.*, SAC ¶¶ 12-14, 182-93, 196, 198-206, 212, 214, 221-231, 300-19, 326-48, 367; IC ¶¶14-18. The bad acts alleged by the Relators and the Government with respect to the Claims I and II occurred in Utah or a state other than Idaho. For example, Relators allege that execution of the PPAs constituted a false certification. SAC ¶¶ 407, 416. None of the PPAs were executed in Idaho or delivered from Idaho. Juhlin Dec. ¶ 23, 24, 27-29, 31-35. SHC executed the applicable PPAs in Utah and other states and delivered them to the Department. *Id.* CEHE executed the applicable PPAs in Arizona and delivered them to the Department. *Id.*

Relators and the Government also assert in these two claims that the Colleges' compensation plan violates the Incentive Compensation Ban (as defined in the SAC) and this results in false certifications being made to the Department. SAC ¶¶ 410, 418; IC ¶¶ 62-64. None of the compensation plans were adopted or approved in Idaho. Juhlin Dec. ¶ 57-59. The graduation bonus payments were made through a payroll system administered from Utah. *Id.* at ¶¶ 46-47. These payments were initiated in Utah and finalized by a withdrawal of funds from bank accounts located in Utah. *Id.* at ¶¶ 46-47.

Relators and the Government allege that submission of loan and grant applications to the Department constituted false certifications. SAC ¶¶ 407, 416, 422-23; IC at ¶102. The

submission of such applications occurred through a Central Financial Aid office in Utah with respect to the Boise and Nampa campuses. Juhlin Dec. ¶ 60.

The specific allegations in the SAC related to audits, faculty information reports, attendance, grades, and other reports relate to or occurred in Utah. *See, e.g.,* SAC ¶¶ 300, 306, 309, 325, 329; IC ¶¶ 105-110. Relators specifically allege Defendant SHC's Orem campus submitted false Faculty Information Reports. SAC ¶¶ 329-34, 340-41. Relators claim false information submitted to ACCSC included academic and attendance information. *Id.* at ¶¶ 425, 430. Their allegations specifically state such information was falsified at the Orem campus. *Id.* at 300-04, 309-15.

Further, Relators claim the submission of Audits with alleged false information constituted the making of a false claim. SAC ¶¶ 421-23; IC ¶¶ 115. Numerous of the Audits were submitted to the Department from Salt Lake City. Juhlin Dec. ¶¶ 48-56.

**b. The Wrongful Acts Alleged to Give Rise to Liability For Claims III, IV, V, VI, VII, and VIII Occurred in Utah.**

Relators' Claims III, IV, V, VI, VII, and VIII also have a material connection to Utah. Relators specifically allege the Orem, Utah campus created and submitted false information to its accreditor, including Faculty Information Reports and student academic/attendance information. *See*, SAC ¶¶ 329-334, 340-41, 425, 430, 449, 454. Again, Relators specifically allege falsifications occurred at the Orem, Utah campus. *Id.* at ¶¶ 300-04, 309-15.

**c. All of the Claims Have a Direct Connection to an Event or Act That Occurred in Utah, Which Is the Appropriate Forum.**

When considering the factual allegations in the SAC and Intervention Complaint, there is not a single claim for relief which does not relate directly to an event or activity which took place in Utah. Relators' personal knowledge and therefore, a majority of the factual allegations in the

Complaint are based upon their employment in Utah. SAC ¶¶ 12, 14; IC ¶¶ 14-15. Defendants' centralized management system has been located in Utah for several years. Juhlin Dec. ¶¶ 6, 39-47. Key executives work in Utah and make management decisions from that location, including the implementation of policies and procedures Relators allege to have resulted in certifications constituting FCA violations. The quantity and substance of these connections with Utah far outweigh the tangential and speculative connections that might exist between the causes of action and the Idaho forum. Utah is the more appropriate forum when analyzing this factor.

**6. Litigation Costs (Particularly for Defendants) Increase Significantly and Unnecessarily if This Case Is Heard in Idaho, Instead of Utah.**

**a. Transfer to Utah Will Not Shift Litigation Expenses from Defendants to Relators.**

The location of the parties and many of the witness in Utah eliminates the possibility that a transfer of this action to Utah will cause any inconvenience for the Relators or shift the burden of litigation costs from the Defendants to Relators. To the contrary, granting a transfer to Utah will significantly reduce litigation costs and associated inconvenience for the Parties.

Relators are both residents of Utah. SAC ¶¶ 12, 14. Counsel for the Relators is located in Utah. *Id.* at p. 1. Obviously, Relators and their Counsel will incur travel costs related to trial and hearings conducted in Idaho that could be avoided if the case was transferred to Utah.

Transferring the case to Utah will not generate additional costs for Relators because such a cost shift could only occur if Idaho witnesses outnumbered Utah witnesses. Neither the SAC nor the Intervention Complaint identify any Idaho residents as being involved in the perpetration of alleged wrongful acts or having particular knowledge of the specific facts alleged. But the substance of the Complaints' factual allegations and causes of action do identify a large number of likely witnesses from the Orem and Salt Lake City, Utah areas.

**b. <u>Transfer to Utah Will Substantially Reduce Travel Costs for Relators and Defendants.</u>**

Utah is the location of the colleges' corporate headquarters and the operations in Utah are much larger than those in Idaho. Juhlin Dec. ¶¶ 8-11, 39, 47, 60, 61, 70, 71, 73. The substantial inconvenience of trial-related travel costs will be reduced by a transfer to Utah, which alone militates in favor of transfer. For purposes of performing a cost comparison, Defendants estimate (a) expected travel and lodging cost based on their corporate travel cost and reimbursement policy and (b) the *per diem* cost based on federal government figures with respect to meals. *Id.* at ¶¶ 86-93. Based upon these cost indicators, the estimated first day costs for one witness for travel, meals, and lodging is $371.70, assuming he/she drives from Salt Lake City to Boise, Idaho ("First Day Cost"). *Id.* at ¶ 90. The cost incurred by one witness for one day spent in Boise (without travel but including an overnight stay) is $187.20 ("Second Day Cost"). *Id.* at ¶ 91. Travel-related costs for a witness to return from Boise to Salt Lake City (again, assuming that he/she drives) is $230.50 ("Last Day Cost"). Juhlin Dec. ¶ 92. Three-day costs for one Utah-based witness to travel and testify at trial in Boise three days is $793.10.

In contrast, the travel and meal cost for a witness who lives in the Salt Lake City area to attend trial in Salt Lake City are estimated at $23.96 ("Local Trial Cost"). *Id.* at ¶ 93. Instead of nearly $800 in costs for travel to Idaho, that same Utah-based witness would incur about $71.88 in costs to testify over three days in Salt Lake City.

Chief Executive Officer Juhlin resides in Salt Lake City and expects to attend the trial each day. Juhlin Dec. ¶ 1. Defendants currently expect trial of this case will range from 4 to 6 weeks, based upon the wide-ranging allegations that relate to virtually every aspect of the Colleges' operations. Based upon Mr. Juhlin incurring five days of First Day Costs, 20 days of

Second Day Costs, and five days of Last Day Costs, the total expense for Mr. Juhlin to attend the trial in Boise will be $6,755.00 versus $718.80 if trial was in Salt Lake City. Assuming Relators are each present throughout the trial and using the same cost estimate as those used for Mr. Juhlin, the travel, meal, and lodging cost of the Relators will be $13,510.00 to attend the trial in Boise versus $1,437.60 to attend the trial in Salt Lake City.

The Colleges anticipate the number of employees residing in Salt Lake City who will offer substantive testimony at the trial, other than Mr. Juhlin, will range from 15 to 20 witnesses, including the nine individuals specifically named in the SAC. If each of these individuals travels to Boise the day before testifying and returns to Salt Lake City two days later, the costs will be substantial. Each of these witnesses will incur $789.40 in three-day, travel-related costs and expenses to testify in Boise. This compares with $71.88 in costs to testify in Salt Lake City (assuming the same three-days of attendance at trial). Based upon these calculations, travel costs for the number of witnesses that reside in the Salt Lake City area will range from $11,841.00 to $15,788.00. The cost range for them to testify in Salt Lake City, assuming they incur 3 days of travel cost, will only be $1,078.20 to $1,437.60. Based upon these conservative estimates, the costs for Relators, the College's corporate representative and the currently known witnesses residing in the Salt Lake City Area will be approaching $36,053.00 as opposed to $3,594.00 if the trial was conducted in Salt Lake City.

It is difficult to predict an exact number of non-employee witnesses residing in Salt Lake City who will need to testify. However, for the reasons set forth herein, Defendants believe it may or will be necessary to offer the testimony of numerous former students and faculty to refute allegations in the SAC pertaining to the falsification of attendance records, grades and faculty qualifications. *See, e.g.*, SAC ¶¶ 12-15, 22-24, 31, 33-34, 182-93, 196, 198-206, 212, 231, 235-

36, 246, 250, 252, 300-19, 326-48, 367-76, 381-83; IC ¶¶14-18. Most of those individuals with knowledge of allegations related to the Ogden, Utah campus likely reside in Utah. Such witnesses cannot be compelled to testify in Boise, Idaho. The Defendants would likely have to incur significant expense, as the number of potential witnesses is substantial.

Defendants will also incur indirect costs if trial is held in Idaho because of lost productivity and significant associated inconvenience on the Colleges based upon key executives traveling out of state for trial. When analyzing motions to transfer venue, courts in the Ninth Circuit consider the disruptions caused to officers and employees having to travel for trial including the relative litigation costs. *See, e.g., Patent Mgmt. Found., LLC v. Analog Devices, Inc.*, 2011 U.S. Dist. LEXIS 7389, *10 (N.D. Cal. 2011). Many of the employee witnesses will be senior level managers, given the allegations that the Colleges devised a series of schemes to hide their fraudulent activities. Juhlin Dec. ¶ 94-95. Travel time from Utah to Boise means they cannot perform their management functions for days, instead of hours (or a single day) if trial occurs in Salt Lake City.

Travel time to drive from Salt Lake City to Boise is about five hours. *See,* Juhlin Dec. at ¶ 87. Each witness, party, or party representative who located in or near Salt Lake City and must travel to attend trial in Boise will have to expend at least ten hours of travel time for each trip, time which would not be required if the trial was conducted in Salt Lake City. Depending upon the trial schedule and the time at which a witness is scheduled to testify, witness currently residing in Salt Lake City will be required to devote two days to travel rather than being able to continue to work until shortly before testifying as they could do if the trial was held in Salt Lake City.

**c. Costs and Associated Inconvenience Will Be Reduced for Defendants (and Relators) if This Trial Is Transferred to Utah.**

The Parties' costs will be substantially lower if trial is in Utah. Defendants will be substantially inconvenienced due to the costs and operational disruptions if trial is held in Idaho. Requiring the overwhelming majority of Utah-based witnesses to travel to Idaho for trial is unnecessary. Moreover, transferring venue to Utah increases the flexibility of the Court and the Parties to change witness order and take other actions that may result in a more efficient trial. This factor weighs in favor of changing the forum to Utah.

**7. The Availability of Compulsory Process for Unwilling, Non-Party Witnesses Is Significantly Enhanced if this Case Is Heard in Utah.**

The few specific facts alleged in Relators' SAC shows that the majority of witnesses (including non-party witnesses) with possible substantive testimony worked and resided in Utah, not Idaho. At this early stage, it is not possible to identify every potential witness, but reasonably anticipate the need to subpoena a substantial number of former employees (particularly those who worked for Utah-based schools) and students (the majority of whom attended a Utah-based campus). Relators live and worked in Utah, so their co-workers (from whom they gained some of their personal knowledge about Defendants' alleged bad acts) most likely continue to reside in the Orem and Salt Lake City areas. Both of these locations are more than 100 miles from Boise, Idaho. Juhlin Dec. ¶ 87.

Relators allege Defendant SHC falsified attendance records and changed student grades without basis at the Orem and Salt Lake City/Murray campuses. SAC ¶¶ 300-05, 309-19. Defendants reasonably anticipate calling as witnesses students who attended these Utah campuses and whose attendance and grades were allegedly falsified. The majority of these students likely continue to reside in the Utah area. Defendants also reasonably expect that

instructors (and former instructors) who worked at these two Utah campuses will be necessary witnesses. The testimony of non-party students and former instructors provide the most reasonable means for Defendants to refute the allegations in the Complaints, yet the majority of these people lived, worked, and attended classes in the Orem and Salt Lake City areas and are outside the subpoena power of the Idaho court.

Other than the Relators, the SAC names twelve specific individuals. Nine of them are currently employed by Colleges in Utah. Juhlin Dec. ¶¶ 94-95. These named individuals are potential witnesses but reside outside the subpoena power of the Idaho court. They could be compelled to testify in Utah by a Utah court.

The SAC does not identify a single individual who resides in Idaho as a potential witness in this case. Relators only worked at one Utah campus, so there exists no reasonable basis to conclude they will identify a substantial number of Idaho-based, non-party witnesses at some point in the future. Yet based upon the specific allegations in the SAC, there exist a myriad of individuals – non-party students as well as non-party former instructors, administrative staff, and managers – from the Utah campuses whose testimony will be necessary to the defense (and prosecution) of this case. For example, records show that the Orem campus employed 156 instructors and teaching assistants during the period 2009 to 2011, when Relators allege falsification of attendance records, grades, and instructor qualification information occurred. Juhlin Dec. ¶ 74. Of those, 136 are former employees whose last known addresses indicate they are Utah residents. *Id.* at ¶ 74.

This witness pool expands substantially after considering executives from CEHE's corporate headquarters, whose testimony will be critical. It is unlikely that any former employees and/or students will voluntarily travel to Idaho to testify at trial. The Idaho court does

not have the power to subpoena unwilling witnesses from Utah to appear, while the Utah court can do so readily. This factor merits in favor of transfer of venue to Utah.

**8. Ease of Access to Proof Is Significantly Enhanced by Transfer to Utah.**

As discussed above, the events giving rise to Relators' causes of action occurred primarily in the District of Utah. This fact should "inform[ ] the Court's analysis regarding which district is a more convenient forum for the parties and witnesses." *Patent Mgmt. Found., LLC v. Analog Devices, Inc.*, 2011 U.S. Dist. LEXIS 7389, *9-10 (N.D. Cal. 2011). In *Patent Management*, the defendant sought transfer of venue to Massachusetts. *Id.* at * 5. In support, defendant stated that its connections to Massachusetts included: (i) the location of its corporate headquarters, (ii) eight of ten executives resided there, and (iii) the department responsible for creating the data sheets which formed the basis for plaintiff's cause of action was based there. *Id.*at * 5, 10.

The facts here are similar to those in *Patent Management*. Defendants' corporate headquarters are not in Idaho, but in Utah. Juhlin Dec. ¶ 39-40. <u>None</u> of Defendants' corporate executives reside in Idaho, while the substantial majority (if not every single one) reside in Utah. Juhlin Decl. at ¶ 39, 95. Those employees at the corporate headquarters responsible for creating and disseminating policies and procedures related to regulatory compliance and the administration of federal financial aid programs are in Utah. Juhlin Decl. at ¶ 39, 47. Employees in those offices responsible for administering Title IV financial aid programs on a day-to-day basis are not located in Idaho, but instead in Utah and Colorado. Juhlin Decl. at ¶ 60-63.

The court in *Patent Management* also determined that the location of the documentary evidence should inform its analysis regarding ease of access to proof. *Patent Mgmt.*, 2011 U.S.

Dist. LEXIS at * 13. In that case, defendant asserted that "most, if not all, of the document evidence" was found at defendant's corporate headquarters. *Id.* Despite the possibility some documents could be produced electronically, the court concluded this fact "does not alter the conclusion that the cost of litigation will likely be less if the case were venued in the forum where the evidence is located." *Id.* (internal citation omitted).

Both Parties' access to witnesses and related documents is substantially eased if venue is transferred to Utah. The great majority of witnesses will not incur travel-related expenses (including lost time) and documents are readily available from the Colleges' Utah campuses and corporate headquarters. On balance, this factor merits in favor of transfer to Utah and that forum is far more convenient with regard to the sources of proof.

## V. THE INTERVENTION COMPLAINT AND SAC SHOULD BE DISMISSED PURSUANT TO RULES 9(b) AND 12(b)(6).

### A. THE COMPLAINTS FAIL IN MATERIAL WAYS TO SATISFY RULE 9(B)'S SPECIFICITY REQUIREMENTS FOR FCA PURPOSES.

#### 1. Rule 9(b) Standard of Particularity Applicable to FCA Cases.

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake *shall* be stated with particularity." Fed. R. Civ. P. 9(b) (emphasis added). At least two principles important to the administration of justice are promoted by consistent application of this rule. First, allegations must be sufficiently specific "to give defendants notice of the particular misconduct . . . alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Second, Rule 9(b) is specifically intended "'to deter the filing of complaints as a

pretext for the discovery of unknown wrongs.'" *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (internal quotations and citations omitted).

Rule 9(b) governs this Court's analysis because FCA claims are rooted in allegations of fraud. *Id.* at 1018; *see also*, *U.S. ex rel. Gross v. Aids Research Alliance – Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (holding the FCA is "an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)"); *Cooper v. Blue Cross Blue Shield of Florida*, 19 F.3d 562, 566–67 (11th Cir. 1994). Therefore, Relators must allege underlying violations of the incentive compensation regulation with the particularity required by Rule 9(b). *See, e.g., U.S. ex rel. Bott v. Silicon Valley Colleges*, 262 Fed.Appx. 810 (9th Cir. 2008).

When fraud claims are alleged in conclusory fashion, courts in the Ninth Circuit have little difficulty stopping them at the pleading stage. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (internal citations omitted). Moreover, claims may not proceed if supported merely by general or conclusory allegations of fraud without facts to support those allegations. *Semegen*, 780 F.2d at 731. Finally, since "allegations of fraud are particularly injurious to business and professional reputations, a fraud claim may withstand a Rule 9(b) challenge only if it states 'the manner in which [the alleged misrepresentations] are false, and the facts that support an inference of fraud by each defendant.'" *Comwest, Inc. v. Am. Operator Serv., Inc.*, 765 F.Supp. 1467, 1470 (C.D. Cal. 1991) (*citing McFarland v. Memorex Corp.*, 493 F.Supp. 631, 639 (N.D.Cal. 1980)). In sum, Rule 9(b) requires a plaintiff to identify the source of the fraud and the specific roles each defendant played in the particular fraud. *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 645 (C.D.Cal. 1983).

Courts dismiss FCA claims that plead merely "by example" when the complaint simply pleads a general methodology of alleged fraud and where the allegations fail to distinguish among defendants. *See, e.g., U.S. ex rel. Cox v. Iowa Health Sys., Inc.*, 29 F. Supp. 2d 1022 (S.D. Iowa 1998) (pleading systemic or pervasive fraud generally did not satisfy Rule 9(b)). In addition, a complaint is insufficient when it presents allegations as "illustrative" but then pleads them generally and without facts to support assertions of allegedly false claims. *U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d. 1365, 1369 (M.D. Fla. 2000).

As argued below, allegations related to 90/10 violations and falsified grade, attendance, and accreditor records merely suggest a general methodology or practice without identifying necessary specific facts as required by Rule 9(b). *See, e.g.,* SAC ¶¶ 295-99, 301-08, 309-17, 322-25, 329-33. Absent detailed allegations satisfying Rule 9(b)'s requirements for an FCA action, these claims should be dismissed. *See, U.S. ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d. 141 (D. Mass. 2000) (dismissing claims alleging possible fraud).

Here, the failure to detail a link between alleged misconduct and the actual submission of a false claim is fatal. Relators' SAC and the Government's Intervention Complaint fail to plead specific facts related to misrepresentations made by each defendant related to the submission of a claim. For example, Relators' SAC is wholly devoid of allegations regarding Defendant Barney with regard to their theories of FCA liability. The SAC also generally fails to identify facts to demonstrate a basis for a claim against each of the Colleges. *U.S. ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1312-13 (11th Cir. 2002).

Even when detailed information is alleged related to methods used to defraud the government, a complaint should be dismissed under Rule 9(b) if it fails to identify specific claims that were actually submitted or dates when they were submitted. *U.S. ex rel. Perry v.*

*Hooker Creek Asphalt & Paving, LLC,* No. 12-35278, 2014 W.L. 1244276 (9th Cir. 2014) (allegations "by example" insufficient to establish claims defendant engaged in a broad scheme to cause the submission of false claims for federal highway funds); *U.S. ex rel. Sallade v. Orbital Sciences. Corp.,* No. CV 05-0604-PHX-NVW, 2008 WL 2020463 (D. Ariz. 2008) (relator identified no facts to establish he knew defendant secured an inflated contract price and submitted improper invoices reflecting that price); *U.S. ex rel. Jorgenson v. Alan Ritchey, Inc.,* No. C-01-588-Z, 2007 WL 1287932 (W.D. Wash. 2007) (concluding claims about one plant's operations satisfied Rule 9(b) but dismissing claims related to other locations).

As stated by the Fifth Circuit, "[a] relaxing of Rule 9(b) is a *qui tam* plaintiff's ticket to the discovery process that the statute itself does not contemplate." *U.S. ex rel. Russell v. Epic Healthcare Management Group, Inc.*, 193 F.3d 304, 308-09 (5th Cir. 1999). Relators' claims regarding 90/10, audits, grades, attendance, and various accreditation forms or requirements fail to provide necessary Rule 9(b) details. Both Relators and the Government also fail to allege any details sufficient to show how the Audits constitute misrepresentations giving rise to FCA liability. Allowing such generalized allegations of misrepresentation without required detail would nullify Rule 9(b) protections. Defendants and the auditing firms are entitled to understand the specific basis for the claims before incurring substantial costs for discovery.

Courts dismiss FCA claims that plead by "example" or "illustratively" or where the complaint simply pleads a general methodology of alleged fraud and the allegations fail to distinguish among defendants. *U.S. ex rel. Cox v. Iowa Health Sys., Inc.*, 29 F. Supp. 2d 1022, 1025 (S.D. Iowa 1998) (alleging systemic or pervasive fraud generally did not satisfy Rule 9(b)); *U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d. 1365, 1369 (M.D. Fla. 2000). Here, the SAC fails to identify facts pertinent to each Defendant and instead seeks to

impute general of fraud as to all defendants "on information and belief." *See, e.g.*, SAC ¶¶ 296-98. As to 90/10 violations and allegations about the falsification of grades, attendance, and accreditor records, Relators suggest a general methodology or practice without identifying specific facts as required by Rule 9(b). SAC ¶¶ 295-99, 301-08, 309-17, 322-25, 329-33. Absent more detailed allegations, such claims should be dismissed. *See, U.S. ex rel. Walsh v. Eastman Kodak Co*., 98 F. Supp. 2d. 141 (D. Mass. 2000) (dismissing claims with prejudice because claims merely alleged "possible fraud").

**2. Allegations Related to 90/10 Violations.**

Relators make six allegations as to how Defendant Schools violated the 90/10 Rule. SHC ¶¶ 294-99. None of these allegations meet Rule 9(b)'s heightened pleading requirements. Rule 9(b) precludes claims that activities permissible under controlling regulations are allegedly unlawful unless supported by requisite detail to show how and why the activities are unlawful. By asserting allegations wholesale against all Defendants and failing to specify which Defendants committed wrongdoing, Relators fail to identify the role that each separate Defendant played in the alleged wrongdoing and thus the SAC violates Rule 9(b). *Hokama v. E.F. Hutton & Co., Inc.*, 566 F. Supp. 636 645 (C.D. Cal. 1983) (requiring the complaint identify the source of the fraud and each defendants' role in it). This compromises each Defendant's ability to identify what fraud they allegedly committed, much less refute the charges, and this infirmity exists with respect to each of the 90/10 allegations. SAC ¶¶ 294-99.

Relators further allege the Colleges falsified records to demonstrate compliance with the 90/10 Rule. SAC ¶ 295. This allegation fails to include any information to identify which of the institutions falsified records, what records were falsified, when these activities occurred, which employees participated in these activities, or how the falsification of the records violated the

regulation. As the 90/10 Rule requires each institution participating in Title IV to complete its own 90/10 calculation based on its unique OPEID number, specificity as to Relators claims are of paramount importance. Absent some identification of the data each separate College falsified in order to evade the 90/10 requirements, there is no way to discern which of the Colleges falsified records, what impact this had on the 90/10 calculation, and during which fiscal year the Colleges received a resulting benefit.

Relators generally describe a purported scheme in which an executive allegedly concealed the existence of a book room from an accrediting agency. SAC ¶ 297. This allegation fails to provide any useful factual support for Relator's 90/10 allegations. Defendant Schools are accredited by the Accrediting Commission of Careers Schools and Colleges ("ACCSC") and that entity does not, pursuant to its *Standards of Accreditation,* enforces any companion standard to the 90/10 Rule and has no role to play in the enforcement of the 90/10 Rule. Further, Relators fail to explain why the mere existence of a book room has any impact on the 90/10 calculation. Relators instead offer a hearsay statement attributed to the executive, without identifying to whom the statement was made, when it was made, how Relators became aware of the statement, at which campus the visit took place, and perhaps most importantly, why the statement bears any relevance to their claim that the Colleges somehow falsified their 90/10 calculations.

Relators also make a general and conclusory statement that "one or more campuses" created false student records. SAC ¶ 298. They allege "on information and belief" that the Colleges altered student enrollment records to show such students were enrolled at "one of the Arizona campuses" and not the Salt Lake City/Murray campus. *Id.* Again, Relators do not identify which records were altered, who altered them, when the records were altered, how they were altered, or how such alterations allowed the Colleges to evade the 90/10 requirements.

There is no nexus alleged in the SAC between the alleged falsified student enrollment records and the College's 90/10 calculations.

Finally, Relators observe that Defendant Schools, should they convert to a non-profit status, would become exempt to the 90/10 Rule. SAC ¶ 299. Such a transaction would not be a violation of the FCA, or any other law.

**3. The Government's Allegations Regarding SHC's Certifications Fail to Meet the Elevated Rule 9(b) Pleading Standards.**

The purpose of the elevated pleading standards of Rule 9(b) in FCA cases is to guarantee defendants receive notice of the *particular misconduct which is alleged to constitute fraud* so that they can defend against the charges instead of placing defendant in the position of simply denying that they have done anything wrong. *Bly-Magee*, 236 F.3d at 1019. The Intervention Complaint fails to meet this standard with respect to the various "false certifications" it recites as the basis for liabilities asserted against SHC.

In lieu of a definite description of the certifications which it says are the predicate to SHC's submission of false claims for payment, the Government alludes generally to "Required Management Assertions," "G5 Certifications," "Master Promissory Notes," and "School Certifications." IC ¶ 64. The Government provides no information to explain who made such certifications, when they were made, or what their contents were. Nor is there any factual support to show how these certifications induced the Government to pay claims for financial aid funds. IC ¶ 66.

Instead, the Government simply invokes categories of documents that are part of the mechanical process of administering Title IV programs. For example, the Government refers to a "School Certification" which Title IV institutions provide in connection with a student's

application for a Title IV loan. IC ¶ 53. However, that certification goes to the *student's eligibility* to receive the loan. *See* 34 C.F.R. § 682.102(a) ("The School determines and certifies the *student's eligibility for the loan*.") (emphasis added). The Government does not illuminate how any certification SHC could have made as to a particular student's eligibility to receive a loan could be perceived as an *institutional* certification regarding compliance with the Incentive Compensation Ban because such a statement is not required to determine student eligibility. *See* 34 C.F.R. § 682.32.

The Government also relies heavily on purported "Required Management Certifications" in which it states SHC expressly certified that it "had '[n]ot paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention.'" IC ¶ 35. But it fails to specifically refer to a single instance when SHC made this representation and does not mention a particular document that contains the quoted certification, the timeframe when it was made, or any other circumstances under which it was purportedly made. Instead, the Government cites to its own published guidance to auditors. IC ¶ 35.

Finally, with respect to the "G5 Certifications," that reference involves a cash management requirement necessary to meet the regulatory requirement that funds be disbursed within three business days of receipt. *See* 34 C.F.R. § 668.166. This narrow certification has no connection to the Relators' or the Government's general allegations of noncompliance with incentive compensation regulations, record-keeping requirements, or accreditation standards.

Because, the Government's Complaint is so bereft of details, SHC must deny wrongdoing generally in order to answer the Government's charges.

**4. Allegations Related to Incentive Compensation Violations.**

The Intervention Complaint and SAC fail to sufficiently allege facts to establish a false certification for FCA purposes. The alleged certifications regarding incentive compensation are insufficient and provide no credible basis to show that ED relied upon such representations in making any specific payment to the Colleges. That failure is fatal. In addition, claims based upon alleged violations of the "completion" safe harbor fails to identify facts to establish a regulatory violation. The Government does not allege bonuses compensation decisions were made based upon any reason other than completion, which complies with the express language of the safe harbor. 34 C.F.R. § 668.14(b)(22)(ii)(E) (July 1, 2010).

Both Complaints generally allege that Defendants' implemented a compensation plan knowing it was a violation. No facts are pled to support the conclusion that Defendants knew the plan violated the law. Absent such facts, the claims fail for 9(b) purposes.

The Complaints assert that the ability to participate in and/or amount of any payment for student completion varied based upon two factors: (1) a minimum number of students enrolled over a specific period and (2) a completion rate based upon leads converted to enrollments over a defined period. IC ¶¶ 86-87. As a threshold matter, the "completion" safe harbor does not mandate that institutions must guarantee all employees participate. 34 C.F.R. § 668.14(b)(22)(ii)(E) (July 1, 2010). It likewise does not prohibit an institution from evaluating criteria to determine in what amount to pay admission consultants for each student that successfully completes. *Id.* Therefore the allegations merely identify working conditions applied by the Colleges which are not unlawful. To rule otherwise would allow ED (or the Government) to improperly rewrite the "safe harbor" and impose additional conditions where none existed. *Id.*

The Court should dismiss the Complaints in this regard because each fails to identify facts confirming the plan was unlawful. There also are no credible facts establishing that any of the Defendants acted with knowledge the plan was unlawful. The Complaints do not cite to an email, alleged discussion, or other facts to support their sweeping conclusions.

Relators allege "upon belief" that financial aid officers ("FAOs") at the Cheyenne, Wyoming campus received "large bonuses for completing financial aid files for students." SAC ¶ 205. The SAC provides no detail identifying any particular recipients of bonuses, the amounts paid to FAOs, who made such payments, or when this may have occurred in Cheyenne. Relators make further conclusory statements "upon belief" that the compensation practices that they allude to have taken place in Cheyenne also occurred at the "other Defendant Schools." *Id.* Because Relators provide no factual support for their allegations in connection with FAO compensation, their claims can not be sustained.

**5. Allegations Related to Attendance, Grades, and Other Accreditation Records.**

As argued below, Relators seek to expand the reach of *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), to numerous other operational areas of the Colleges. This Court should reject that invitation. Relators fail to identify specific certifications relied upon by ED when it issued payments nor have Relators pled facts that even credibly identify specific certifications regarding grades, attendance, and other accreditation matters and tie them to specific payments of federal funds.

Significantly, the SAC fails to identify specific students for which any alleged falsification occurred, much less how such falsification resulted in an improper disbursement or

retention of federal funds. The only attempts to plead such facts are deficient or incomplete. *See, e.g., SAC* ¶¶ 302-05.

Such allegations are confusing and without sufficient particularity to identify the who, what, when, where, and how as applicable to federal funding requested and disbursed to the Colleges. In addition, those allegations are limited related to SHC and no facts are provided as to the other Colleges. Despite that failure, Relators claim that all "Defendant Schools" submitted false claims without having made specific allegations to support that conclusion. *See, e.g.,* SAC ¶¶ 431-33. Rule 9(b) requires particular allegations to support a fraud claim against each defendant. The SAC fails to meet this basic requirement and should be dismissed before the parties incur substantial discovery costs simply so that Relators can attempt to manufacture information through discovery.

### B. THE INTERVENTION COMPLAINT AND SAC FAIL TO STATE CLAIMS AS A MATTER OF LAW FOR 12(B)(6) PURPOSES.

#### 1. Legal Standard for Rule 12(b)(6).

Under Rule 12(b)(6), analysis begins with the court accepting "factual allegations in the complaint as true and constru[ing] [them] in the light most favorable to the nonmoving party." *Outdoor Media Grp. Inc., v. City of Beaumont*, 506 F.3d. 895, 900 (9th Cir. 2007). Nonetheless, a complaint should be dismissed if the plaintiff has failed to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). Moreover, a "formulaic recitation of the elements of a cause of action" are insufficient to survive a motion to dismiss under 12(b)(6). *Id.* at 545. In addition, conclusory allegations contradicted by exhibits referred to in the complaint need not be accepted as true. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Finally, the

allegations must "*plausibly* give rise to an entitlement to relief." *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011) (holding the plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully") (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009)).

The SAC fails to state a claim under Rule 12(b)(6) because Relators' allegations do nothing more than raise the mere *possibility* that the College violated applicable regulations. Absent allegations establishing it is *plausible* such violations occurred, their claims should be dismissed. *Id.* at 991.

Relators also fail to allege payments made based upon the compensation plan for student completion was a "sham." As argued above, the plan complied with the completion safe harbor and is therefore not actionable under the FCA. Accordingly, the Complaint cannot state a claim the College violated the FCA. For those reasons, the incentive compensation claims in the SAC and Intervention Complaint related to student completion should be dismissed.

**2. Application To FCA Claims.**

With respect to the incentive compensation claims brought by the Government and Relators (as well as the other theories of FCA liability in the SAC), this Court should reject and not expand to every aspect of institutional operations the reasoning of *United States ex rel. Hendow v. Univ. of Phoenix*. 461 F.3d 1166 (9th Cir. 2006). Defendants respectfully ask the Court to find that *Hendow* should not be controlling and instead adopt the reasoning of the Fifth Circuit, which finds that institutions participating in Title IV do not provide sufficient certifications with regard to alleged violations of incentive compensation to be actionable under the FCA. *See*, *U.S. ex rel. Graves v. ITT Educ. Services, Inc.*, 284 F. Supp. 2d 487, 496-97 (S.D. Tax. 2003), *aff'd* (5th Cir. 2004); *U.S. ex rel. Bowman Educ. America, Inc.*, No. H-00-3028 (S.D.

Tax. 2004), *aff'd* (5th Cir. 2004); *U.S. ex rel. Gay v. Lincoln Tech. Inst.*, No. 3:01-cv-505-k (N.D. Tax. 2003), *aff'd* (5th Cir. 2004). Other Circuits have similarly rejected the expansive theory of false certification for FCA purposes. *See, e.g., Mikes v. Straus*, 274 F.3d 687, 699 (2nd Cir. 2001) (the FCA "does not encompass those instances of regulatory non-compliance that are irrelevant to the government's disbursement decisions"); *cf. U.S. ex rel. Castnor v. URS Consultants, Inc.*, 317 F.3d 883, 886 (8th Cir. 2003) (noting the alleged falsehood must be material to the payment decision.).

In this case Relators seek to expand the application of *Hendow* and turn every regulatory violation into an FCA fraud claim. Relators attempt to turn non-specific regulatory requirements into certifications, absent any detailed factual allegations demonstrating how or if ED relies upon such certifications. This effort also disregards remedies available to the federal government under Title IV to address proof that grades or attendance does not support Title IV requirements, or requires a return of Title IV. Consider the following hypothetical, Relators allege that Title IV paid to a specific student is not supported by attendance. If accepted, Relators merely have to allege an inaccuracy and that it was a knowing violation by general conclusory allegations to state a claim under the FCA.

**a. Regulatory Non-Compliance Is Not A Basis For FCA Liability.**

The Complaints should be dismissed because they attempt to convert alleged regulatory violations into FCA claims. Despite established precedent making clear that the FCA is not concerned with regulatory noncompliance, Relators seek recovery based solely on alleged regulatory violations. The FCA "serves a more specific function, protecting the federal fisc by

imposing severe penalties on those whose false or fraudulent claims cause the government to pay money." *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 795-96 (8th Cir. 2011)

In addition to the Eighth Circuit, both the Third and Tenth Circuits have distinguished "conditions of payment" from "conditions of participation." The former can provide a basis for an FCA claim while the latter cannot.[2] *U.S. ex rel. Charles Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 309 (3rd Cir. 2011); *see also U.S. ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008) (conditions of participation, as well as a provider's certification that it has complied with those requirements are enforced through administrative mechanisms, which might result in removal from the program). The alleged certifications at issue in the Complaints are conditions of participation because they do not relate to specific claims for payment and therefore do not provide a basis for FCA liability.

Although violations of particular regulations may ultimately lead to termination of the provider's contract with a federal agency, the regulations do not require perfect compliance with each and every regulatory provision as an absolute condition to receiving specific payments. *Wilkins,* 659 F.3d at 310. Allowing a false certification claim under the FCA based on mere noncompliance with regulatory conditions of participation would give rise to an impermissibly "broad theory of FCA liability." *Id.* at 310-11. Private litigants would then begin to displace the federal agencies with responsibility, discretion, and administrative procedures to address regulatory transgression. As the *Wilkins* court stated,

> "Federal agencies are unquestionably better suited than federal courts to ensure compliance with regulations. In the

[2] As indicated above, the distinction in precedent among the Ninth and Tenth Circuits warrants transfer at this early stage in the proceeding and militates in favor of resolving transfer issues in advance of the other issues so the parties can address the distinction in case precedent.

> circumstances, we believe that by permitting *qui tam* plaintiffs to file suit based on the violation of regulations which may be corrected through an administrative process and which are not related directly to the Government's payment of a claim, courts unwisely would shift the burden of enforcing the . . . regulations to themselves even though the administration of the vast and complicated [administrative] program is best left to the administrators."

659 F.3d at 310-11.

The FCA imposes liability when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). In order to draw down federal funds, institutions must be eligible to do so and the Colleges were at all relevant times. Regulatory violations, such as those alleged in the Complaints, may jeopardize the College's continued participation in the Title IV if true. However, alleged lack of regulatory compliance is insufficient to establish an FCA claim. *Vigil*, 639 F.3d at 799.

ED possesses regulatory authority over institutions like the College. Indeed, ED maintains formal procedures to address regulatory violations by these institutions. The HEA explicitly provides that an eligible institution may be subject to financial liability or disqualified if ED determines, after notice and an opportunity for a hearing, that an eligible institution has engaged in activities proscribed by regulations. 20 U.S.C. § 1094(c)(1)(G). Since regulatory violations are only a condition of participation in Title IV, they "are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." *U.S. ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008). The SAC fails to allege false certifications to support a claim under the FCA.

**b. The PPA Is Not A "Certification."**

The Colleges' PPAs do not include an affirmative declaration that the College has fully complied with all statutes and regulations. Juhlin Dec., Exhibit 1. Instead, the PPAs contain a statement about the institution's *present* intent to comply in the future. By executing a PPA, the Colleges agreed to abide by hundreds of federal regulations, many of which are administrative. For example, institutions must agree to "[e]stablish an on-going drug-free awareness program," "establish[] a campus security policy," and notify ED within ten days after being notified that an employee was convicted of a drug-related crime in the workplace. *Id.* The PPA does not, however, require perfect compliance with these myriad regulations as a condition of receiving any specific payment. *Wilkins*, 659 F.3d at 310. Violations of regulations do not automatically make the Colleges ineligible to receive federal funds or mean such funds constituted false claims for FCA purposes. Instead, ED's regulations give it authority and discretion to impose sanctions, including seeking the return of financial aid funds or levying fines. *See, e.g.*, 34 C.F.R. §§ 668.84-85, 95.

**c. Relators Do Not Identify a Single False Certification or Claim for Payment.**

Despite the litany of regulatory violations alleged in the Complaints, Relators never identify a single specific certification seeking payment from the government. It is not enough for Relators to generally allege that *every* Title IV disbursement constitutes a false claim by reason of certification. *See, e.g.*, SAC ¶ 412. The FCA only attaches liability to the actual "claim for payment" and not the underlying fraudulent activity or to the government's wrongful payment. *U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F.Supp 2d 487, 495 (S.D. Tex. 2003), *aff'd* (5th Cir. 2004). The Government and Relators disregard precedent expressly requiring detailed

allegations about the making, using, or submitting false certifications and why the certifications were material to ED's payment decisions. *Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556-57 (8th Cir. 2006).

## V. CONCLUSION

This Court should transfer venue of this action to the federal district court for Utah. Defendants respectfully request that the Court transfer the litigation before ruling on the various motions to dismiss to allow the parties to address issues related to the Tenth Circuit related to the motions to dismiss. If the Court denies the request to transfer, the Intervention Complaint and SAC should be dismissed pursuant to Rules 9(b) and/or 12(b)(6) because insufficient facts are alleged for FCA purposes. For these reasons and those that may be presented at a hearing before the Court, Defendants are entitled to the relief requested.

Dated this 4th of November, 2014.

JONES & SWARTZ PLLC

/s/ Eric B. Swartz
Counsel for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

Dated: November 4, 2014

RITZERT & LEYTON, P.C.

/s/ Steven M. Gombos
Counsel for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 4, 2014, I filed the foregoing document electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Amy S. Howe, amy.howe@usdoj.gov
U.S. ATTORNEY'S OFFICE
*Counsel for Plaintiff United States of America*

Brandon J. Mark, bmark@parsonsbehle.com
Joseph M. Stultz, jstultz@parsonsbehle.com
John N. Zarian, jzarian@parsonsbehle.com
Alissa M. Mellem, amellem@parsonsbehle.com
PARSONS BEHLE & LATIMER
*Counsel for Plaintiffs Katie Brooks and Nannette Wride*

A. Dean Bennett, adbennett@hollandhart.com
Eric G. Maxfield, egmaxfield@hollandhart.com
HOLLAND AND HART LLP
*Counsel for Defendants Shaw & Co., P.C. and Shaw, Mumford & Co., P.C.*

Richard Greener, rgreener@greenerlaw.com
Thomas J. Lloyd III, tlloyd@greenerlaw.com
Daniel L. Glynn, dglynn@greenerlaw.com
GREENER BURKE SHOEMAKER OBERRECHT, P.A.
*Counsel for Defendant PricewaterhouseCoopers LLP*

Steven M. Gombos, sgombos@ritzert-leyton.com
Gerald M. Ritzert, gritzert@ritzert-leyton.com
RITZERT & LEYTON, P.C.
*Counsel for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney*

*/s/ Steven M. Gombos*
Steven M. Gombos