Eric B. Swartz, ISB No. 6396
JONES & SWARTZ PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808
Telephone: (208) 489-8989
Email:eric@jonesandswartzlaw.com

Steven M. Gombos (*Admitted pro hac vice*)
RITZERT & LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, VA 22030
Telephone: (703) 934-2660
Email: sgombos@ritzert-leyton.com

Attorneys for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE, <br><br> Plaintiffs, <br><br> v. <br><br> STEVENS-HENAGER COLLEGE, INC., *et al.* <br><br> Defendants. | Case No. 1:13-CV-00009-BLW <br><br> **DEFENDANTS' REPLY TO RELATORS' OPPOSITION TO MOTION TO TRANSFER VENUE AND DISMISS** |

COMES NOW Defendants Stevens-Henager College, Inc. ("SHC"), California College San Diego, Inc., CollegeAmerica Denver, Inc., CollegeAmerica Arizona, Inc. ("CAA"), Center for Excellence in Higher Education, Inc. ("CEHE"), and Carl Barney (collectively, "Defendants" or "Colleges"), by and through counsel, respectfully presenting the following Reply Brief to Relators' Opposition to Motion to Transfer Venue and to Dismiss (Doc. 113) and in Support of Defendants' Motion to Transfer Venue and to Dismiss (Doc. 103).

I. **POSITION STATEMENT**

Relators have not rebutted overwhelming reasons to transfer this case to Utah to allow consideration of the dismissal arguments in that venue. In particular, Defendants' consideration and management of the compensation plan and regulatory compliance (such as for 90/10 and accreditation purposes) occurred in Utah. The number of witnesses, cost considerations, ability to compel testimony, and other considerations pertinent to trial strongly favor transfer. Relators' forum-shopping for the purpose of relying upon Ninth Circuit case law should not be condoned.

With regard to the incentive compensation ban ("Ban"),[1] Defendants' motion seeks to end this litigation. Relators want to evade the plain language of the safe harbor.[2] Relators advance multiple theories related to violations of the Ban. The primary theory is the same one advanced by the Government. Relators' claims should be denied for the same reasons.[3]

Compensation paid when a student completes one academic year cannot violate the Ban. If the Court does not agree that the alleged conduct is protected by the Safe Harbor, the next question is whether the SAC states a claim under the FCA. It does not. Such determination hinges on precedent. The Tenth Circuit would not follow the Ninth Circuit's decision in *Hendow*. The SAC does not allege sufficient certifications and materiality for FCA purposes for claims arising out of alleged non-compliance with the Ban, 90/10, and accreditation requirements. Moreover, Relators will not be prejudiced by a transfer to a district court in the Tenth Circuit if existing precedent leads to the same result.

---

[1] 20 U.S.C. § 1094(a)(20).
[2] The Safe Harbor appears at 34 C.F.R. § 668.14(b)(22)(ii)(E) (July 1, 2010) ("Safe Harbor").
[3] Defendants incorporate all of the arguments made in their Motion to Dismiss (Doc. 101), supporting Memorandum (Doc. 103), and Reply to the Government's Opposition.

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-2**

## II.   ARGUMENT

### A.   Evaluation of the *Jones* Factors Shows Utah is the Proper Venue.

Relators' analysis of the eight relevant factors fails to demonstrate that transfer is not appropriate. *Jones v. GNC Franchising, Inc.* 211 F.3d 495, 498 (9th Cir. 2000). Relators do not agree with the Defendants as to the weight of any of the *Jones* factors. Their obvious preference for Ninth Circuit precedent has resulted in a misapplication of the factors. The principal reason presented as to why Utah residents and their Salt Lake City-based lawyers needed to file this case in Idaho is based upon factual inaccuracies. Relators ignore facts and their claims that Idaho is the convenient forum for the "most important" witnesses is a transparent attempt to justify forum-shopping, especially when supported primarily by the declaration of an attorney of record. Rel. Opp. at 5-6 (Section B) (Doc.113); Doc. 113-1.

#### 1.   Relevant Activities Occurred in Utah and the Utah Court Can Best Compel Witnesses.

Relators contend this case should not be transferred because its witnesses can be compelled to testify in Idaho. Relators place particular importance upon campuses located in Idaho because witnesses can appear from two different Defendant colleges (SHC and CAA). Rel. Opp. at 6-7 (Section B, addressing *Jones* factors 5 (claim contacts with forum) and 7 (ability to compel witnesses)) (Doc. 113). Relators argue this makes witnesses in Idaho the most important in the case. *Id.* This contention is baseless and flawed for a number of reasons.

Relators' attorney, Joseph Stultz ("Stultz"), submitted a declaration identifying Idaho third-party witnesses and related testimony. Stultz Dec. (Doc. 113-1). He identifies a number of former admissions consultants and financial counselors employed at the Idaho Falls campus in 2010. Stultz Dec. ¶¶ 7-8. Stultz claims the Idaho venue provides a unique opportunity to put on witnesses from two of the Defendants' colleges in one forum. *Id.* Contrary to Stultz's

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-3**

representation, CAA did not have a campus in Idaho Falls in 2010. Juhlin Supp. Dec. ¶¶ 24-27, 39. In fact, no student began attending the Idaho Falls campus until May 2011 and no student could have completed one academic year (for purposes of the compensation plan) within two months when the plan terminated on June 30, 2011. Juhlin Supp. Dec. ¶¶ 26, 39. Therefore, no payment under the Safe Harbor could have been made for a student enrolled at the Idaho Falls campus. *Id.* at ¶ 36. As a result, the significance Relators ascribe to Idaho Falls employees simply does not exist. Their choice of the Idaho venue on that basis has no merit.

It is also significant in evaluating factor 7 in *Jones* that no witness located in Idaho was involved in developing or implementing the incentive compensation system at issue. Juhlin Dec. ¶ 58 (Doc. 100); Barney Dec. ¶¶ 5-6. In fact, no Idaho-based witnesses can provide testimony related to the development and implementation of the compensation system which Relators specifically allege occurred at the executive level. SAC ¶¶ 258, 260, 410, 419, 436.

As the compensation plan at issue was the same for each college in Defendants' system, Relators themselves can provide the same testimony as any Idaho-based witness. Juhlin Supp. Dec. ¶¶ 28-29. There are many more current and former employees in Utah who are relevant to the compensation plan than in Idaho. Juhlin Supp. Dec. ¶¶ 20-23, 30-33. The most important witnesses are those who can speak to the implementation, management, and payment of compensation. They reside in Utah. Juhlin Dec. ¶¶ 57-58 (Doc. 100); Barney Dec. ¶¶ 5-6. There is no basis to retain the case in Idaho.

> **2. Relators Fail to Refute That the Most Important Agreements Are Overwhelmingly Associated with Utah Compared to Idaho.**

Relators do not contend that any of the important agreements relevant to this case were negotiated or executed in Idaho. Rel. Opp. at 12-14 (Section C, discussing *Jones* factor 1 (execution of relevant agreements)) (Doc. 113). The importance of these contracts and their

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-4**

execution in Utah is clarified by Mr. Juhlin's supplemental declaration.  Juhlin Supp. Dec. ¶¶ 4-13; *see also,* Def's. Brief at 9-10 (Doc. 103).  The supplemental declaration also resolves the confusion Relators identified regarding Defendants' auditors by recounting extensive relevant auditing functions performed in Utah.  Rel. Opp. at 13, n. 5 (Doc. 113); Juhlin Supp. Dec. ¶¶ 4-13.  These clarifications rebut the substance of Relators' argument that almost none of the important agreements were executed in Utah.  Rel. Opp. at 13-14.

### 3. Utah Courts Understand the FCA But Relators Prefer the Ninth Circuit.

Relators' forum-shopping is also apparent based upon their Opposition Brief.  Rel. Opp. at 14-15 (Section D, discussing *Jones* factor 2 (court familiarity with the law)) (Doc. 113).  All federal courts regularly consider FCA cases.  Relators cannot credibly suggest that the Tenth Circuit is less equipped to consider these federal issues.  For instance, it makes no difference whether published Tenth Circuit cases involve a for-profit school since the FCA does not have separate legal requirements for those entities.  The Tenth Circuit is capable of applying the relevant law to the facts of this case.  The crux of Relators' (and the Government's) position on venue is that they want to rely on *Hendow*.

### 4. Relators' Choice of Forum Is Entitled to Minimal Deference.

In evaluating Relators' choice of forum, the Government maintains that it is the real party in interest.  Gov't. Opp. at 30 (Doc. 110).  Relators' agreement with this position does not modify this Court's consideration of all of the *Jones* factors or change the fact that Relators' choice of forum is not entitled to deference.  Rel. Opp. at 18-20 (discussing *Jones* factor 3 (choice of forum)) (Doc. 113); *Patent Mgmt. Found., LLC v. Analog Devices, Inc.*, 2011 U.S. Dist. LEXIS 7389, *8-9 (N. D. Cal. 2011); *see also, United States v. Nature's Farm Prods.*, 204 U.S. Dist. LEXIS 8485, *20 (S.D.N.Y. 2004).

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-5**

### 5. The Overwhelming Number of Meaningful Contacts Are in Utah.

Relators repeat the erroneous contention that Idaho is the appropriate forum because it is the only forum in which two of the Defendants' colleges have campuses. Rel. Opp. at 15-18 (Section E, discussing *Jones* factor 4 (contact with forum)) (Doc. 113). This contention is without merit for the reasons stated above. In addition, Relators are incorrect in asserting that two Idaho schools received the most Title IV funds. Rel. Opp. at 15; Juhlin Supp. Dec. ¶ 22 (Utah schools received about 39% of Title IV funds for the whole system, while the Idaho schools only received about 10%).

The balance of Relators' argument contends that their contacts with Idaho are sufficient to confer jurisdiction in Idaho. This argument is irrelevant because jurisdiction is not at issue. Instead, as *Jones* makes clear, the issue is whether the parties' contacts are more significant in one forum versus another such that the alternative forum is more appropriate. *Jones*, 211 F.3d at 499. Defendants have shown that the Parties have many more significant contacts with Utah than Idaho and that critical third-party witnesses reside in Utah. Juhlin Supp. Dec. ¶¶ 4-7, 20-23, and 30-33; *see also*, Juhlin Dec. ¶¶ 39-47, 60-74. (Doc. 100)

In attempting to rebut the relationship between Defendants' payroll activities and payments from Utah, Relators incorrectly claim that Defendants' payroll is processed in Florida. Defendants' CEO confirms that employees in Salt Lake City processed and managed payroll through bank accounts in Utah. Juhlin Supp. Dec. ¶¶ 14-17; Juhlin Dec. ¶¶ 46-47 (Doc. 100). Payments made between 2007 and 2011 are central to this case. Payroll decisions occurred in Utah and employees initiated payments from bank accounts in Utah. *Id.*

Relators assert that the SAC is "replete with facts" alleged about events occurring in Idaho. Yet out of the 456 paragraphs in the SAC, only 17 reference events in Idaho and 13 of

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-6**

those are made upon "information and belief." *See* Rel. Opp. at 23 (Doc. 113). Relators overstate the occurrence and significance of events in Idaho and rely on inaccurate facts.

### 6. Relators Fail to Overcome the Detailed Expense Analysis by Defendants.

Other than referencing expense analysis cited by the Government, Relators offer no factual arguments to refute Defendants' cost of litigation analysis. Rel. Opp. at 20-21 (Section G, discussing *Jones* factor 6 (cost of litigation)) (Doc. 113). The Government's expense analysis fails to include any costs associated with witnesses' travel from Utah to Idaho. In addition, the rate the Government receives for lodging and per diem meal allowances is not available to the majority of witnesses.

Rather than addressing the difference in trial expenses in Utah versus Idaho, Relators urge this Court to adopt a prior ruling. *Superior Merch. Servs., LLC v. Bell*, 2012 U.S. Dist. LEXIS 10608 (D. Idaho 2012). In *Bell,* the Court measured the costs for witnesses to travel between Salt Lake City and Pocatello, Idaho. *Id.* at *18-19. But *Bell* had substantially different facts because it was a breach of contract case involving less complex issues and significantly fewer witnesses than expected in this case.

*Bell* also should not control because costs for numerous third-party witnesses were not an issue. *Id.* In addition, the distance between the two locations in the instant case is twice as far as the distance in *Bell*. Juhlin Dec. ¶ 87 (Doc. 100). Reliance on *Bell* for the proposition that travel costs between this Court and Salt Lake City is misplaced and overstates the ruling. Moreover, *Jones* makes it clear that the consideration of a motion to transfer is to be made on a "case by case" basis. *Jones,* 211 F.3d at 498. Relators have made no effort to compare the actual costs of litigation for the Parties because it is obvious that the costs of litigation will be higher in Idaho than Utah.

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-7**

### 7. Practical Reasons Confirm Utah Offers the Best Access to Evidence.

Relators do not address the practical significance of transferring this case to Utah in the context of *Jones* factor 8 (ease of access to evidence). Instead, they focus primarily on the impact of the "digital world," which makes transporting documents easier. No one is contending the case should be transferred to Utah to facilitate the presentation of paper evidence. Instead, the practical considerations this Court should consider relate to the improved efficiency and lower cost associated with presenting witnesses for deposition and trial in Utah. Those benefits include the likelihood of more live testimony at trial as opposed to having to use video or other deposition transcripts at greater cost. They also include the benefits of having a court with the ability to compel more third-party witnesses to attend depositions and trial.

## B.     The SAC Should Be Dismissed Pursuant to Rules 12(b)(6) and 9(b).

### 1. Express Certifications in the PPA Are Conditions of Participation and Not Conditions of Payment.

Relators inaccurately conclude that institutional certifications made in the Program Participation Agreement ("PPA") and allowing Title IV participation give rise to FCA liability because they are conditions of payment. Rel. Opp. at 33 (Doc. 113). Relators' reliance on *Hendow* is misplaced and based on the fallacy that "if conditions of participation were not conditions of payment there would be no conditions of payment at all – and thus, an educational institution could flout the law at will." *See* Def. Reply to Gov't. Opp. at 8-12.[4]   But Title IV includes both conditions of participation, of which the PPA is one, and conditions of payment, which it is not. Relators' position seeks to extend *Hendow* and the reach of the FCA to any Title

---

[4] The Government similarly seeks to have its cake and eat it too by arguing that a difference exists between conditions of participation and payment, but that the courts should ignore that distinction. This Court should not allow Relators (and the Government) to continue expanding the bases for FCA liability in the Title IV context by affording opportunities to define, based upon self-serving grounds, which regulations are conditions of payment.

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-8**

IV regulatory violation.  Taking Relators' theory to its logical conclusion would result in FCA liability, for example, for an institution which fails to accurately report the graduation and transfer-out rate of its student athletes.  34 C.F.R. §§ 668.14(b)(20), 668.48.[5]

In addition, Relators have not rectified the SAC's failure to identify false claims Defendants allegedly submitted for payment.  Relators name, as the embodiment of the alleged false claims for payment, three categories of certifications:  the PPA, Required Management Assertions ("RMAs"), and G5 certifications.  Rel. Opp. at 29 (Doc. 113).  The PPA constitutes a condition of participation and does not support allegations of a false claim for payment.

Similarly, Relators incorrectly assert RMAs are conditions of payment.  Institutions must file audits with the government incorporating RMAs on an annual basis and "no later than six months *after* the last day of the institution's fiscal year."  34 C.F.R. § 668.23(a)(4) (emphasis added).  Contrary to the Relators' description of them in the SAC, RMAs are backwards-looking statements.  *See* Doc. 52-2 at 32 ("[Institution] *complied* with the Institutional Eligibility and Participation compliance requirements …") (emphasis added).  An institution does not issue any RMAs in connection with any specific request(s) for payment.  Neither is the Government's payment of Title IV funds in response to a specific request ever conditioned on the contents of an institution's RMAs.  Common sense dictates that the RMAs do not serve as prerequisites for payment, but instead place conditions upon an institution's ability to *continue* participating in Title IV programs and disbursing funds on a prospective basis.

Further, Relators propose that G5 certifications could be the evidence of a false claim for payment.  Unlike the PPA and RMAs, the G5 certification is a condition of payment.  The

---

[5] Relators argue, for example, that FCA liability attaches when an institution does not meet 90/10 requirements or violates requirements imposed by its accrediting commission. Rel. Opp. at 37-38 (Doc. 113).  Before opting "not . . . to pursue" different theories, Relators asserted that keeping inaccurate grade and attendance information also gave rise to FCA liability.  SAC at ¶¶ 309-25(Doc. 86).

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-9**

government requires the G5 certification as a condition to requesting a transfer of funds. The G5 certification does not support Relators' interpretation that it somehow incorporates elements (i.e., all of the conditions in the PPA) which do not appear in the plain language of the certification. The certification reads, "I certify, by processing this payment request and/or re-allocation, that the funds are being expended within three business days of receipt for the purpose and condition of the agreement." Doc. 52-2.[6] G5 certification expressly incorporates the "agreement" that institutions comply with the requirements of 34 C.F.R. Part 668, Subpart K, Cash Management regulations.

G5's express purpose is cash management. G5 as defined by the Department of Education ("Department"), "provides financial management support services . . . [and] supports the planning, obligating, authorizing, disbursing, and final closing of . . . grant awards." FSA Bluebook Appx. B at 13-10 (Ex. D to Def. Req. for Judicial Notice). It more specifically requires certification of compliance with the "excess cash" rule requiring institutions expend all federal funds they draw down within three business days. *See* 34 C.F.R. 668.166(a). The G5 certification further captures the general admonition of the Cash Management regulations that an institution's fiduciary duties compel it to use Title IV program funds only for the expressly conditioned program purposes. 34 C.F.R. § 668.161(b) ("The institution . . . may not use or hypothecate (i.e. use as collateral) title IV, HEA program funds for any other purpose").

In attempting to expand the reach of the G5 certification beyond these self-evident requirements, Relators rewrite it to read, "[B]y processing this payment request … the funds are being expended … for the purposes and condition[s] of the [Program Participation] agreement." Rel. Opp. at 37 (Doc. 113). This misleading and self-serving revision to the plain language is

---

[6] The government could easily have written that certification to reference or incorporate the PPA itself. It chose not to do so. Such a decision should not be construed in its favor.

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-10**

unavailing. The Court should focus on the language used in the certification, which compels the conclusion that it relates to compliance with the Cash Management regulations at Subpart K (as cited above) and does not involve certification of compliance with the Ban, 90/10 requirements, or anything else.

### 2. Relators' Allegations Regarding 90/10 Fail as a Matter of Law.

Relators' putative FCA claims based upon 90/10 fail to state a claim for Rule 12(b)(6) for the same reasons as the incentive compensation claims. The SAC fails to allege a violation of the 90/10 rule, which requires a minimum ratio of federal to non-federal revenue. *See generally,* 34 C.F.R. § 668.28. Curiously, Relators provide no numerical or fiscal information to support this theory of FCA liability. Nowhere in the SAC do Relators state that any of the Defendants' colleges would have failed to meet the 90/10 requirements but for some bad act. Relators also fail to allege any actual facts to support the conclusion that (a) improper revenue was counted as non-federal revenue, (b) inclusion of such improper revenues materially impacted the 90/10 calculations, and (c) but for the inclusion of improper revenues Defendants' colleges would have failed the 90/10 requirements. For example, if a school's actual 90/10 ratio is 88.5%, but it included additional improper revenue to lower its ratio to 87.5%, that institution would still comply with the regulatory requirement upon removal of the improper revenue. This flaw is fatal to Relators' 90/10 allegations.

Further, Relators' allegation that "one or more campuses of the Defendant Schools have created false student records for the purposes of complying with 90-10 Rule" provides no nexus between the purportedly false attendance records and revenue calculations completed by the Defendants' colleges. SAC ¶ 298 (Doc. 86). The 90/10 regulations deal exclusively with revenue, not student attendance or enrollment. 34 C.F.R. § 668.28. Relators offer a conclusion –

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-11**

that unidentified false records were created to show a student attending one SHC campus actually attended class at another campus – but fail to explain what difference, if any, this would make to the 90/10 calculations of either campus.  It is pure speculation to say it might have made any difference at all.  The effect of revenue collected by an institution on its 90/10 calculation depends on a myriad of other information, such as what source of funds the student used to pay for tuition, fees, and supplies; which campus received those funds; the amount of funds received; and what other sources of federal or non-federal revenue comprise the ultimate 90/10 calculation.  Relators provide none of these facts.  Relators fail to properly tie their allegation of false attendance records back to any institution's actual 90/10 calculation.

Similarly, Relators fail to provide a factual basis that ties the way Defendants' colleges charge students for textbooks to compliance with the 90/10 rule.  Relators indicate that students pay for textbooks the institution provides, either as a portion of their overall tuition or through separate charges.  SAC ¶¶ 296-97 (Doc. 86).  Missing here is any factual statement describing *how* (i) students pay such charges and (ii) Defendants' colleges account for them.  If the students are using some source of funds other than Title IV for this purpose, revenues derived from the transaction could rightfully be included as part of the "10" portion of the calculation.  34 C.F.R. § 668.20(8)(a).  Also missing is any discussion of how Defendants accounted for student payments or how this impacts the 90/10 calculation and causes it to fail for two years in a row (which for most of the period at issue is the trigger for loss of eligibility).[7]

---

[7] An institution must fail to meet the 90/10 ratio required for *two consecutive years* to cause it to lose eligibility to disburse Title IV funds.  34 C.F.R. § 668.28(c)(1).  Section 493 of the Higher Education Opportunity Act of 2008 (Pub. L. 110-315) ("HEOA") amended 20 U.S.C. § 1094(d)(2), effective August 14, 2008 (sanction of loss of Title IV eligibility for violating 90/10 occurs when an institution fails 90/10 for *two consecutive fiscal years*).  Relators do not plead facts to indicate when Defendants' colleges violated 90/10, Relators have not alleged a violation of 90/10 prior to the enactment of the HEOA, or a violation in two consecutive fiscal years subsequent to August 14, 2008.

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-12**

At most, Relators identify two possible sources of non-federal revenue that they allege were included in the 90/10 calculations.  These allegations, even if taken as true, do not form a basis for one to conclude it is plausible that any of the Defendants' colleges violated the 90/10 rule.  In order to do that, the Relators would have to explain what the source of the payments was, how much revenue was received and accounted for, and why that made a difference in the 90/10 calculations. Instead of providing this necessary factual basis, Relators merely state that the bad acts identified were done with the intent or purpose of violating the 90/10 rule.  Pursuant to Rules 9(b) and 12(b)(6), this claim should be dismissed as a matter of law.

### 3.  Alleged Accreditation Violations Do Not State Valid FCA Claims.

For the reasons discussed above with respect to the Ban and 90/10, alleged accreditation violations are not conditions of payment, but instead conditions of participation.  Noncompliance with accreditation requirements concerning faculty qualifications and a "lack" of admissions criteria do not create FCA liability.  Relators fail to state a claim under Rule 12(b)(6).

With respect to the alleged falsification of faculty qualifications, Relators allege Relator Wride reported the faculty qualifications problems to the Department and to Defendants' accrediting agency, the Accrediting Commission of Career Colleges and Schools ("ACCSC").  SAC ¶ 349 (Doc. 86).  Relators then note, "Neither the Department [ ] nor the ACCSC ever responded to any of [Realtor Wride's] reports."  *Id.*  Relators therefore cannot allege that either of these entities viewed this "problem" as material to their decision to allow the Defendants' colleges to, respectively, continue disbursing Title IV funds and maintain valid accreditation.  They also cannot allege either entity took negative action of any sort despite being put on specific notice of these alleged bad acts.

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-13**

Relator Wride's self-serving conclusion that, in her view, faculty member(s) failed to meet ACCSC's qualification requirements is without merit because ACCSC itself took no action in light of her complaint. Similarly, Relators cannot allege Defendants' colleges violated a condition of payment (such that FCA liability could attach) because the Department allowed Defendants' colleges to continue to disburse funds after being put on notice. The respective regulatory entities' failure to take any action, despite notice of actions alleged to be illegal and improper, leads to the inevitable conclusion that the acts themselves did not constitute a problem and certainly do not establish liability under the FCA.

Relators go on to suggest that observing an open admissions policy somehow constitutes a "flagrant" violation of ACCSC's Standards ("Standards"). Rel. Opp. at 40 (Doc. 113). Nothing could be farther from the truth. The Standards do not prohibit an "open" admissions policy or require "selectivity" as part of the admissions process. Doc. 52-3. Instead, the Standards require that schools establish written admissions policies (including minimum criteria for admission); inform prospective students of these admissions requirements, processes, and procedures (typically done by publication in the school's catalog); and then follow these policies (i.e., not admit students who fail to meet admissions requirements, not discriminate in making admissions decisions, etc.). Doc. 52-3 at 96-7. Relators have not alleged Defendants' college failed to abide by these requirements.

Instead, Relators couch as allegations their personal opinions (and self-serving conclusions) that possessing a high school diploma or a G.E.D. does not serve as sufficient proof of an individual's ability to benefit from programs of career and technical education offered by Defendants' colleges. This view is not shared by either the ACCSC or the Department. ACCSC allows students who do not have a high school diploma (or its equivalent) to qualify for

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-14**

admission based upon their ability to benefit if they achieve "an approved score on a test or tests that have been reviewed by a qualified, independent third party for appropriateness of the instrument and specific score levels required for admission." Doc. 52-3 at 96.  The Standards provide an alternative path for students without a high school diploma to show they can benefit from matriculation to an accredited postsecondary educational program.  The clear implication is that such students *can* benefit from an education offered by Defendants' colleges.

The Department also considers the possession of a high school diploma (or G.E.D.) to demonstrate a student's eligibility to benefit from a postsecondary program and obtain Title IV funds to assist in paying for that program.  34 C.F.R. 668.32(e)(1).  Moreover, it authorized similar "ability to benefit" provisions to ACCSC's (i.e., allowing a student without a diploma to qualify based upon passing an approved exam).  *See* 34 C.F.R. 668.32(e)(2) and Subpart J.[8]

Thus, the "ability to benefit" language does not reflect a command from ACCSC to its accredited schools to implement "selective" admissions policies.  Instead, it is a term of art referring to how a student who has not completed secondary education and is beyond the age of compulsory attendance can pursue a postsecondary education through some alternative means.  Defendants' colleges' "open" admissions policy does not violate the Standards in any way and does not provide any basis for FCA liability.

### III.   CONCLUSION

For the foregoing reasons, the case should be transferred as requested, or dismissed with prejudice.

---

[8] ATB eligibility was abrogated pursuant to the Consolidated Appropriations Act, 2012 (Pub. L. 112-74) except for certain grandfathered exceptions.

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-15**

Dated this 22nd day of December, 2014.

                        JONES & SWARTZ PLLC

                        _____/s/ Eric B. Swartz_____
                        Counsel for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney


                        RITZERT & LEYTON, P.C.

                        _____/s/ Steven M. Gombos_____
                        Counsel for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-16**

**Certificate of Service**

   I certify that I will/have electronically file(d) the foregoing with the Clerk of the Court using the CM/ECF system this December 22, 2014:

Eric B Swartz – eric@jonesandswartzlaw.com
Amy S. Howe – Amy.Howe@USDOJ.gov
John N. Zarian – jzarian@parsonsbehle.com
Brandon J. Mark – bmark@parsonsbehle.com
Alissa M Mellem – AMellem@parsonsbehle.com
Joseph Stultz - jstultz@parsonsbehle.com
A. Dean Bennett – adbennett@hollandhart.com
Eric G Maxfield – EGMaxfield@hollandhart.com
Gerald Ritzert – gritzert@ritzert-leyton.com
Steven M. Gombos – sgombos@ritzert-leyton.com
Richard Greener – rgreener@GreenerLaw.com
Christina Morrow – cmorrow@greenerlaw.com
Carolyn Baldino – cbaldino@GreenerLaw.com
Thomas J. Lloyd III – tlloyd@GreenerLaw.com

                _____/s/_____
                Eric B. Swartz

**DEFS.' REPLY TO REL. OPP. TO MOT. TO TRAN. VENUE AND DISMISS-17**