Eric B. Swartz, ISB No. 6396
JONES & SWARTZ PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808
Telephone:  (208) 489-8989
Email:eric@jonesandswartzlaw.com

Steven M. Gombos (*Admitted pro hac vice*)
RITZERT & LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, VA 22030
Telephone:  (703) 934-2660
Email: sgombos@ritzert-leyton.com

Attorneys for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* KATIE BROOKS and NANNETTE WRIDE, <br><br> Plaintiffs, <br><br> v. <br><br> STEVENS-HENAGER COLLEGE, INC., *et al.* <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:13-CV-00009-BLW <br><br> **DEFENDANTS' REPLY TO UNITED STATES' OPPOSITION TO MOTION TO TRANSFER VENUE AND DISMISS** |

COMES NOW Defendants Stevens-Henager College, Inc. ("SHC") and Center for Excellence in Higher Education, Inc. ("CEHE"), (collectively, "Defendants" or "Colleges"), by and through counsel, respectfully presenting the following Reply Brief to Plaintiffs' Opposition to Motion to Transfer Venue and to Dismiss (Doc. 110).

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 1**

## I.    POSTION STATEMENT

Overwhelming reasons exist to transfer this case based upon application of the factors mandated by the Ninth Circuit. Defendants' management and implementation of the compensation plan occurred from Utah. The number of witnesses, cost considerations, ability to compel testimony, and other factors strongly favor transfer. There is no real prejudice to the Government if the case is transferred. The affidavit offered is a transparent attempt to support Relators' forum-shopping.

Defendants' Motion to Dismiss exemplifies the reasons to transfer now, early in the case. The only claim advanced by the Government is an alleged violation of the incentive compensation ban ("Ban").[1] This motion seeks to end this case. The Government seeks to avoid the plain language of the regulatory safe harbor at issue.[2] Simply put, compensation for a student's successful completion of a program (or one academic year) cannot violate the Ban. Suggestions that such payments were somehow disguised or improper are not supported with factual allegations. Instead, the Government's position evades the plain language of its own Safe Harbor by relying upon theories of qualification to participate in the plan and other factors not included in the Safe Harbor's plain language. Significantly, the Complaint does not allege compensation was made without reference to an actual student's completion of at least one academic year.

If the Court does not agree that the alleged conduct is protected by the Safe Harbor, the next question is whether the Complaint states a claim under the False Claims Act ("FCA"). It does not. Such determination necessarily hinges on precedent. The Government argues that the

---

[1] 20 U.S.C. § 1094(a)(20).
[2] The Safe Harbor appears at 34 C.F.R. § 668.14(b)(22)(ii)(E) (July 1, 2010) ("Safe Harbor").

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 2**

Tenth Circuit would follow the Ninth Circuit's decision in *Hendow*, but the Complaint does not allege sufficient certifications and materiality for FCA purposes. In addition, how can the Government really be prejudiced if the matter is transferred to a district court in the Tenth Circuit if it truly believes that existing precedent leads to the same result? Only Defendants are harmed by having to defend a claim in Idaho involving multiple years and potentially hundreds of employees as well as claims asserted by Relators.

## II.   ARGUMENT

**A.   Evaluation of the *Jones* Factors Shows Utah Is the Proper Venue.**

The Parties agree this Court should balance eight factors to determine whether to transfer this case to Utah pursuant to 28 U.S.C. § 1404(a). *Jones v. GNC Franchising, Inc.* 211 F.3d 495, 498 (9th Cir. 2000). The Government prefers to litigate this matter in the Ninth Circuit because it perceives it as more favorable to its claim. To avoid transfer, the Government disregards and minimizes facts favoring transfer.

Neither the Government's Opposition nor its supporting declaration indicate whether any investigation was done as to Defendants' substantial operations in Utah. No information about any investigation outside of Idaho is provided. This raises a concern that the Government "cherry-picked" information from its investigative file to avoid transfer. The Government certainly has not refuted Defendants' contention that its operations in Utah are far more substantial than Idaho with respect to the issues in this case.

Of compelling significance is the fact that decisions made regarding the compensation program at issue were implemented and managed from Utah. In addition, oversight of the plan was part of the management functions which have always been performed in Utah. Former and current witnesses involved in that decision-making process and management are predominantly

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 3**

in Utah. None are in Idaho. Moreover, former and current admissions consultants and managers who are located in Utah far outnumber those in Idaho. The eight *Jones* factors demonstrate transfer is appropriate.

### 1. Location Where Relevant Agreements Executed.

There is no dispute that relevant contracts were signed in Utah and none signed in Idaho. Juhlin Supp. Dec. ¶¶ 4-5, 18; Juhlin Dec. ¶¶ 20-35 (Doc. 100). The Government admits that the PPA signed in Utah is a significant contract. Gov't. Opp. at 29 (Doc. 110). The balance of the Government's argument is unrelated to where contracts were executed but devoted primarily to a self-serving and irrelevant statement of transactions it claims occurred in Idaho. *Id*. The Idaho location is not unique in using the subject compensation plan and the Government fails to address the fact that the few transactions it mentions as having relevance to the issue at hand (i.e., distribution of Procedure Directive 85R, calculation and execution of completion certificates, and payment of admission consultants) occurred in all the states where the Defendants' colleges operated, including Utah. Juhlin Supp. Dec. ¶ 29; Juhlin Dec. ¶¶ 39, 57-59.

### 2. State Most Familiar with Governing Law.

The Defendants and Government agree this factor is neutral.

### 3. Plaintiff's Choice of Forum.

The Government agrees that it is the real party in interest. Gov't. Opp. at 30 (Doc. 110). For that reason, Relators' choice of forum is not entitled to deference. The Government argues that it suffered damages and makes the erroneous assertion that two of Defendants' colleges (Stevens-Henager College and CollegeAmerica) had campus locations in Idaho in 2010. The Idaho Falls campus (CollegeAmerica d/b/a Stevens-Henager College) was not accredited and could not enroll students or disburse Title IV funds until May 2011. Juhlin Supp. Dec. ¶¶ 24-27.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 4**

Defendants terminated the compensation plan only two months after the Idaho Falls campus opened. *Id.* at ¶ 36. As a result, no student could have started and completed an academic year before July 1, 2011, when the Department eliminated the Safe Harbor.

### 4. The Parties' Contacts With the Forum.

The Government argues that the services company (CollegeAmerica Services, Inc. ("CASI")) operated primarily outside of Utah prior to December 31, 2012. Gov't. Opp. at 31 (Doc. 110). However, as explained in declarations, CASI has always provided its services to the Defendants' colleges from locations in Utah. Juhlin Supp. Dec. ¶¶ 21, 32-33, 35; Barney Dec. ¶¶ 8-22. This information clarifies the Government's apparent confusion about information Mr. Juhlin previously provided describing the centralized nature of administrative oversight and management, which occurs in Salt Lake City. *Id.*; *see also,* Juhlin Dec. ¶ 39 (Doc. 100). CASI became part of CEHE when the organization converted to nonprofit on December 31, 2012. Juhlin Supp. Dec. ¶ 21; Barney Dec. ¶ 8. The Government's position is mistaken. No Idaho Falls employee could have received a payment under the Safe Harbor. *See* Section A(3), *supra*; Juhlin Supp. Dec. ¶¶ 24-27, 39.

### 5. Contacts Relating to the Plaintiff's Cause of Action.

The Government urges the Court to ignore the centralized services and management process in Utah because it asserts Defendants operated in many states. Gov't. Opp. at 32 (Doc. 110). The compensation plan was managed primarily from Utah. Juhlin Supp. Dec. ¶¶ 20, 21-23, 31-35; Juhlin Dec. ¶¶ 39-47, 60-74, 85 (Doc. 100). The Government also disregards the fact Defendants initiated and made the payments from Utah. Juhlin Supp. Dec. ¶¶ 14-17. Further, the certifications alleged only occurred in Utah or Colorado, not Idaho. Defendants only submitted requests for financial aid funds from Utah and Colorado. Juhlin Dec. ¶¶ 60-68.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 5**

**6. Difference in Litigating Costs Between the Two Forums.**

The Government's cost calculations do not account for actual travel costs and focus only on lodging and per diem meals allowed for Government employees. Gov't. Opp. at 32-36 (Doc. 110). Governmental discounts for lodging and meals are not available to non-government witnesses. Defendants' Idaho-related travel costs would be significant. It is unlikely government representatives will be witnesses in this litigation.

**7. Ability to Compel Attendance.**

The Government concedes access to third-party witnesses in Utah. Gov't. Opp. at 36 (Doc. 110). It also concedes that it is not prepared at this time to identify witnesses for trial. *Id.* While the Government contends the most important witnesses are those who were trained on admissions practices and earned bonuses, such as campus directors and admissions consultants, it does not identify a single such witness. *Id.* at McKay Dec. (Doc. 110-9). Moreover, the Government contends that employee turnover at the Defendants' colleges is "extremely high." Gov't. Opp. at 37. Therefore, there would be many more former campus directors and admissions staff residing in Utah than in Idaho. Defendants' presence and business operations in Utah are larger than in any other states. Juhlin Supp. Dec. ¶¶ 20, 22-23, 30-35; Juhlin Dec. ¶¶ 69-74 (Doc. 100).

Agent McKay's declaration vaguely suggests that testimony from relevant employees is only available from third-party witnesses residing in Idaho. Gov't. Opp. (Doc. 110-9). This ignores the fact that *all* of the Defendants' college campuses have employees with titles such as admissions consultant, financial planner, director of admissions, and campus director. Juhlin Supp. Dec. ¶ 37. While the Government alleges it interviewed employees in Idaho, it provides no information regarding Utah. There are far more individuals in Utah with knowledge of

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS - 6**

discoverable information.  *See, id.* at ¶¶ 12-13, 20, 22-23, 30-35; Juhlin Dec. ¶¶ 69-74 (Doc. 100).  The Government encourages Relators' forum-shopping and wants to be in the Ninth Circuit.  This is particularly troubling because Relators live in Utah, were employed at the Provo, Utah campus, and received payments under the Safe Harbor in Utah.

        **8.  Access to Sources of Proof.**

The Government focuses only on documents in responding to Defendants' contention that the ease of access to proof favors Utah.  Gov't. Opp. at 37 (Doc. 110).  It provides no analysis as to the access to witnesses.  These employees, former employees, and students overwhelmingly reside in Utah.  Juhlin Supp. Dec. ¶¶ 12-13, 20, 22-23, 30-35; Barney Dec. ¶¶ 5-7, 9-22.

**B.**    **The Safe Harbor's Plain Language Permits Payments for Completion.**

The Safe Harbor is an express exception to the statutory prohibition against paying "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments."  Gov't. Opp. at 5 (Doc. 110) (*citing* 20 U.S.C. § 1094(a)(20)).  As an exception to the statutory language, the Government promulgated the Safe Harbor and allowed schools to make exactly such payments provided they were "based upon students successfully completing their educational programs or one academic year of their educational programs."  34 C.F.R. § 668.14(b)(22)(ii)(E) (July 1, 2010).

The Government did not include any other conditions in the Safe Harbor.  For instance, the plain language does not prohibit a school from (i) specifying individuals who could (or could not) participate, (ii) setting minimum requirements for those eligible to participate, or (iii) establishing and/or varying the amount of the payment(s) it made under the Safe Harbor.  Instead, it permits the payment of bonuses based upon specific students' actual completion.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 7**

The Government's Complaint fails as a matter of law because it nowhere alleges that Defendants made a payment for a student who did not complete at least one academic year. Instead, the Government quibbles with the fact that Defendants established minimum eligibility requirements and paid different amounts to employees. Yet its Safe Harbor does not preclude such activities. No underlying FCA liability arises because Defendants complied with the plain language of the Safe Harbor and paid an employee if (and only if) a student he/she enrolled completed the necessary credit hours.[3] To rule otherwise subjects participating institutions to crippling claims for damages and litigation expenses for following the plain language of a Safe Harbor, which could never be a knowing violation for FCA purposes.

**C.     The Tenth Circuit Would Not Follow *Hendow*.**

The Government argues that precedent in the Tenth Circuit is similar to the Ninth Circuit's decision in *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006). Gov't. Opp. at 11 (Doc. 110). It suggests the Tenth Circuit has "expressly approved" the *Hendow* court's determination that a school's promise to comply with the Ban is the *sine qua non* of federal funding. *Id*. at 13 (*citing United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211 (10th Cir. 2008)). The Government is wrong. This position obliterates the distinction between regulations which are conditions of participation and those which are conditions of payment.

---

[3] The decision to eliminate the Safe Harbor demonstrates that it was not written in the manner the Government now seeks to apply to it. Gov't. Opp. Brief at 7-9. That is, the Government believed, *after* implementing the Safe Harbor, that "'unscrupulous actors routinely rely upon these safe harbors to circumvent [the HEA].'" *Id.* at 7 (*quoting* 75 Fed. Reg. 34816, 34817 (June 18, 2010)). It then changed the language of the Safe Harbor to comply with its enforcement expectations, not by revising ambiguous language, but instead by *removing it altogether*. The Government therefore knows how to write language to effectuate its enforcement goals. Yet it now seeks to punish Defendants, who complied with the Safe Harbor's plain language, because in retrospect the Government does not believe they complied with some unstated and unwritten conditions about how to implement it. Such a position is improper and should be rejected.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 8**

However, the Government concedes that the *Conner* court's statement is dicta. Gov't. Opp. at 13. Because *Conner* deals with Medicare, not Title IV, that court's opinion included no analysis of the regulatory scheme underlying Title IV or the HEA. Without any explanation as to why the Ban is so integral to the Government's payment decisions, the *Conner* court explains why a distinction between conditions of participation and payment is appropriate for Medicare.[4] At most, *Conner* took notice of a Ninth Circuit decision about a different federal program. Lacking any discussion of the Title IV regulatory scheme in *Conner*, one cannot say that the Tenth Circuit "adopted" the Ninth Circuit's reasoning.

### 1. Compliance With the Ban Is Not a Condition of Payment.

If *Conner* had dealt with Title IV instead of Medicare and applied the same rationale, it would have arrived at the same result and recognized distinctions between conditions of participation and conditions of payment. Holding otherwise means that conditions of participation are conditions of payment and compliance with every regulation becomes necessary to validly receive funds. That is because, like Relators here, the Government could simply allege a regulatory violation occurred to state an FCA claim if this expansive interpretation of *Hendow* applies. But to prevail on its claim, the Government must prove that "the defendant has certified compliance with a statute or regulation *as a condition* to government payment." *Conner,* 543 F.3d at 1217 (internal quotations omitted) (emphasis in original). *Conner* sets forth a two-prong test to determine whether a certification is a condition of payment, so either (i) the

---

[4] The *Hendow* court's analysis of the issue seems to rest primarily on the observation that the Ban appears in statutory language, in a clarifying regulation, and also in the PPA. This repetition is not unusual in administrative practice and should not have been given undue weight by the court in lieu of a complete analysis of the overall regulatory scheme. The *Conner* court undertook this analysis in the Medicare context, but the Tenth Circuit has not done so for Title IV purposes.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS - 9**

certification itself states it is a condition of payment or (ii) the underlying statutory and regulatory provisions in fact condition payment on the express certification. *Id*. at 1218.

Much like the Medicare annual cost reports at issue in *Conner*, an analysis of the underlying statutory and regulatory scheme is required to determine whether the certification is a condition of payment. Here, the certification of compliance with the Ban, which appears in the Program Participation Agreement ("PPA"), contains no express language that subsequent payments are conditioned upon strict compliance. The Government does not credibly allege Defendants certified compliance with the Ban to receive any Title IV funds.

### 2. Title IV Has the Same Attributes as the Medicare Scheme in *Conner*.

Properly distinguishing conditions of participation from conditions of payment avoids undermining the government's administrative scheme to ensure compliance. *Conner,* 543 F.3d at 1220. Contrary to the Government's position, if the differences between conditions of participation and payment are "distinctions without a difference," FCA liability attaches every time an entity's regulatory compliance is less than perfect. This result frustrates the underlying regulatory scheme, whether for Medicare, Title IV, or any similar programs. Such schemes also ensure that compliance, whether in the fields of healthcare, education, or otherwise, is determined by subject matter experts. As the *Conner* court observed, "courts are not the best forum to resolve medical issues concerning levels of care." 543 F.3d at 1222 (*quoting Mikes v. Straus*, 274 F.3d 687, 701-02 (2d Cir. 2001)). The same applies for resolving concerns about regulatory compliance ensuring quality educational programs.[5]

---

[5] In its Complaint, the Government repeatedly asserts that the Ban relates to these very issues, including the quality of enrolled students and overall "program quality." Doc. 41 at ¶¶ 7, 40. Though the Government repeatedly references unqualified students, it does not provide any required Rule 9(b) details to support such allegations.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 10**

Because *Conner* was not about Title IV, that court received no briefing on that regulatory scheme. That court noted a false distinction made in *Hendow* that Medicare differs from Title IV because only Medicare has a scheme of regulatory compliance that is "ensured by peer review and extensive monitoring." *Id*. at 1222 (*citing Hendow*, 461 F.3d at 1177). But Title IV institutions *are* subject to peer review and extensive onsite inspection by governmental and quasi-governmental regulators, just like their counterparts in Medicare. *See infra.*

The *Conner* court took notice of Medicare's "complex monitoring and remedial scheme that ends Medicare payments only as a last resort." 543 F.3d at 1222. Similarly, Title IV provides an array of regulatory enforcement tools to resolve non-compliance through the administrative processes. *See, e.g.,* 34 C.F.R. Part 668, Subparts F and H. The government can also terminate institutional Title IV eligibility as a last resort if an institution violates a statute or regulation. 34 C.F.R. § 668.86(a)(i)-(ii).

Hospitals seeking the initial right to participate in Medicare are subject to inspections by private accreditation organizations. *Conner,* 543 F.3d. at 1220. Once accredited, a hospital remains subject to periodic government validation surveys as part of random surveys or based upon specific allegations of noncompliance. *Id.*

As a condition of initial eligibility, Title IV schools must become accredited by an agency recognized by the Secretary of Education. 34 C.F.R. §§ 600.4(a)(5), 600.5(a)(5)(B)(2), 600.6(a)(5). Obtaining and maintaining accreditation requires submission of a comprehensive self-study as well as onsite visits by peers. *See, e.g.,* Doc. 52-3 at 20-25. Accreditation site visits utilize peer review because visiting team members possess relevant experience. *Id.* at 23.

Title IV institutions must also be authorized to provide a program of postsecondary education by states in which they operate. 34 C.F.R. §§ 600.4(a)(4), 600.5(a)(4), 600.6(a)(3).

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 11**

Title IV institutions are subject to onsite reviews conducted by state licensing authorities, typically through subject matter experts.  *See, e.g.,* IDAPA 08.01.11.302.01 (2014); Utah Code § 13-34a-305.

Under Title IV, the Department of Education ("Department"), accrediting commissions, and state agencies make up an enforcement "triad."  Just like Medicare participants, Title IV schools are subject to peer review and extensive monitoring by states and outside agencies.  The Department also conducts regular onsite program reviews of institutions.  20 U.S.C. § 1099c-1.

The Government may, at its discretion, terminate a Medicare participation agreement upon a finding of substantial noncompliance.  *Conner*, 543 F.3d. at 1221.  Similarly, the Government may limit, suspend, or terminate a school's PPA for violating statutory or regulatory participation requirements.  34 C.F.R. Part 668, Subpart G.  The discretion provided in the regulatory schemes of both Medicare and Title IV reflects detailed administrative mechanisms for managing program participation.  *Conner*, 543 F.3d. at 1221.  For the same reasons the Tenth Circuit concluded that a provider's express certification in its Medicare cost agreement was an assurance of continued compliance with conditions of *participation*, the certifications contained in the PPA should also be viewed as assurances of continued compliance with conditions of participation and not *absolute conditions to each and every payment*.  *Id.*

### 3. Past Practices Show Compliance With the Ban Is Not a Condition of Payment.

The Government repeatedly alleges Defendants enrolled unqualified students without providing any facts as required by Fed. R. Civ. P. 9(b).  *See, e.g.,* Gov't. Opp. at 3, 8-9, and 19 (Doc. 110).  Despite numerous references to unqualified students and submission of a declaration

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 12**

from its Agent McKay, the Government never identifies a single such student or any factual basis to suggest employees enrolled unqualified students to obtain money. *Id.* at Doc. 110-9.

In 2010, Government Accountability Office ("GAO") audits indicated that between 1998 and 2009 the Department found that 32 schools violated the Ban. GAO-10-370R (February 2010) at 4 (Ex. A to Def. Req. for Judicial Notice). Significantly, during that same time period, "[The Department] resolved most incentive compensation cases by requiring corrective actions or reaching settlement agreements, and did not limit, suspend, or terminate any school's access to financial aid." GAO-11-10 (October 2010) at 3 (Ex. B to Def. Req. for Judicial Notice).

Further, the Department only imposed fines against two schools and only found one school liable for the return of Title IV funds. *Id.* at 30. In six other cases, the Department took no action. *Id.* If compliance with the Ban were, in fact, the *sine qua non* of Title IV payments, how could all 32 schools named in the GAO report escape termination? And how could only one of the schools be liable for the repayment of Title IV funds? It defies common sense to believe that perfect compliance with the Ban was a condition of payment when no action was taken to limit, suspend, or terminate access to Title IV funds for 32 institutions that violated the regulation.

### 4. Title IV Funding Requests Include Express Conditions of Payment.

Given the request to transfer venue, this Court should not overlook, as the *Hendow* court did, the actual and express conditions of payment which exist within Title IV. The Government enacted Subpart K ("Cash Management") to "establish rules and procedures under which a participating institution requests, maintains, disburses, and otherwise manages title IV, HEA program funds." 34 C.F.R. § 668.161(a). Subpart K regulations govern an institution's requests

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 13**

for and management of Title IV funds and constitute conditions of payment. Nothing in Subpart K requires a certification of compliance with the Ban to request (and obtain) funds.

Subpart K regulations specify detailed conditions an institution must satisfy before disbursing student loan or grant funds. These conditions relate to confirming (and certifying) students' eligibility to receive such funds. 34 C.F.R. § 668.164(b)(3). Institutions certify student eligibility prior to disbursing Title IV funds using the Common Origination and Disbursement system ("COD").[6]

The obligation to confirm *student* eligibility and update payment records electronically in COD  replaced a prior written certification which was required when Title IV awards were paper-based. *See, e.g.,* Stafford Loan School Certification (Ex. C to Def. Req. for Judicial Notice). Under neither scenario was a school required to re-certify, as a prerequisite to receiving payments or making disbursements, compliance with the Ban or any other facet of institutional eligibility. That is so because compliance with the Ban (and other regulations regarding institutional eligibility) was a condition of ongoing participation and *not* a condition of payment.

D.     *Hendow*'s Expansive View Encourages Overreaching.

The Government asserts that the *Hendow* decision leaves intact the materiality element of FCA liability. Gov't. Opp. at 15 (Doc. 110). Yet it simultaneously argues that *Hendow* was correct in holding that all the PPA's terms, including the Ban, constitute conditions of payment. *Id.* at 13. These positions cannot logically coexist. *Hendow* states, incorrectly, that in the context of Title IV *all* conditions of participation are conditions of payment. 461 F.3d at 1176. The obliteration of the distinction between conditions of participation and conditions of payment

---

[6] Institutions must confirm information in COD before they can draw down funds through G5, the Department's electronic payment system. G5 funding draw downs are later reconciled against student records in COD.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 14**

makes any knowing (or even reckless) violation of every regulation material to payment decisions. If *Hendow* stands for this proposition, it is simply wrong. As reflected in *Conner*, the Tenth Circuit would not adopt such reasoning.

Significantly, the Government acknowledges that the Fraud Enforcement and Recovery Act of 2009 ("FERA") expressly incorporates materiality as a required element of proof to establish an actionable false claim. Gov't. Opp. at 15. FERA's enactment calls into question the continued viability or scope of the *Hendow* court's reasoning that in Title IV all conditions of participation are conditions of payment. If so, all that a *qui tam* relator need allege is that a regulatory violation occurred and the materiality element is met because regulatory compliance is the "'*sine qua non*' of federal funding" in that if the school "had not agreed to comply [with the PPA's terms], it would not have gotten paid." *Id.* at 12. The express terms of the PPA broadly require that a school comply with *all* statutory and regulatory provisions prescribed under Title IV. Doc. 41 (Exhibit A). The *Hendow* decision effectively disregards the materiality element and contradicts the express intent of Congress in enacting FERA.[7] In this case, given the plain language of the Safe Harbor, there is no factual basis to establish a knowing violation of a material certification to a condition of payment.

E.    **The Government Does Not Establish a False Claim in Connection to the Ban.**

In an attempt to manufacture false claims for payment, the Government alters and mischaracterizes documents that it claims contain Defendants' express false certifications. This is a deliberate attempt to mislead the Court. The Government asserts that PPAs, Required Management Assertions ("RMA"), G5 Certifications, Master Promissory Notes ("MPN"), and

---

[7] Relators' SAC highlights this very circumstance because it alleges FCA liability exists by dint of Defendants' purported violation of (i) 90/10 regulations and (ii) regulations related to accreditation requirements.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS - 15**

other "School Certifications" constitute false claims for payment based on a compensation plan which allegedly violates the Ban.[8]  Complaint ¶ 100 (Doc. 110); *see also,* Def. Reply to Rel. Opp. at 9-10.

As the Government's theory of recovery is based entirely on alleged violations of the Ban, it is critical to note that for both the Federal Direct Loan Program ("FDLP") and the Federal Family Education Loan Program ("FFELP") the institution *is not a party* to the MPN.  *See* 34 C.F.R. § 682.102(a).  For both FDLP and FFELP, the borrower and the lender agree to the MPN's terms.  *See, e.g., id.*  Institutions make no certifications whatsoever as part of the MPN because they are not parties to that document.  Instead, institutional responsibility in this area begins and ends with ensuring the existence of an executed MPN before disbursing loan funds.

The origination of a loan by a FFELP lender only required that an institution certify the *student's* eligibility for the loan.  34 C.F.R. § 682.102.  No actual certifications refer to the Ban.  *See,* Exhibit C to Def. Req. for Judicial Notice.  Indeed, these certifications are completely silent as to the institution's regulatory compliance.

FFELP was phased out on June 30, 2010.  Pub.L.111-152.  After that date, all Title IV Stafford loans originated through the FDLP, which does not require any express certification of student eligibility.  Instead schools are directed to confirm student eligibility when entering information into COD.  Federal Student Aid Bluebook at 3-43 (Ex. D to Def. Req. for Judicial Notice).  At no point in the FDLP origination process does an institution certify compliance with the Ban.

---

[8] The Government's Complaint in Intervention fails to state what these other "School Certifications" might be or provide any representative examples.  *See, e.g.,* Doc. 110 ¶ 100.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 16**

The suggestion that the G5 certification relates back to the PPA, thus implying a certification of compliance with the Ban is a substantial mischaracterization.  Similar to Relators, the Government attempts to rewrite the G5 certification to create a plausible interpretation favorable to their claim.  *See* Def. Reply to Rel.  Memo in Opp. at 10-11.  The Government represents the certification reads:

> [B]y processing this payment request . . . the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement.

ECF Doc. 52 at ¶ 50.

The actual language of the certification is:

> I certify, by processing this payment request and/or re-allocation, that the funds are being expended within three business days of receipt for the purpose and condition of the agreement.

Doc. 52-2.

The Government, unlike the Relators, did not delete the direct reference in that certification to the "excess cash" rule, which requires that funds drawn down be expended within three business days.  34 C.F.R. § 668.166(a).  Yet the Government did choose to insert "PPA" before the word "agreement" and to pluralize "condition," so as to falsely imply that each and every condition in the PPA is incorporated into the G5 certification.  Such revisions to the plain language is necessary to support the Government's theory  because the actual language, referring to the Cash Management regulations, are the only agreed upon "condition" and "agreement" at issue in the G5 certification.  The certification's language, despite the Government's tortured attempts to demonstrate otherwise, is simply not a certification of compliance with the Ban.  Rather, the G5 system is a fiscal management tool, not a tool for confirming day-to-day compliance with regulations.

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 17**

### III. CONCLUSION

For the foregoing reasons, the case should be transferred as requested, or dismissed with prejudice.

Dated this 22nd day of December, 2014.

                                                           JONES & SWARTZ PLLC
                                                           _____/s/ Eric B. Swartz_____
                                                           Counsel for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

                                                           RITZERT & LEYTON, P.C.

                                                           _____/s/ Steven M. Gombos_____
                                                           Counsel for Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; Center for Excellence in Higher Education, Inc.; and Carl Barney

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 18**

**Certificate of Service**

   I certify that I will/have electronically file(d) the foregoing with the Clerk of the Court using the CM/ECF system this December 23, 2014:

Eric B Swartz – eric@jonesandswartzlaw.com
Amy S. Howe – Amy.Howe@USDOJ.gov
John N. Zarian – jzarian@parsonsbehle.com
Brandon J. Mark – bmark@parsonsbehle.com
Alissa M Mellem – AMellem@parsonsbehle.com
Joseph Stultz - jstultz@parsonsbehle.com
A. Dean Bennett – adbennett@hollandhart.com
Eric G Maxfield – EGMaxfield@hollandhart.com
Gerald Ritzert – gritzert@ritzert-leyton.com
Steven M. Gombos – sgombos@ritzert-leyton.com
Richard Greener – rgreener@GreenerLaw.com
Christina Morrow – cmorrow@greenerlaw.com
Carolyn Baldino – cbaldino@GreenerLaw.com
Thomas J. Lloyd III – tlloyd@GreenerLaw.com


                _____/s/_____
                Eric B. Swartz

**DEFS.' REPLY TO U.S. RESP. IN OPP. TO MOT. TO TRANSFER AND DISMISS  - 19**