UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

UNITED STATES OF AMERICA ex rel.
KATIE BROOKS and NANNETTE
WRIDE,

      Plaintiffs,

      v.

STEVENS-HENAGER COLLEGE,
INC., a Utah corporation; CALIFORNIA
COLLEGE SAN DIEGO, INC., a Utah
corporation; COLLEGEAMERICA
DENVER, INC., a Colorado corporation;
COLLEGEAMERICA ARIZONA, INC.,
a Colorado corporation; CENTER FOR
EXCELLENCE IN HIGHER
EDUCATION, INC., an Indiana
corporation; CARL BARNEY, an
individual; SHAW, MUMFORD & CO.,
P.C., an expired Utah professional
corporation; SHAW & CO., P.C., a Utah
professional corporation;
PRICEWATERHOUSECOOPERS LLP,
a Delaware limited liability partnership;
and DOES 1-500, inclusive,

      Defendants.

Case No. 1:13-cv-00009-BLW

**MEMORANDUM DECISION &
ORDER**

**INTRODUCTION**

Pending before the Court is Defendants Stevens-Henager College, Inc., California College San Diego, Inc., College America Denver, Inc., College America Arizona, Inc., Center for Excellence in Higher Education, Inc., and Carl Barney's motion to transfer venue to the District of Utah. (Dkt. 101). Alternatively, these defendants ask the Court to dismiss this case pursuant to Federal Rules of Civil Procedure 9(6) and 12(b)(6). *Id.* Defendants Shaw Mumford & Co., P.C. and Shaw & Co, P.C. join in the transfer motion. (Dkt. 107). For the reasons explained below, the Court will grant the motion to transfer.

**BACKGROUND**

In January 2013, relators Katie Brooks and Nannette Wride sued four colleges on behalf of the United States government: (1) Stevens-Henager College, Inc., (2) California College San Diego, Inc., (3) CollegeAmerica Denver, Inc., and (4) CollegeAmerica Arizona, Inc. Brooks and Wride allege that these colleges made false claims and statements in order to participate in federal financial aid programs, thus violating the federal False Claims Act (FCA), 31 U.S.C. §§ 3721-33. *See Compl.*, Dkt. 1. Brooks and Wride later amended their complaint to name additional defendants, including individual defendant Carl Barney, corporate defendant Center for Excellence in Higher Education, Inc., and three auditing firms: Shaw Mumford & Co., P.C., Shaw & Co, P.C, and PricewaterhouseCoopers, LLP. The amended complaint also expanded the scope of their FCA claims against the schools. *See Second Am. Compl. (SAC)*, Dkt. 86.

In April 2014, the United States intervened in a portion of the claims against two

of the nine defendants: Stevens-Henager College, Inc. and Center for Excellence in

Higher Education, Inc. *See Intervention Compl.,* Dkt. 41. Before detailing the

government's and relators' more specific allegations, the Court will provide some

background information on the FCA and Title IV of the Higher Education Act, 20 U.S.C.

§§ 1070-99.

**1.      False Claims Lawsuits Against For-Profit Colleges**

        The FCA imposes civil liability on a party who "knowingly presents, or causes to

be presented, a false or fraudulent claim for payment or approval" or "knowingly makes,

uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim" paid by the government. *See* 31 U.S.C. § 3729(a)(1) (A) and (B).

Realistically, the government cannot discover and prosecute all FCA violations, given

that "[f]raud permeates generally all Government programs . . . ." *See* S. Rep. No. 99–

345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5267. Accordingly, the FCA

provides a *qui tam* enforcement mechanism, which allows private parties (relators) to sue

on the government's behalf. *See* 31 U.S.C. § 3730(b).

        The *qui tam* statute incentivizes whistleblowing by allowing relators to keep a

share of the proceeds from judgment or settlement in their cases – as much as 30 percent

of the total to which the United States is entitled. *See* 31 U.S.C. § 3730(d)(1) and (2). By

offering "private relators bonanzas for valuable information," *United States ex rel.

Chovanec v. Apria Healthcare Group, Inc.*, 606 F.3d 361, 364 (7th Cir. 2010), Congress

ensured robust enforcement of the FCA's goal of rooting out fraud.

In recent years, numerous FCA lawsuits have been filed against for-profit colleges. In what is becoming a typical fact pattern, the relators are former employees who worked in the college's admissions office. These employees – called "admissions consultants" in this case – will typically say that the school paid them hefty bonuses simply for enrolling students. The problem with this practice is that schools receiving federal funding under Title IV of the Higher Education Act are banned from offering recruiters financial incentives for enrolling students. This ban, known as the "incentive-compensation ban," is codified at 20 U.S.C. § 1094(a)(20).[1] *See also* 34 C.F.R. § 688.14(b)(22). The incentive-compensation ban is meant "to curb the risk that recruiters will 'sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans." *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1168-69 (9th Cir. 2006) (quoting *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (Easterbrook, J.)). For-profit schools, in particular, are seen as being more likely to violate the ban; after all, a for-profit school is incentivized to make money, and one obvious way to make money is to enroll more students, without regard to whether the student will benefit from the educational services provided. *See generally* Gayland O.

_____

[1] As codified, the ban prohibits schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, . . . ." 20 U.S.C. § 1094(a)(20).

Hethcoat II, *For-Profits Under Fire: The False Claims Act as a Regulatory Check on the For-Profit Education Sector,* 24 Loy. Consumer L. Rev. 1, 18 (2011) (for-profit schools "cater to the very students that public and private nonprofit institutions often determine are unqualified to attend their institutions, and for-profits are also generally removed from pressures such as institutional rankings").

In many lawsuits against for-profit colleges, plaintiffs will proceed under a "false-certification" theory. *See id.* (*citing Hendow*, 461 F.3d at 1171). As its name suggests, these plaintiffs will allege that the school falsely certified compliance with the incentive-compensation ban. These certifications are allegedly made in the schools' "Program Participation Agreements" (PPAs). Schools must enter into PPAs with the government if they wish to receive federal funds under Title IV of the Higher Education Act. And within these PPAs, the schools "must agree to abide by a panoply of statutory, regulatory, and contractual requirements" – including the incentive-compensation ban. *Hendow,* 461 F.3d at 1168. The courts that have adopted false-certification theories generally recognize that "[i]f a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Main*, 426 F.3d at 916.

In *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006), the Ninth Circuit embraced the false-certification theory of liability in an educational setting, following the Seventh Circuit's lead in *United States ex rel. Main v. Oakland City University*, 426 F.3d 914, 916 (7th Cir. 2005). *See also Ebeid ex rel.*

*United States v. Lungwitz,* 616 F.3d 993, 998-99 (9th Cir. 2010). The parties dispute

whether the Tenth Circuit would apply a false-certification theory of liability in this case.

*See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220

(10th Cir. 2008). Given its intended ruling on this motion – which is to transfer the case

to a district court within the Tenth Circuit – the Court will not weigh in on this dispute.

**2.      The Factual Allegations in this Case**

The factual allegations in this case generally follow the framework described

above. Relators Katie Brooks and Nannette Wride worked as admissions consultants at

defendant Stevens-Henager's Orem, Utah campus during 2009 to 2011. They say that

the school paid them bonuses for enrolling students – in violation of the incentive-

compensation ban. Relators further allege that this practice was implemented at all

defendants' schools, not just at the Orem campus where they worked.

Relators also allege two other types of misconduct. First, they allege that the

schools falsely certified compliance with the so-called "90-10 rule." This rule requires

for-profit schools to obtain at least 10% of their revenue from non-government sources.

*See* 20 U.S.C. § 1094(a)(24). Second, relators allege that the schools gave false

information about faculty qualifications, attendance-taking practices, and student

academic performance to an accrediting body. *See SAC*, Dkt. 86, ¶¶ 425, 430.

According to relators, the Department of Education then relied on the schools'

accreditation to determine that they were eligible to participate in Title IV programs. *Id.*

As described above, the relators' theory is that the schools knew they were

violating the incentive-compensation ban and other applicable statutes and regulations, but nonetheless falsely certified to the government that they were in compliance with applicable statutes and regulations.

Finally, the relators implicate the schools' financial and compliance auditors in the alleged fraud. Relators accuse the auditors of falsely representing that they performed their audits within "applicable standards and guidelines," thus inducing the Department of Education to make the schools eligible to participate in Title IV programs. *Id.* ¶ 412; *see also id.* ¶¶ 421, 438, 445.

As mentioned above, the government intervened in a relatively small portion of relators' claims. The government alleges claim against just two of the nine defendants (again, Stevens-Henager College, Inc. and Center for Excellence in Higher Education, Inc.). The government's allegations are limited to violations of the incentive-compensation ban; it did not intervene in claims related to the other allegedly improper practices, nor did it allege claims against the auditors. Finally, the government's claims are limited to a four-year period (July 2007 to July 2011) as opposed to the more than ten-year year period the relators allege.

## ANALYSIS

Eight of the nine defendants ask the Court to transfer this case to the District of Utah pursuant to 28 U.S.C. § 1404. Section 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

When considering a motion to transfer venue under this section, a court must weigh

multiple factors, which could include, but are not limited to, the following:

(1)     the location where the relevant agreements were negotiated and
        executed;

(2)     the state that is most familiar with the governing law;

(3)     the plaintiff's choice of forum;

(4)     the respective parties' contacts with the forum;

(5)     the contacts relating to the plaintiff's cause of action in the
        chosen forum;

(6)     the ease of access to sources of proof;

(7)     the differences in the costs of litigation in the two forums; and

(8)     the availability of compulsory process to compel attendance of
        unwilling non-party witnesses.

*Jones v. GNC Franchising, Inc*., 211 F.3d 495, 498-99 (9th Cir. 2000) (citing *Stewart*

*Org. v. Ricoh Corp*., 487 U.S. 22, 29 (1988)). This balancing test is completed on a case-

by-case basis, with different weight afforded to each of the elements in accordance with

the unique circumstances of each case. *Id.* While district courts are given broad

discretion in deciding whether a transfer is appropriate, the moving party bears the

burden of showing why a transfer is merited. *Commodity Futures Trading Comm'n v.*

*Savage*, 611 F.2d 270, 279 (9th Cir. 1979). The Court will examine each of these factors.

**1.  The Relevant Agreements**

        The first factor – where the relevant agreements were negotiated and executed – is

more relevant in a contract case. In a fraud case such as this, it is more useful to ask where the bulk of the claim arose. *Cf. Allen v. Scribner,* 812 F.2d 426 (9th Cir. 1987). Put differently, the Court should determine where the "crux of the case" lies. *See Jovel v. i-Health, Inc.*, No. cv-12-05526 DDP, 2012 WL 5470057, at *6 (C.D. Cal. Nov. 8, 2012).

In any given fraud case, there may or may not be relevant agreements and if there are, the significance of those agreements will depend upon the facts. As will be explained further below, the PPAs and other documents are significant in this case, because plaintiffs allege that within these documents the defendants falsely certified that they were in compliance with various statutes and regulations, including the incentive-compensation ban. But under the circumstances of this case, figuring out where these agreements were negotiated and executed is not particularly illuminating – primarily because they were executed in various locations. Granted, none were negotiated, executed, or sent from Idaho, and that fact is somewhat telling, as will be discussed further below. But to pinpoint the location of the alleged fraud, it is more useful to ask basic questions about various aspects of defendants' business that are at issue in this case, beginning with these: Where are the college campuses located? Which colleges enrolled the most students? Which colleges employed the greatest number of admissions consultants? Which colleges certified compliance with applicable statutes and regulations? Which colleges received Title IV funds?

Defendants have presented evidence demonstrating that they conduct the bulk of their business in Utah. In contrast, they have a relatively minor presence in Idaho. Thus,

the Court is ultimately not persuaded by relators' argument that "Idaho has at least as strong a connection to the underlying claims as Utah." *Response Br.*, Dkt. 113, at 21.

Collectively, defendants have established seven campuses in Utah, four in Colorado, three in California, three in Idaho, two in Arizona, and one in Wyoming, as follows:[2]

| Corporate Defendant | Campuses Established |
|---|---|
| **Stevens-Henager College, Inc.,** a Utah corporation with its principal place of business in Murray, Utah | (1) Ogden, Utah – main campus<br>(2) Provo/Orem, Utah – branch campus<br>(3) Salt Lake City/Murray, Utah – branch campus<br>(4) Logan, Utah – branch campus<br>(5) St. George, Utah – branch campus<br>(6) Layton, Utah – satellite of the Ogden campus<br>(7) Lehi, Utah – branch campus<br>(8) Boise, Idaho – branch campus<br>(9) Nampa, Idaho – satellite of the Boise branch |
| **California College San Diego, Inc**., a Utah corporation with its principal place of business in Salt Lake City, Utah | (1) San Diego, California – main campus<br>(2) San Marcos, California – branch campus<br>(3) National City, California – satellite of the San Diego campus |
| **CollegeAmerica Denver, Inc.,** a Colorado corporation, with its principal place of business in Denver, Colorado | (1) Denver, Colorado – main campus<br>(2) Fort Collins, Colorado – branch campus<br>(3) Colorado Springs, Colorado – branch campus<br>(4) Colorado Springs (South), Colorado – satellite of the Colorado Springs branch<br>(5) Cheyenne, Wyoming – branch campus |
| **CollegeAmerica Arizona, Inc.,** a Colorado corporation with its principal place of business in Flagstaff, Arizona | (1) Flagstaff, Arizona – main campus<br>(2) Phoenix, Arizona – branch campus<br>(3) Idaho Falls, Idaho – satellite of the Phoenix branch |

---

[2] This table does not include Stevens-Henager's online university. *See Juhlin Dec.* ¶¶ 8-11. It does, however, include a Lehi, Utah campus. The relators' and the government's complaints both allege that Stevens-Henager has a Lehi campus, and Mr. Barney identifies this campus as well. *See SAC,* Dkt. 86, ¶ 22; *Intervention Compl.*, Dkt. 41, ¶ 16; *Barney Dec.,* Dkt. 133-2, ¶ 4.

Based on information provided by the parties, it appears that the Utah schools, collectively, enroll the greatest number of students, and that Idaho is a relatively minor player. For example, according to defendants' calculations (which plaintiffs do not challenge), from 2009 to present, between 43% and 65% of defendants' collective student body was enrolled in Utah schools. *Juhlin Dec.* ¶ 72. During this same time period, the percentage of students in Idaho schools fluctuated from a high of 10% in 2009 to a low of about 5% in 2014. *Id.* The government points out that the Boise campus had numerous "starts" in 2009, but this information is not placed in context, and thus has relatively little informative or persuasive value in terms of pinpointing the central location of defendants' business and of the alleged fraud. *See United States Response Br.*, Dkt. 110, at 32.

Further, it appears likely that more admissions consultants worked in Utah than in any other state. As an example, defendants say that during 2010 and 2011, roughly 50% of the schools' admissions consultants worked in Utah. During that same time period, Idaho schools employed between three and five percent of the schools' admissions consultants. *Juhlin Dec.* ¶ 71.

Of course this does not end the inquiry, because simply paying admissions consultants to recruit students does not violate the FCA unless the defendants told the government that they were not making these types of payments. This is where, according to plaintiffs' theory, the PPAs and other documents become relevant. The parties have submitted a wealth of information about where some (but not all) of these documents were signed. The defendants stress the fact that none of these documents was signed in

Idaho, or transmitted to the Department of Education from Idaho. But in this particular case, the Court finds the more pertinent question regarding the PPAs is to simply ask which schools provided the certifications to the government – regardless of where those certifications were physically signed. Plaintiffs allege that each school submitted such certifications. So this again leads back to the information discussed above: Defendants' largest presence is in Utah, which means that, comparatively, most of the PPAs at issue will relate to Utah schools. Additionally, in terms of sheer numbers, there will be more certifications at issue for Utah schools, as compared to the Idaho schools, given that four of the seven Utah schools (Ogden, Salt Lake City/Murray, Provo/Orem, and Logan) have been operational since before 2002, which is the beginning of the relevant time period. *Barney Dec.*, Dkt. 133-2, ¶ 4. None of the Idaho schools has been open since 2002. Rather, the Boise campus opened in 2004 and the Idaho Falls campus opened in 2010 or 2011. *See id.*; *Juhlin Supp. Dec.,* Dkt. 132-1, ¶ 24; *Stultz Dec.*, Dkt. 113-1, ¶¶ 7-8, 31. The parties have not given specific information on Nampa, other than to describe it is a "satellite" of the Boise campus, which presumably means it opened in 2004 or later. *See Juhlin Dec.*, Dkt. 100, ¶ 8.

Determining where the federal money ultimately landed is also relevant in terms of determining the location of the fraud. Defendants have provided information for the period 2008 to 2011. They say that during this time, Utah schools received 39% of the Title IV funds for the whole system, while the Idaho schools received about 10%. *See Juhlin Supp. Dec.*, Dkt. 132-1, ¶ 22.

Turning to the claims related to the auditors, the Court finds that this factor points to Utah more than any other place. *See Juhlin Dec.* ¶¶ 48-56. The two Shaw defendants are located in Bountiful, Utah and PricewaterhouseCoopers is a Delaware limited liability company. Other auditors who have not been named as defendants were located in California. *See id.* ¶¶ 49, 50, 53. But, once again, the Court finds it more informative to ask which schools were being audited, and where those schools were operating.

Finally, the Court will observe that the parties' disputes as to some of the finer points are not particularly significant in terms of determining where the fraud occurred. As an example, the parties dispute where defendants' payroll servicer is located. (Defendants say Utah; Relators say Florida. *See Relators' Response Br.,* Dkt. 113, at 22; *Defendants' Reply,* Dkt. 132, at 6.) Although this sort of information might be significant in another case, it is not particularly helpful in determining where this case is centered. As noted above, the key facts here are where, physically, the schools were operating and receiving federal funds based on certifications that they were complying with applicable federal law.

Based on all the above information, the Court concludes that Utah is the center of gravity for this lawsuit. A majority of material events occurred in Utah, while activity in Idaho was relatively minimal. Thus, the Court determines that this factor weighs heavily in favor of transferring the case to the District of Utah. *Cf. United States v. Kellogg Brown & Root Servs., Inc.*, 2013 WL 5888302 (C.D. Ill. Nov. 4, 2013) ("The fact that a clear majority of material events did *not* occur in the [Eastern District of Virginia]

*against* transferring this case there.") (emphasis added).

## 2.     Familiarity with the Governing Law

The second factor – familiarity with governing law – is neutral as this case deals with federal law. The Court is not persuaded by relators' argument that this factor weighs against a transfer because Tenth Circuit law on point is described as being less developed than Ninth Circuit law. *See Relators' Response,* Dkt. 113, at 14-15. At least one other district court rejected a similar argument, stating:

> All federal courts handle ERISA cases; the suggestion that the District of Minnesota is a less appropriate forum for this action because it lacks the experience in ERISA matters of the courts in this circuit is both an affront to that court and an illusion to be ignored.

*Cargill Inc. v. Prudential Ins. Co.*, 920 F. Supp. 144, 148 (D. Colo. 1996). If anything, relators' argument on this point lends some weight to defendants' assertion that relators were forum shopping when they chose to file in Idaho. Regardless, the Court concludes that this factor is neutral.

## 3.     Plaintiff's Choice of Forum

The third factor – the plaintiff's choice of forum – weighs against a transfer. The Court will not accord much weight to the relator's choice of forum, as they have no contacts with Idaho and they are not the real party in interest. Rather, the real party in interest in this case is the United States. *See, e.g. United States ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 720 (9th Cir. 1994) ("in a *qui tam* action, the government is the real party in interest"). The government's choice of forum in a *qui tam* action would thus prevail over the relators' choice. In this case, the government did not disturb

relators' choice of forum when it intervened.

In judging the weight to be accorded plaintiffs' choice of forum, consideration must be given to the extent of the parties' contacts with the forum, including those relating to the claims alleged in the complaint. *See generally Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968). If operative facts have not occurred within the forum and the forum has no particular interest in the parties or subject matter, plaintiffs' choice is entitled to only minimal consideration. *Id.*

In this case, some operative facts allegedly occurred in Idaho. But as discussed above, the size and significance of defendants' relevant operations in Idaho pales in comparison to their Utah operations. *Cf. Lou v. Belzberg,* 834 F.2d 730, 739 (9th Cir. 1987) (plaintiff's choice of forum is given less weight when plaintiff brings a derivative suit or represents a class and where operative facts have not occurred within the forum). Regardless, the Court will weigh this factor in plaintiffs' favor because even though most of the operative facts occurred elsewhere, several of the defendants still had significant contacts with Idaho. The Court will therefore accord deference to the government's choice of forum. As a result, defendants must make a strong showing of inconvenience to warrant upsetting this choice. *See Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

**4.      The Parties' Contacts with the Forum**

The fourth factor focuses on the parties' contacts with the forum. *Jones,* 211 F.3d at 498. This factor weighs in favor of a transfer, primarily because the parties have so

many more contacts with Utah than they do with Idaho.

Relators do not allege any personal contacts with Idaho. They have significant contacts with Utah, however. They both reside there and they worked at Steven-Henager's Orem, Utah campus.

Several of the defendants have contacts with Idaho. Three of the defendants (Stevens-Henager, CollegeAmerica Arizona, and now the Center for Excellence) have operated, or currently operate, schools in Idaho. Additionally, the auditors performed audits for Idaho schools. But as has been discussed at some length above, the defendants' contacts with Utah are far more substantial, based on the size of defendants' Utah operations as compared to their Idaho operations.

Relators point out that in unrelated cases defendants have litigated in Idaho, and that some of defendant's representatives have traveled to Idaho on other business. In context, the Court does not find that these contacts significantly impact the venue analysis. As this Court observed in *Doolittle v. Structured Invs. Co.,* LLC, No. CV-07-356-S-EJL-CWD, 2008 WL 5121591 (D. Idaho 2008), "the Court must analyze how the cause of action relates to the chosen forum, and how the parties' contacts with the forum relate to the issues the Court must decide. Mere travel to the forum, without more, is not part of the *Jones* analysis." *See also Italian Colors Rest. v. Am. Express Co.*, No. C-03-3719-SI, 2003 WL 22682482, at *5 (N.D. Cal. 2003) (discounting the fact that the defendant was a party to lawsuits in the forum in unrelated lawsuits for purposes of determining venue).

**5.**     **The Contacts Relating to the Plaintiff's Cause of Action in the Chosen Forum**

In this case, discussion of the fifth factor – contacts relating to the plaintiff's cause of action in the chosen forum – is subsumed within the discussion of factor one, which ultimately dealt with pinpointing the central location of the alleged fraud.

**6.**     **Ease of Access to Sources of Proof**

The sixth factor deals with ease of access to sources of proof, which will include witnesses and documents.

**a.**     **Witnesses**

Turning first to witnesses, the parties concede that at this early stage it will be difficult to identify witnesses with precision.  Nevertheless, the record suggests that a majority of likely witnesses probably will be found in Utah.

Preliminarily, most of the individuals specifically identified in the relators' complaint reside in Utah.  *See Juhlin Dec.*, Dkt. 100, ¶ 94.  These individuals allegedly held the following positions at Stevens-Henager's Orem, Utah campus:  (1) Relator <u>Katie Brooks</u>, admissions consultant; (2) Relator <u>Nannette Wride</u>, admissions consultant and executive assistant; (3) <u>Jesse Hafen</u>, Director of Admissions;[3] (4)  <u>Ken Plant</u>, Executive Director;[4] (5) <u>Dr. Stephen Babb</u>, Dean of Education;[5] (6) <u>David Sambrano</u>, Dean of the

---

[3] *See SAC,* Dkt. 86, ¶¶ 187-88, 195, 198-203, 216, 218, 220-23, 22-28, 234-36, 247.

[4] *Id.* ¶ 204, 222-28, 335-48.

Graduate School;[6] (7) <u>Mary Jo Barratt</u>, Director of the Financial Aid Office;[7] and (8) <u>Dr. Robert Roberts</u>, instructor (allegedly unqualified);[8] (9) <u>Dr. Bryan Thayn</u>, instructor (allegedly unqualified; also alleged to have falsified student grades).[9] The complaint also identifies Eric Juhlin (CEO of CollegeAmerica Services, Inc.) and Robert Salmon (Campus Director at Stevens-Henager's Salt Lake City/Murray campus) – both of whom are Utah residents – as having knowledge regarding the alleged wrongdoing.

To be sure, not all likely witnesses reside in Utah, including, most notably, Carl Barney and Barbara Thomas. According to relators, defendant Barney is the owner of the four colleges they are suing, and Ms. Thomas is Stevens-Henager's Chief Operating Officer. *See SAC,* Dkt. 86, ¶¶ 3, 206. Mr. Barney resides in Nevada, and it appears that Ms. Thomas resides in California. Relators allege that Mr. Barney and Ms. Thomas were the primary architects of the allegedly illegal compensation scheme for admissions consultants. *See Juhlin Dec.* ¶¶ 57-58.

Additionally, relators say they intend to call a host of individuals who worked at

---

[5] *Id.* ¶¶ 204, 305, 306, 325, 327, 335, 367.

[6] *Id.* ¶¶ 214-16.

[7] *Id.* ¶ 311.

[8] *Id.* ¶ 332.

[9] *Id.* ¶¶ 312, 334.

Idaho schools to testify about various aspects of these schools' operations. *See Stultz Dec.,* Dkt. 113-1, ¶¶ 3-15. But in compiling this list, relators do not adequately explain why they focused so heavily on the Idaho schools – particularly given that they are alleging that the fraud was systemic. There is no obvious reason why relators would put so much attention on the Idaho employees, given that the Idaho operations are relatively small in size and, further, defendants have indicated that no Idaho employee was involved in developing or evaluating the compensation plan for admissions consultants. *See Barney Dec.,* Dkt. 133-2, ¶ 6.

The government takes a slightly different approach. It says that the admissions-consultant job has a high turnover rate, and then says that there is simply no guarantee that admissions consultants will continue to reside in the state where they worked for the defendants. *Gvt. Response,* Dkt. 110, at 25. As the government says, "They could be anywhere." *Id.* The problem with this argument is that neither side has come forward with evidence showing where all former admissions consultants (or other former employees) currently reside. But common experience suggests that most individuals who worked in a particular state are likely to stay in that state. In fact, the relators' evidence regarding the Idaho employees lends some weight to this assumption. Their attorney has submitted a declaration indicating that several former employees continue to live in the state where they were formerly employed. *See Stultz Dec.* ¶¶ 3-5, 7, 9, 10, 12 (employees who formerly worked at the Idaho campus currently reside in Idaho); *id.* ¶ 16 (employee who formerly worked at the San Diego campus resides in San Diego). *But see id.* ¶ 17

(employee who formerly worked at the Wyoming campus now resides in Colorado).

On balance then, after considering the record in this case, the Court is persuaded that although not all witnesses are located in Utah, a critical mass of witnesses with relevant knowledge will be located in Utah. By comparison, relatively few will be located in Idaho. This part of the analysis thus weighs in favor of a transfer.

**b.    Documents**

As for the documents involved in this case, relators and the United States point out that many documents are digital, and thus argue that the Court should not give much weight to the original situs of the records. *See United States Response,* Dkt. 110, at 37; *see also Relator's Response,* Dkt. 113, at 24-25. Many courts, including this one, have observed that "'[t]he location of documents will rarely weigh in favor of transfer because documents may be easily photocopied and shipped to wherever the documents are needed.'" *Obendorf v. Wash. Mut. Bank*, No. CV-06-475-S-MHW, 2007 WL 1381798, at *4 (D. Idaho Mar. 14, 2007) (citation omitted). On the other hand, at least one court has observed that "while 'developments in electronic conveyance have reduced the cost of document transfer somewhat, the cost of litigation will be substantially lessened if the action is venued in the same district where most of the documentary evidence is found.'" *Patent Foster v. Nationwide Mut. Ins. Co*., No. C 07–04928 SI, 2007 WL 4410408, at *6 (N.D. Cal. Dec. 14, 2007) (citation omitted).

In this case, it seems logical that the bulk of documentary evidence will be found in Utah. Nevertheless, defendants have not indicated that it will pose any difficulties to

electronically transfer these copies to another district. The Court thus finds that the original situs of the document is neutral.

**7.     The Differences in the Costs of Litigation in the Two Forums**

The next relevant factor is litigation costs. The trickle-down effect of determining that the bulk of the fraudulent activity occurred in Utah, and that most witnesses will probably be found in Utah, is that it will be cheaper to litigate there.

Relators point out that in another case, this Court stated that the expense of litigating in Idaho, as opposed to Utah, was a "'slight burden." *Response Br.*, Dkt. 113, at 20 (citing *Superior Merch. Servs., LLC v. Bell*, No. 4:11-cv-487-BLW, 2012 WL 256031, at *7 (D. Idaho Jan. 27, 2012). But everything is relative. In this case, it appears that there will be dozens of witnesses, and that most will be found in Utah. Further, this is not a simple breach of contract case involving a few people negotiating and performing a single contract. Rather, according to relators, this case involves systemic fraud that took place in several different schools (most in Utah) in a variety of ways over a more-than-ten-year period. These sorts of allegations sweep in numerous witnesses, and most of them will likely be in Utah. As a result, it is not accurate to say that it would be a "slight burden" to litigate in Idaho, rather than Utah. Rather, the Court finds that it would greatly inconvenience the defendants and the potential witnesses to litigate this controversy in Idaho. The Court therefore finds that this factor weighs in favor of a transfer.

**8.      Availability of Compulsory Process**

The final factor enumerated earlier above focuses on the availability of compulsory process to compel the attendance of unwilling non-party witnesses.  The Court finds that this factor weighs in favor of a transfer.

Preliminarily, the parties do not agree on the scope of the Court's power to enforce subpoenas in an FCA action.  The relators and defendants rely on Federal Rule of Civil Procedure 45 in arguing that a court could not enforce a trial subpoena that required a non-party witness to travel more than 100 miles to appear at trial.  *See* Fed. R. Civ. P. 45(c)(1)(A).  The government, on the other hand, says that a separate statute, 31 U.S.C. § 3731, creates a subpoena power for FCA claims that exceeds the Court's subpoena authority under Rule 45.  *See United States Response,* Dkt. 110, at 36.

Section 3731(a) provides:  "A subpena requiring the attendance of a witness at a trial or hearing conducted under section 3730 of this title [the False Claims Act] may be served at any place in the United States."  It does not appear that any circuit court of appeals has interpreted § 3731(a), but most district courts facing the issue have concluded that § 3731(a) empowers courts to compel witnesses to testify in any given federal judicial district.  *See United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 771 F. Supp. 2d 42, 49 (D.D.C. 2011) (under § 3731(a), "all prospective witnesses will be available for trial in either district"); *United States v. Gwinn*, No. 06-00267, 2008 WL 867927, at *19 (S.D.W. Va. Mar. 31, 2008); *Little v. ENI Petroleum Co.*, No. 06-120-M, 2007 WL 2254318, at *4 (W.D. Okla. Aug. 3, 2007).  Thus far, one court – the District

Court of the Virgin Islands – disagrees. *See United States ex rel. Thomas v. Siemens AG*, No. 04–116, 2009 WL 1657429, at *2 (D.V.I. June 12, 2009) ("Because Section 3731 addresses service of such subpoenas and not the enforcement thereof, the Court finds that it does not supercede Fed. R. Civ. P. 45(c) nor does it preclude any witness outside the 100-mile 'zone' from moving to quash and discharge any duty to comply with such a subpoena.").

Although the issue is not resolved, the weight of persuasive authority supports the court's power to subpoena witnesses from anywhere in the United States to testify in either the District of Idaho or the District Utah in this case. As a result, the Court is not convinced by relators' argument that prosecuting this action in Idaho is the only way they will be able to call live trial witnesses from two of the four colleges being sued.

But if a transfer is granted, the Utah court would potentially be called upon to interpret § 3731(a) – not this Court. Nevertheless, even if one assumes that § 3731(a) does *not* empower nationwide enforcement of a trial subpoena, the Court still concludes that this factor weighs in favor of a transfer. The key reason for this is simple: As discussed earlier, more likely non-party witnesses reside in Utah than in Idaho.

Lastly, the Court is not convinced by relators' argument that Idaho would be the best possible trial venue in terms of calling key witnesses to testify live at trial. *See Relators' Response Br.*, Dkt. 113, at 6-9. Ultimately, to accept this argument, the Court would be called upon to accept relators' implicit assertion that some of the most critical trial witnesses in this entire lawsuit will be employees who worked at the Idaho Falls

campus. Yet relators are alleging systemic fraud in numerous schools dating back to 2002. The Idaho Falls campus did not open its doors until 2010 or 2011.

In sum, for the all the reasons discussed above, the Court finds that the compulsory-process factor favors a transfer.

**9.      Public-Interest Factors**

In addition to the factors discussed above, the following public-interest factors may be considered:  (1) congestion in this Court as compared to congestion in the District of Utah; (2) the "'local interest in having localized controversies decided at home;'" and (3) "the unfairness of burdening citizens in an unrelated forum with jury duty." *Decker,* 805 F.2d at 843 (*citing Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

**a.      Court Congestion and Delay**

The parties have not argued that this Court's docket is more congested than the District of Idaho's, or vice versa. Relators, however, generally argue that a transfer will delay resolution of this case because this Court is "already familiar with the action, the parties, the underlying claims and allegations, and other important aspects of the case." *Relators' Response Br.*, Dkt. 113, at 26.

The Court is not persuaded. This case is in its beginning stages, notwithstanding that the relators commenced this action over two years ago, in January 2013.  The primary reason for the delay in moving this case along is that the government repeatedly requested extensions of time to investigate relators' claims. The Court reluctantly granted most of these requested extensions, and the relators did not oppose a single requested

extension. So as matters now stand, the case is not even at issue. Meaning that the District of Utah will inherit a fresh case in terms of weighing in on the substantive issues presented by this lawsuit.

### b.     Local Interest

With respect to the local-interest factor, the Court concludes that because the majority of operative facts allegedly occurred in Utah, Utah has a greater interest in this case than Idaho. *See, e.g., Liban v. Churchey Group II, L.L.C*, 305 F.Supp.2d 136, 143 (D.D.C. 2004) (local interest favored transfer to Maryland given that the majority of alleged discriminatory events relevant to the plaintiff's claim occurred there).

### c.     Jury Duty

None of the parties has argued that it would be unfair to burden the citizens of either forum with jury duty in this matter. The Court thus deems this factor neutral.

## CONCLUSION

After weighing all the above factors, the Court concludes that a transfer is warranted. Notwithstanding the plaintiffs' preference to litigate in Idaho, most of the material events allegedly occurred in Utah, and the critical mass of likely witnesses is located there. A transfer would thus allow the case to proceed more conveniently and would better serve the interests of justice. The Court will therefore grant the motion and transfer this case to the District of Utah.

Further, because the Court will transfer this action to the District of Utah, and because the parties dispute the law governing the pending motions to dismiss, the Court

will not reach these motions, or any related motions.  In this instance, the Court does not

believe it appropriate to shape the pleadings of an action that will be heard in another

district.

## ORDER

**IT IS ORDERED that** the Defendant Schools and Barney's Motion to Transfer

Venue (Dkt. 101) is **GRANTED.**  The Clerk of Court is directed to immediately transfer

this action to the District of Utah and close this file.

DATED: February 23, 2015

B. Lynn Winmill
Chief Judge
United States District Court